**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
---------------------------------------------------------- X

SCOTTIE NELL HUGHES,                 :

                                    :

                    Plaintiff,      :       Civil Action No.:

                                      :

        v.                          :

                                      :       **COMPLAINT**

TWENTY-FIRST CENTURY FOX, INC., FOX   :

NEWS NETWORK LLC, DIANNE BRANDI, in   :

her individual and professional capacities, and   :       **Jury Trial Demanded**

IRENA BRIGANTI, in her individual and      :

professional capacities, CHARLES PAYNE, in his  :

individual and professional capacities,       :

                                      :

                    Defendants.    :
---------------------------------------------------------- X

      Plaintiff Scottie Nell Hughes ("Ms. Hughes") brings this Complaint against Twenty-First Century Fox, Inc. ("21st Century Fox"), Fox News Network LLC ("Fox News," and, together, "Fox" or the "Company"), Dianne Brandi ("Brandi"), Irena Briganti ("Briganti") and Charles Payne ("Payne") (collectively with Fox, "Defendants"), and hereby alleges as follows:

## INTRODUCTION

      1.     Fox's hubris appears to have reached an all-time high. Thirteen months have passed since Gretchen Carlson publicly demanded accountability from Rupert Murdoch's media conglomerate for the heinous bias and sexual harassment that female employees silently suffered. The public watched in disbelief as one female employee after another stepped forward to tell their stories. What emerged was a horror show. The media giant's culture emboldened senior male executives to treat female employees as second-class citizens whose lowly status meant that references to them as "whores" or "ugly" went unheeded. With each passing month, and each new story, public fury mounted at Fox's despicable conduct – culminating in media pressure that finally forced Bill O'Reilly's termination, Fox's biggest talent, in May 2017.

2.      Now, Fox has hit a base, deplorable level that no one suspected possible.

3.      When Scottie Nell Hughes, a political commentator who regularly appeared on Fox News and Fox Business Network, dared report to Fox that she had been sexually assaulted and raped by Fox anchor Charles Payne, Fox responded with an appalling cruelty.  In late June 2017, Ms. Hughes, *confidentially*, contacted lawyers at Paul Weiss, the outside firm hired by Fox to conduct "internal investigations" following the barrage of sexual harassment allegations, to disclose the details about the sexual assault and rape, and other relevant facts of her unlawful treatment.  The lead independent lawyer suggested that it would be best to reach a business solution rather than conduct a formal investigation.  The Paul Weiss lawyer explained that a formal investigation simply would open a can of worms.

4.      Just days later, Fox made clear that a business solution was not feasible. Simultaneously, the wheels of the Fox public relations ("PR") machine launched into high gear. Suddenly, Ms. Hughes's manager received a call from a reporter at the National Enquirer seeking comment on a breaking story about Ms. Hughes and Payne.  Fox, through its notorious spokesperson, Irena Briganti, leaked Ms. Hughes's name to the National Enquirer, knowing that Ms. Hughes was a victim of a violent sexual assault.

5.      Despicably, Fox leaked Ms. Hughes's identity to the National Enquirer at the same time that it emailed a self-serving "statement," purportedly drafted by Payne, that expressed his sorrow at having engaged in what he described as an affair with Ms. Hughes.[1]

---

[1]      As detailed *infra*, Fox's belief that its spin about an affair would somehow negate Ms. Hughes's sexual assault claims speaks volumes about Fox's ignorance about sexual violence against women.

6.      Sadly, such a response by the Fox PR team to damaging news is predictable.  In the last thirteen months, Fox repeatedly has attempted to front stories of egregious discrimination by leaking information with its own spin.

7.      At the same time that Fox leaked Ms. Hughes's name, it messaged that it was suspending Payne to conduct an investigation.  Mysteriously, personal emails between Payne and Ms. Hughes that suggested a consensual relationship found their way into the public.  Even for Fox, such conduct exceeds all bounds of decency.

8.      Despite being humiliated and shamed by Fox's portrayal of what had happened, Ms. Hughes opted to remain silent, naively believing that Fox would do the right thing and investigate Payne.  On September 8, 2017, without ever speaking to Ms. Hughes, Fox announced that Payne would return to anchor his show on Fox Business Network.  Outraged and no longer willing to be harmed by Fox's retaliation and victim-shaming, Ms. Hughes is forced to seek refuge in our legal system.

9.      However painful it is to expose the fact that she is a rape victim, and knowing that the Fox PR machine will follow through with its threats to reveal more personal emails, Ms. Hughes cannot allow Fox to victimize her a second time by trampling on her reputation and ruining her career in order to promote the actions of a male on-air talent.  Through Fox's sham investigation of Payne, it opted for business as usual and blamed Ms. Hughes for the discrimination she experienced, retaliated against her in a terrifying manner, and restored Payne to his position of power.

10.     No rational female employee would dare to report sexual assault by a senior male employee if she knew that Fox's response would involve leaking her name to a national tabloid, along with a contrived depiction of underlying events, meant to debase the female employee and

protect the male perpetrator.  This is the *modus operandi* at Fox.  As seen in the cases involving Bill O'Reilly and Roger Ailes, when Fox confirms that male executives have committed abhorrent wrongs, it opts to exit them with mega severance packages in the tens of millions of dollars while the true victims are left to fight their battles in the court system, only to have their confidential monetary demands land in media reports in a further attempt to ridicule and intimidate them.

11.     Fox must be held accountable for its horrific behavior.

## JURISDICTION AND VENUE

12.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a), as Ms. Hughes is a resident of Sumner County, Tennessee and Defendants Twenty-First Century Fox, Inc. and Fox News Network LLC are Delaware corporations with their principal place of business in New York County, New York.  Defendant Dianne Brandi resides in New York County, New York, Defendant Irena Briganti resides in New York County, New York, and Defendant Charles Payne resides in Bergen County, New Jersey.  There is complete diversity.

13.     Pursuant to 28 U.S.C. § 1332(a), the amount in controversy, exclusive of costs and interest, is in excess of $75,000.

14.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this district.

## ADMINISTRATIVE PROCEDURES

15.     Pursuant to New York City Human Rights Law ("NYCHRL") § 8-502, Plaintiff will serve a copy of this Complaint upon the New York City Commission on Human Rights and

the New York City Law Department, Office of the Corporation Counsel within ten days of its filing, thereby satisfying the notice requirements of this action.

16.     Plaintiff has complied with any and all other prerequisites to filing this action.

## PARTIES

17.     Plaintiff Scottie Nell Hughes is a resident of Sumner County, Tennessee.  During the years 2013 through 2016, Ms. Hughes regularly appeared on Fox programs as a panelist, commentator and journalist.  Many of her appearances were live programs aired by Fox from its principal place of business, 1211 Avenue of the Americas, New York, New York.  At all relevant times, Ms. Hughes meets the definition of an "employee" under all applicable statutes.

18.     Defendant Twenty-First Century Fox, Inc. is duly organized and existing under and by virtue of the laws of the State of Delaware, and has its principal place of business at 1211 Avenue of the Americas, New York, New York.  At all relevant times, Twenty-First Century Fox, Inc. has met the definition of an "employer" of Plaintiff under all applicable statutes.

19.     Defendant Fox News Network LLC is a limited liability company duly organized and existing under and by virtue of the laws of the State of Delaware, and has its principal place of business at 1211 Avenue of the Americas, New York, New York.  Fox News Network LLC is a wholly owned subsidiary of Twenty-First Century Fox, Inc.  At all relevant times, Fox News Network LLC has met the definition of an "employer" of Plaintiff under all applicable statutes.

20.     Defendant Dianne Brandi resides in New York County, New York.  Defendant Brandi is employed at Fox as the Executive Vice President, Legal and Business Affairs. Defendant Brandi has served as in-house counsel for Fox for over twenty years.  In this capacity, she oversees multiple departments and other executives.  At all relevant times, Defendant Brandi has met the definition of an "employer" of Ms. Hughes under all applicable statutes.

21.     Defendant Irena Briganti resides in New York County, New York.  Defendant Briganti has worked at Fox for over twenty years and currently is the Executive Vice President of Corporate Communications for Fox News Network and Fox Business Network.  In this capacity, she oversees multiple departments and other executives.  At all relevant times, Defendant Briganti has met the definition of an "employer" of Ms. Hughes under all applicable statutes.

22.     Defendant Charles Payne resides in Bergen County, New Jersey.  Defendant Payne worked at Fox as an anchor, host and contributor for more than a decade.  In this capacity, Defendant Payne exercised control over numerous subordinate employees, including Ms. Hughes.  By way of example only, in June 2014, Fox gave Payne his own show, *Making Money*.  At all relevant times, Defendant Payne exercised substantial discretion as to who appeared on *Making Money*, and Ms. Hughes appeared four out of five nights a week on his program.  At all relevant times, Defendant Payne has met the definition of an "employer" of Ms. Hughes under all applicable statutes.

## FACTUAL ALLEGATIONS

### I.     SUMMARY OF FACTS

23.     Ms. Hughes is a political strategist and commentator.  From 2013 through 2016, Ms. Hughes appeared on numerous programs at Fox News and Fox Business Network.  In the spring of 2013, she met Charles Payne, a Fox Business Network anchor, contributor and host of the show, *Making Money,* when she and Payne appeared as panelists together on Fox programs *Cavuto* and *Hannity*.

24.     From the beginning, Payne expressed his romantic interest in Ms. Hughes and suggested that he could help advance her career, including by helping her receive a contributor contract at Fox.

25.     In July 2013, while they were both in New York City to appear on a Fox program, Payne pressured his way into Ms. Hughes's hotel room for a "private discussion."

26.     Tragically, Payne sexually assaulted and raped Ms. Hughes.  Despite her clear refusal of his advances and telling him "no" and to "stop," Payne forced her to engage in sexual intercourse against her will.  Too shocked and ashamed to speak out, Ms. Hughes told no one about what happened.

27.     After the rape, Payne's invitations to Ms. Hughes to appear on Fox shows increased dramatically.  At Payne's suggestion, producers also increased their requests for Ms. Hughes to appear on other Fox shows.  Payne did little to hide his romantic interest in Ms. Hughes or his sexually motivated favoritism.

28.     Despite his sexual assault and rape, he managed to coerce Ms. Hughes, his subordinate, into a sexual relationship in exchange for career opportunities and benefits. While there are admittedly, many emails that Fox and Payne will no doubt use to suggest that a consensual relationship existed after the July 2013 sexual violence, describing what happened here as simply an "affair" or "consensual relationship" is misleading and wrong. What constitutes a consensual affair between adults in a relationship *outside of the workplace* is not the same as a relationship between *a male employee in a position of authority* and *a female subordinate in the workplace*.  Payne used his position of power to pressure Ms. Hughes into submission.[2]

---

[2]     Further, Fox's attempt to get out in front of Ms. Hughes's claims by spinning a narrative that a relationship must negate the sexual assault and rape shows Fox's level of ignorance about the fact that a large percentage of reported rapes and sexual assaults happen within the context of relationships between two adults.   *See*  https://www.law.georgetown.edu/campus-life/advising-counseling/personal-counseling/sarvl/general-information.cfm ("Fact: Most sexual assaults and rapes are committed by someone the victim knows. Among victims aged 18 to 29, **two-thirds had a prior relationship with the offender**. During 2000, **about six in ten rape or sexual**

29.     Payne made clear that her increase in appearances and other employment benefits would have been withdrawn had Ms. Hughes refused his sexual advances.  On those occasions that Ms. Hughes did attempt to terminate the relationship, Payne became enraged and physically violent.

30.     In the face of his temper, Ms. Hughes finally gathered the strength to cut off the relationship.

31.     Shortly after Ms. Hughes terminated further contact between herself and Payne, Payne's wife contacted former Fox co-President Bill Shine ("Shine") to complain about the relationship and demand that Shine block any continued appearances by Ms. Hughes on Fox programs.

32.     Thereafter, Ms. Hughes went from appearing on Fox programs four or five times a week to only appearing five times in total over a ten-month period.  Eventually, she learned that Fox had blacklisted her.

33.     Payne was not disciplined.

34.     Although she regularly appeared on CNN, Ms. Hughes continued to contact Shine to inquire about appearances on Fox.  Shine repeatedly ignored Ms. Hughes.

---

**assault victims stated the offender was an intimate partner,** other relative, a friend or an acquaintance…. Most often, **a boyfriend, ex-boyfriend**, … sexually victimized the women. Sexual assault can be committed within any type of relationship, **including in marriage, in dating relationships**, or by friends, acquaintances or co-workers."); *see also* https://www.rainn.org/articles/intimate-partner-sexual-violence (discussing rape and sexual assault within the context of partner relationships); *see* https://mainweb-v.musc.edu/vawprevention/research/defining.shtml (Abuse in Intimate Relationships: Defining the Multiple Dimensions and Terms, by Vera E. Mouradian, PhD, National Violence Against Women Prevention Research Center, Wellesley Centers for Women, explaining that within relationships, some individuals, while fulfilling positive needs of their partners, "also behave abusively, causing their partners substantial emotional and/or physical pain and injury.").

35.     In early 2017, when Ms. Hughes's booking agent reached out to Fox to schedule appearances, she repeatedly was told that Fox does "not have anything for Ms. Hughes right now."   Other major networks suddenly had no appearances for Ms. Hughes.   Previously, a number of networks regularly made requests for Ms. Hughes to appear and comment on various political issues.   Aware that the sudden drop-off was unusual, especially since Donald Trump had taken office, Ms. Hughes's booker began pressing her contacts at networks for underlying reasons of the new disinterest.

36.     Sometime in the spring of 2017, Ms. Hughes's booker was told, "off the record," by a colleague that Ms. Hughes had "had an affair with someone at Fox and we were told not to book her."

37.     Also during this time, Ms. Hughes learned that she had been in the running for several high profile positions in the Trump administration, but was taken out of consideration once it became known that Fox labeled her as "not bookable."

38.     At all relevant times, Payne continued to appear as the host of *Making Money*. Purportedly, Fox and Payne agreed to a lucrative three-year contract in late spring 2017.

39.     After learning that she had been blacklisted by Fox and blamed for reports about an affair while Payne, the male on-air "talent," remained unscathed, Ms. Hughes's manager contacted Paul Weiss, the outside firm hired to perform internal investigations following the sexual harassment scandals.

40.     During a series of discussions between Paul Weiss and Ms. Hughes's manager about what had happened to Ms. Hughes, including the sexual assault and rape, the Paul Weiss lawyers suggested a possible business solution to the situation.   A lead lawyer explained to Ms. Hughes's manager that a business solution was preferable to a formal investigation, because a

formal investigation would open a can of worms. Paul Weiss lawyers said that they would contact the programming organizers as well as Kevin Lord ("Lord"), the newly hired head of Fox's human resources department ("HR"), who would reach out to Ms. Hughes's manager.

41.     Instead of being contacted by Lord to discuss what he thought would be business solutions to get Ms. Hughes off the blacklist, on the morning of June 26, 2017, Ms. Hughes's manager found himself on a call with Dianne Brandi, the General Counsel of Fox News, who interrogated him about Ms. Hughes's facts. Aware that Brandi's motivations were not aligned with Ms. Hughes's interests, he refused to provide the level of detail that Brandi demanded.

42.     ***Approximately four to five hours later***, he received a call from a reporter at the National Enquirer who was seeking comment about a breaking story involving an alleged affair between Ms. Hughes and Payne. Shockingly, Ms. Hughes's manager learned that Irena Briganti, Executive Vice President of Corporate Communications at Fox, leaked Ms. Hughes's identity to the reporter. Worse, to support Fox's self-serving spin, Briganti also leaked a prepared statement and "apology" by Payne that described the relationship as a "consensual affair."

43.     Although Ms. Hughes was able to contain the disclosure of her name in the National Enquirer story, Huffington Post learned of the information disclosed by Briganti to the National Enquirer and ran a story on July 6, 2017 that included Ms. Hughes's name. The story was reported on for days, nationally and internationally.

44.     Ms. Hughes endured horrific humiliation and criticism.

45.     Just as the Fox PR machine had hoped, Payne's statement successfully led public opinion to believe that he and Ms. Hughes were simply consenting adults in an ordinary affair.

46.      This litigation will undo Fox's attempt to provide an orderly rendition of facts that insulates it from liability, and importantly, shields yet another male on-air talent from scorn.

47.     No longer willing to remain silent, Ms. Hughes intends to hold Fox accountable for its ruthless and intentional quest to victim-blame and shame her.  Fox's malicious decision to reveal her identity to the National Enquirer, knowing that she is a rape victim, exceeds the bounds of all decency.

48.     Disclosure of a rape victim's identity is a documented re-traumatization that leads to underreporting of rape.[3]

49.     Given the highly sensitive nature of her claims, and her status as a victim of sexual violence, Fox's retaliatory conduct and disclosure of Ms. Hughes's identity was malicious and indefensible.

50.     Displaying its ignorance about gender-motivated violence to the world, and without interviewing Ms. Hughes, Fox returned Payne to his anchor position on September 8, 2017.

51.     Presumably, the internal investigation that Fox claimed it undertook, concluded that Payne was involved in an ordinary affair with Ms. Hughes,[4] and thereby exonerated Payne's

---

[3]     *See* Paul Marcus & Tara L. McMahon, *Limiting Disclosure on Rape Victims' Identities*, 64 S. CAL. L. REV. 1020, 1030-36 (1991) (discussing the stigma attached to rape, and harm brought to victims by those who "seek routine disclosure of victims' names."); Ann Bartow, *A Feeling of Unease About Privacy Law*, 155 U. PA. L. REV. PENNUMBRA 52, 61 (2007) (victims are "harmed in a significant, cognizable way when their personal information is distributed against their will."); Suzanne M. Leone, *Protecting Rape Victims' Identities: Balance Between the Right to Privacy and the First Amendment*, 27 NEW ENG. L. REV. 883, 909-10 (1993) (quoting Laurence H. Tribe, *American Constitutional Law* § 12-14, at 650 (1st ed. 1978)) (a victim's right to control information about him or herself "constitutes a central part of the right to shape the 'self' that any individual presents to the world.  It is breached most seriously when intimate facts about one's personal identity are made public against one's will . . . in defiance of one's most conscientious efforts to share those facts only with close relatives or friends."); *Protecting Victims' Privacy Rights: The Use of Pseudonyms in Criminal Cases*, NCVLI NEWSLETTER OF CRIME VICTIM LAW, 16th Ed. (Nat'l Crime Victim Law Inst., Portland, Or.), Dec. 2013 ("Refusing victims the opportunity to access justice without sacrificing privacy is one form of re-victimization at the hands of the justice process.").

conduct – however violent or assaulting.  As set forth *supra*, a large percentage of reported rapes and sexual assaults happen within the context of relationships, and workplace relationships involving men in positions of power involve inherent and tangible differences as compared to relationships between private individuals outside of work.   Fox's willingness to follow antiquated myths about gender violence, at Ms. Hughes's expense, supports the claims by Ms. Hughes and the numerous other female employees that allege Fox was knowingly complicit in the ubiquitous sexual harassment.

52.    The egregiousness of Fox's ignorance is heightened by its recent claims of systemic changes to improve awareness about discrimination, including by supporting women who report sexual discrimination concerns.[5]

53.    Fox has done nothing to change.  By viciously retaliating against Ms. Hughes in such a public and personally damaging way, Fox shows that it is willing to blame female victims of sexual discrimination, and assault, in order to support male harassers, especially on-air talent.

---

[4]    Although Ms. Hughes was not interviewed or otherwise questioned about what happened between she and Payne by Fox or Paul Weiss, after the National Enquirer story and the July 6, 2017 disclosure of Ms. Hughes's name by the Huffington Post, curiously, a handful of personal emails between Payne and Ms. Hughes were leaked to social media.  The leaked emails are an attempt at supporting Payne's assertion that he was involved romantically with Ms. Hughes.

[5]    Fox executives, including Rupert Murdoch, his sons Lachlan and James, and Gerson Zweifach, the General Counsel of Twenty-First Century Fox, testified under oath to regulatory officials in the U.K. as recently as May 2017, that Fox has engaged in tangible, meaningful change in order to rectify the past abhorrent discrimination.  *See* https://www.ofcom.org.uk/__data/assets/pdf_file/0013/103621/decision-fit-proper.pdf.  Such claims ring hollow, however, as once again, Fox has opted to victimize and bully a female into silence after she reported sexual violence and gender discrimination.

54.    Ms. Hughes has suffered, and continues to suffer, immeasurable reputational harm, professionally and personally because of Fox's unlawful conduct in violation of (i) the New York State Human Rights Law's ("NYSHRL") prohibitions against sexual harassment, sex discrimination, and retaliation; (ii) the New York City Human Rights Law's ("NYCHRL") prohibitions against sexual harassment, sex discrimination, and retaliation; (iii) the Gender Motivated Violence Act, NYC Admin. Code §§ 8-901, *et seq.*; and (iv) defamation.

## II.    MS. HUGHES'S WORK AT FOX

55.    Ms. Hughes is a political strategist and commentator.  In the 2016 election, Ms. Hughes was a political contributor for CNN election coverage as well as one of the first surrogates for the "Donald J. Trump for President" campaign.

56.    Ms. Hughes has appeared on numerous national television and radio networks to provide her perspective on important political events and to discuss a wide range of topics involving national and foreign affairs.

57.    From March 2013 through March 2016, Ms. Hughes appeared on countless televised programs across many networks, including Fox News and Fox Business Network.

58.    Specifically, on March 9, 2013, Ms. Hughes made her first appearance on *Fox & Friends* to discuss and provide commentary on such topics as Obamacare and tax reform.

59.    For the next three years, in addition to appearing on *Fox & Friends*, Ms. Hughes regularly appeared on multiple Fox programs such as *The O'Reilly Factor*, *Varney & Co.*, *Cavuto*, *Hannity* and *Making Money*.

60.    Fox asked Ms. Hughes to appear on its network because Ms. Hughes's services were valuable to Fox.  Ms. Hughes provided insights and commentary on current political and financial issues that Fox considered important to its viewers.

61.     In connection with Ms. Hughes's appearances, Fox paid for her travel to and from its headquarters at 1211 Avenue of the Americas, as well as covered the cost to do her hair and make-up.

62.     From June 2014 through the summer of 2015, Ms. Hughes appeared four out of five nights a week on Payne's program, *Making Money*.

63.     At all relevant times, Fox conveyed to Ms. Hughes that a contributorship contract was going to happen.  Fox encouraged Ms. Hughes to continue appearing on its many programs, and she did so, based on Fox's promises to retain her as a formal contributor.

## III.     CHARLES PAYNE

64.      During the time that Ms. Hughes was affiliated with and appeared on Fox, Charles Payne worked at Fox as an anchor, host and contributor.  Hired in 2007, Payne has worked his way up the Fox ladder, and currently hosts a nightly program on the Fox Business Network entitled *Making Money*.

65.     In April 2013, Ms. Hughes made her first appearance with Payne when he hosted the Fox program *Cavuto*.  Shortly thereafter, Ms. Hughes appeared as a panelist alongside Payne on the show *Hannity*.

66.     Over the next several months, Ms. Hughes and Payne corresponded and Payne expressed his willingness to mentor her as a way to help advance her career and opportunities.

67.     On or about July 9, 2013, Ms. Hughes accepted Payne's invitation to accompany him to a Manhattan museum, after which the two shared a taxi back to Fox's headquarters at 1211 Avenue of the Americas.  During this ride, Payne pressured Ms. Hughes to give him her hotel room information.  She refused.

68.     Over the next several hours while at Fox's headquarters, Payne persisted in forcing Ms. Hughes into giving him her hotel room number.  When she continued to refuse, Payne expressed his anger.  Eventually, by way of his pressure and insistence, Ms. Hughes agreed that he could come to her room in order to speak privately.

69.     That night in her room, Payne sexually assaulted and raped Ms. Hughes.

70.     Rape is forcing another person to engage in sexual activity the person does not agree to; including forcing a body part or object into a female's vagina, rectum or mouth against her will.  Ms. Hughes clearly told Payne to "stop," and that she was not willing to have physical contact with him.  Not willing to stop when she said "no," Payne forced her to engage in sexual intercourse against her will.

71.     During his violent tirade, Payne said, "you know you want this," and "you've been teasing me since that first time on set, wearing those short dresses over those long legs with your big boobs hanging out."  When Ms. Hughes again said, "no," and said that she just "wanted to be friends," Payne became more incensed, tightened his grip on her and angrily said, "You have a bright future but you're not acting like you have the priorities I thought you did; come on girl, you know you want it."  She tried to push him away but Payne was too strong.  Fearing that he would cause her irreparable physical harm, Ms. Hughes stopped physically fighting back. After he raped her, Payne disturbingly announced on his way out, "This changes things."

72.     Shocked, humiliated and afraid to speak out, Ms. Hughes told no one about what happened.

73.     After the sexual assault, Payne's invitations to Ms. Hughes to appear on Fox programs increased dramatically.

74.     At Payne's suggestion, producers also increased their requests for Ms. Hughes to appear on other Fox programs.  Payne did little to hide his romantic interest in Ms. Hughes and Fox employees were aware of his sexually motivated favoritism.  Moreover, it was known that Shine considered Payne a personal favorite and a rising star at Fox.

75.     In an effort to convince Ms. Hughes to submit to his advances in exchange for increased on-air visibility, Payne often cited to other "relationships" between certain Fox male hosts and subordinate female employees to suggest that such conduct was acceptable.  Payne said that, as a female, it was important to have a male host who would "go to bat" for you.

76.     In another attempt to bully Ms. Hughes, in reference to former Fox employee Andrea Mackris, Payne told Ms. Hughes that Ms. Mackris's career was "over" after she made a sexual harassment complaint against Bill O'Reilly.

77.     At all times, in his position as an anchor and host at Fox, Payne exercised managerial and supervisory authority over Ms. Hughes.  Payne had the discretion to have Ms. Hughes appear more or less frequently on his show, decide what topics he wanted her to discuss, and determine for what length of time she would appear on any given show.  Moreover, Payne regularly critiqued her performance, mentoring her with the purpose of helping her secure appearances on other Fox programs.

78.     Because of Payne's authority and power over Ms. Hughes, his acts of favoritism and preferential treatment affected her work assignments, compensation, treatment at Fox and evaluations of her performance.

79.     Ms. Hughes's willingness to engage in sexual conduct with Payne translated into tangible employment benefits that would have been withdrawn from her had she refused Payne's sexual advances.  Indeed, each time that Ms. Hughes attempted to sever the sexual relationship, Payne refused and responded angrily and violently.  In addition to being prone to angry outbursts and profanity-laced tirades, on several occasions, when Payne was angry with her, he forcibly grabbed Ms. Hughes in such a way that bruises were left on her arms.  These incidents took place in Payne's office at Fox's headquarters, 1211 Avenue of the Americas.

80.     On another occasion that occurred in Payne's office, by way of example only, he burst into anger and yelled at Ms. Hughes, "Get the fuck out of my office…if you think someone else can get you the contributorship!"

81.     As such, Ms. Hughes knew that if she wanted to continue to appear on Fox programs, and potentially receive a contributor contract, she must continue to submit to Payne's sexual advances.

82.     In early 2014, Payne was told that he was getting his own show, *Making Money*. Payne promised Ms. Hughes that he would secure her as a "regular panelist."

83.     In June 2014, *Making Money* launched.  In or about October 2014, Ms. Hughes began appearing four out of five nights a week on Payne's program.   The program was broadcasted from Fox's 1211 Avenue of the America's studios, requiring Ms. Hughes, who resided in Tennessee with her family, to travel and stay in Manhattan.

84.     On a number of occasions, Ms. Hughes reached out to Shine, who at that time was the senior executive vice president in charge of programming at Fox, to discuss her position at Fox and the offer of a contributor contract.  Shine repeatedly avoided meeting in person with Ms. Hughes, despite her multiple requests to do so.

85.    In or about June 2015, Ms. Hughes told Payne that she was no longer willing to continue her relationship with him.  Furious, Payne threatened that she must choose between (a) her family and not appearing on Fox, or (b) Payne and continued appearances on Fox.

86.    Ms. Hughes remained steadfast in her decision to end the relationship with Payne despite his violent temper and threats about her continued work at Fox.

87.    It was known throughout Fox that Shine favored Payne and acted as a mentor to him, not just a boss.

88.     Without speaking to Ms. Hughes, Shine decided that she must be to blame for the alleged affair.  Not surprisingly, Shine acted to protect Payne, at Ms. Hughes's expense.  Such blatant gender discrimination is behavior Fox has engaged in for years.

89.    As threatened by Payne, and as orchestrated by Shine, Ms. Hughes appearances on Fox programs dramatically decreased.  After months of appearing four or five times a week on *Making Money*, plus regular and weekly appearances on other Fox programs, suddenly Ms. Hughes's appearances were reduced to a mere five appearances on *The O'Reilly Factor* over the course of the following ten months.

90.    The adverse employment actions suffered by Ms. Hughes, including her reduction in appearances as well as not being offered a contributor contract, were motivated by gender-bias and sexual in nature.

91.    Although Ms. Hughes was aware of the favoritism extended to Payne by Shine, she believed that her past work and unique political insights would cause Fox to continue her appearances.  She attempted to contact Shine even after she was working as a CNN contributor but Shine refused to meet with her.

92.     Payne's wife had been reaching out to Shine to complain about the relationship and demand that Shine prevent Ms. Hughes from any future appearances on Fox.   Upon information and belief, Payne's wife was complaining to Shine as recently as February/March 2016.  Ms. Hughes's last Fox appearance was on or about March 2016.

93.     Fox refused to schedule Ms. Hughes for any appearances even after President Trump's administration took over, despite her well-established connections.   Eventually, a booking agent for Ms. Hughes learned that Fox had messaged to its bookers, as well as other networks, that Ms. Hughes was blacklisted from future appearances because of her alleged affair with Payne.

94.      As a direct result of her refusal to submit to continued sexual relations with Payne, and Shine's decision that she was to blame while Payne was not, Ms. Hughes was blacklisted from Fox.  This decision is sexual in nature, based on gender-bias, and motivated to adversely affect Ms. Hughes.  Because Ms. Hughes was the female in the relationship, Fox opted to marginalize and blame her for Payne's conduct, rather than hold Payne accountable.

## IV.     MS. HUGHES REPORTS THE RAPE TO FOX

95.     In the last thirteen months, at least publicly, Fox has said that it is taking the multiple claims of sexual discrimination seriously.

96.     To prove that it is "committed to change," Fox points to the fact that it retained Paul Weiss to conduct internal investigations.

97.     Although Shine and Payne were aware of the *quid pro quo* sexual discrimination forced upon Ms. Hughes, as well as the retaliatory blacklisting, as of June 2017, no one from Fox or Paul Weiss had contacted her as part of the internal investigations.

98.     As detailed above, through management, Ms. Hughes contacted a partner at Paul Weiss, on or about June 22, 2017, and disclosed the details about her rape, sexual assault, and ongoing gender discrimination and retaliation at Fox from 2013 through her last appearance, in or about March 2016.  The retaliation, however, was ongoing and continuing through the time when Paul Weiss was told about Fox's efforts, and success, in blacklisting Ms. Hughes from the network and other major networks.

99.     Fox engaged in additional retaliation when it answered her protected complaints with the malicious leaking of her identity, and self-serving efforts to get out ahead of any anticipated public disclosure by Ms. Hughes.

100.     Rather than adhering to civil laws precisely designed to afford Ms. Hughes the protection she deserves, Fox engaged in the same victim shaming and intentional malicious treatment of female employees that has become regular news.

101.     Unfortunately, since July 2016, too many remnants of the old regime remain at Fox, including Brandi, Briganti, Jack Abernathy and Denise Collins, the long-time head of HR.  Clearly, neither Lord's presence at Fox nor Paul Weiss's investigations failed to stop the default response by Fox to women who engage in protected complaints.

102.     Ms. Hughes is outraged.

103.     The public should be outraged and stand by her side – demanding accountability by Fox and demanding proof, not mere hollow promises, that Fox's commitment to change is real.

## FIRST CAUSE OF ACTION
### (Discrimination in Violation of the NYSHRL)
*Against all Defendants*

104.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

105.    Defendants have discriminated against Plaintiff on the basis of her gender in violation of the NYSHRL by denying her the same terms and conditions of employment available to employees who are male including, but not limited to, subjecting her to disparate treatment and compensation, and ultimately blacklisting her from all future appearances. This includes, but is not limited to: (a) subjecting Plaintiff to sexual advances and physical violence; (b) *quid pro quo* sexual discrimination; (c) not extending a contributor contract to Plaintiff; and (d) blacklisting Plaintiff after complaints by Payne's wife and ultimately Plaintiff's complaint.

106.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation the NYSHRL, Plaintiff has suffered and continues to suffer monetary and/or economic harm for which she is entitled to an award of damages.

107.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, emotional distress for which she are entitled to an award of compensatory damages.

108.    Defendants' unlawful and discriminatory actions were intentional, done with malice and/or showed a deliberate, willful, wanton and reckless indifference to Plaintiff's rights under the NYSHRL, for which Plaintiff is entitled to an award of punitive damages.

## SECOND CAUSE OF ACTION
### (Retaliation in Violation of the NYSHRL)
### *Against All Defendants*

109.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

110.    As explained above, Plaintiff engaged in protected activity when she reported to counsel for Fox, and to Fox, the rape and sexual assault inflicted on her by Payne, as well as the continued conditioning of her work at Fox in exchange for sexual relations with Payne.

111.    Defendants retaliated against Plaintiff, in violation of the NYSHRL by, *inter alia*, intentionally contacting news outlets, and providing Plaintiff's identity, name, and by contriving a fabricated narrative based only a purported consensual relationship between Plaintiff and Payne.

112.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, for which she is entitled to an award of damages.  As detailed above, because of Fox's retaliatory conduct, Ms. Hughes has suffered, and continues to suffer, immeasurable reputational harm, professionally and personally, as well as relentless vitriol from a public that was given false information about her and what she experienced at Fox.

113.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress, for which she is entitled to an award of damages.

**THIRD CAUSE OF ACTION**
**(Aiding and Abetting in Violation of the NYSHRL)**
*Against Defendants Dianne Brandi and Irena Briganti*

114.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

115.    Defendants Brandi and Briganti knowingly and maliciously aided and abetted the unlawful employment practices, discrimination and retaliation, as described herein, committed against Plaintiff in violation of the NYSHRL.

116.    As a direct and proximate result, Plaintiff has suffered and continues to suffer monetary and/or economic harm, including, but not limited to, loss of past income, future income, compensation and benefits, for which she is entitled to an award of monetary damages and other relief.

117.    As a direct and proximate result, Plaintiff has suffered, and continues to suffer, emotional distress, for which she is entitled to an award of monetary damages and other relief.

**FOURTH CAUSE OF ACTION**
**(Discrimination in Violation of the NYCHRL)**
*Against all Defendants*

118.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

119.    Defendants have discriminated against Plaintiff on the basis of her gender in violation of the NYCHRL by denying her the same terms and conditions of employment available to employees who are male, including, but not limited to, subjecting her to disparate treatment and compensation, and ultimately blacklisting her from all future appearances. This includes, but is not limited to: (a) subjecting Plaintiff to sexual advances and physical violence;

(b) *quid pro quo* sexual discrimination; (c) not extending a contributor contract to Plaintiff; and

(d) blacklisting Plaintiff after complaints by Payne's wife and ultimately Plaintiff's complaint.

120.     As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, including, but not limited to, loss of future income, compensation and benefits for which she is entitled to an award of damages.

121.     As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, emotional distress for which she is entitled to an award of damages.

122.     Defendants' unlawful and discriminatory actions constitute malicious, willful and wanton violations of the NYCHRL, for which Plaintiff is entitled to an award of punitive damages.

## FIFTH CAUSE OF ACTION
### (Retaliation in Violation of the NYCHRL)
### *Against All Defendants*

123.     Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

124.     As explained above, Plaintiff engaged in protected activity when she reported the rape and sexual assault inflicted on her by Payne, as well as the continued conditioning of her work at Fox in exchange for sexual relations with Payne, to Paul Weiss and Fox.

125.     Defendants retaliated against Plaintiff, in violation of the NYCHRL by, *inter alia*, intentionally contacting news outlets, and providing Plaintiff's identity, name, and by contriving a fabricated narrative based only a purported consensual relationship between Plaintiff and Payne.

126.     As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, for which she is entitled to an award of damages.

127.     As a direct and proximate result of Defendants' unlawful discriminatory retaliation in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress, for which she is entitled to an award of damages.

128.     Defendants' unlawful and retaliatory actions constitute malicious, willful and wanton violations of the NYCHRL, for which Plaintiff is entitled to an award of punitive damages.

**SIXTH CAUSE OF ACTION**
**(Gender Motivated Violence Pursuant to NYC Admin. Code §§ 8-901, *et seq*.)**
***Against Defendant Charles Payne***

129.     Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

130.     The above-described conduct of Defendant Payne, including, but not limited to, Defendant Payne's sexual assault and rape of Plaintiff, constitutes a "crime of violence" and a "crime of violence motivated by gender" against Plaintiff as defined by NYC Admin. Code § 8-903.

131.     The above-described conduct of Defendant Payne, including, but not limited to, Defendant Payne's sexual assault of Plaintiff, constitutes a "crime of violence" against Plaintiff motivated:  (i) by her gender; (ii) on the basis of her gender; and/or (iii) due, at least in part, to an animus based on her gender.

132.     Defendant Payne committed a "crime of violence" against Plaintiff because she is a woman and, at least in part, because he has an animus towards women.  Defendant Payne's

gender-motivated animus towards women is demonstrated by, among other things: (i) his sexually violent treatment of women; and/or (ii) his repeated discriminatory, misogynistic conduct towards women.

133.    As a direct and proximate result of the aforementioned gender-motivated violence, Plaintiff has sustained in the past and will continue to sustain, monetary damages, physical injury, pain and suffering, and serious psychological and emotional distress, entitling her to an award of compensatory damages.

134.    Defendant Payne's gender-motivated violence against Plaintiff entitles her to punitive damages and an award of attorneys' fees and costs.

### SEVENTH CAUSE OF ACTION
**(Defamation)**
*Against All Defendants*

135.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

136.    Fox, including Briganti and Brandi, knowingly issued a false narrative to the National Enquirer that Ms. Hughes was a participant in an affair with Payne. Fox, including Briganti and Brandi, knowingly revealed Ms. Hughes's identity to the National Enquirer even though they knew that Ms. Hughes was sexually assaulted and raped by Payne, and had submitted a protected complaint about these facts.

137.    Fox approved and ratified the defamatory statements about Plaintiff when it conveyed its false narrative to the National Enquirer and when it ratified Payne's drafted statement that similarly conveyed false facts about Ms. Hughes in connection with the relationship between she and Payne. Specifically, Briganti emailed Payne's prepared statement to the National Enquirer on or about June 26, 2017.

138.   Fox, Briganti, Brandi and Payne knew that they were sending a false and self-serving statement to the National Enquirer, or sent the statements intending they be published by the National Enquirer with reckless disregard for their truth.

139.   Payne knowingly wrote a misleading and false narrative about his relationship with Ms. Hughes, the "statement," and sent it to the National Enquirer, intending that it be published by the National Enquirer.   Upon information and belief, Payne knowingly disseminated private emails between he and Ms. Hughes that supported his misleading and false narrative as depicted in the statement.

140.   Plaintiff has suffered harm as a result of the defamatory statements, including, but not limited to, reputational and professional harm, emotional distress and mental anguish, and the statements about Ms. Hughes were defamatory *per se*.   As such, Plaintiff is entitled to monetary and punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court enter judgment in her favor and against Defendants, containing the following relief:

A.   An injunction and order permanently restraining Defendants and their partners, officers, owners, agents, successors, employees and/or representatives and any and all persons acting in concert with them, from engaging in any such further unlawful conduct, including the policies and practices complained of herein;

B.   An order directing Defendants to place Plaintiff in the position she would have occupied but for Defendants' discriminatory and retaliatory treatment and otherwise unlawful

conduct, and to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices are eliminated and do not continue to affect Plaintiff;

C.     A declaratory judgment that the actions, conduct and practices of Defendants complained of herein violate the laws of the State and City of New York;

D.     An award of damages in an amount to be determined at trial, plus pre-judgment interest, to compensate Plaintiff for all monetary and/or economic damages;

E.     An award of damages in an amount to be determined at trial, plus pre-judgment interest, to compensate Plaintiff for all non-monetary and/or compensatory damages, including, but not limited to, compensation for her mental anguish and emotional distress, emotional pain and suffering and any other physical and mental injuries;

F.     An award of damages to be determined at trial, plus pre-judgment interest, to compensate Plaintiff for harm to her professional and personal reputation and loss of career fulfillment;

G.     An award of punitive damages;

H.     An award of costs that Plaintiff has incurred in this action, as well as reasonable attorneys' fees to the fullest extent permitted by law; and

I.     Such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: September 18, 2017
         New York, New York                    Respectfully submitted,

                                                **WIGDOR LLP**

                                                By: _____
                                                     Douglas H. Wigdor
                                                     Jeanne M. Christensen
                                                     Michael J. Willemin

                                                85 Fifth Avenue
                                                New York, NY  10003
                                                Telephone:  (212) 257-6800
                                                Facsimile:  (212) 257-6845
                                                dwigdor@wigdorlaw.com
                                                jchristensen@wigdorlaw.com
                                                mwillemin@wigdorlaw.com

                                                *Counsel for Plaintiff*