**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------ X

| | |
|---|---|
| SCOTTIE NELL HUGHES, | : |
| | : |
| Plaintiff, | :     Civil Action No.: 17-cv-07093 (WHP) |
| | : |
| v. | : |
| | :     **AMENDED COMPLAINT** |
| TWENTY-FIRST CENTURY FOX, INC., FOX | : |
| NEWS NETWORK LLC, DIANNE BRANDI, in | : |
| her individual and professional capacities, and | :     **Jury Trial Demanded** |
| IRENA BRIGANTI, in her individual and | : |
| professional capacities, CHARLES PAYNE, in his | : |
| individual and professional capacities, | : |
| | : |
| Defendants. | : |

------------------------------------------------------------ X

Plaintiff Scottie Nell Hughes ("Ms. Hughes") brings this Amended Complaint against Twenty-First Century Fox, Inc. ("21st Century Fox"), Fox News Network LLC ("Fox News," and, together, "Fox" or the "Company"), Dianne Brandi ("Brandi"), Irena Briganti ("Briganti") and Charles Payne ("Payne") (collectively with Fox, "Defendants"), and hereby alleges as follows:

<u>**INTRODUCTION**</u>

1.     Fox's hubris appears to have reached an all-time high. Almost eighteen months have passed since Gretchen Carlson publicly demanded accountability from Rupert Murdoch's media conglomerate for the heinous bias and sexual harassment that female employees silently suffered. The public watched in disbelief as one female employee after another stepped forward to tell their stories. What emerged was a horror show. The media giant's culture emboldened senior male executives to treat female employees as second-class citizens whose lowly status meant that references to them as "whores" or "ugly" went unheeded. With each passing month,

and each new story, public fury mounted at Fox's despicable conduct – culminating in media pressure that finally forced Bill O'Reilly's termination, Fox's biggest talent, in May 2017.

2.      Fox has hit a base, deplorable level that no one suspected possible.

3.      When Scottie Nell Hughes, a political commentator who regularly appeared on Fox News and Fox Business Network, dared report to Fox that she had been sexually assaulted and raped by Fox anchor Charles Payne, Fox responded with appalling cruelty.  In late June 2017, Ms. Hughes, *confidentially,* contacted lawyers at Paul Weiss, the outside firm hired by Fox to conduct "internal investigations" following the barrage of sexual harassment allegations, to disclose the details about the sexual assault and rape, and other relevant facts of her unlawful treatment.  The lead independent lawyer suggested that it would be best to reach a business solution rather than conduct a formal investigation.  The Paul Weiss lawyer explained that a formal investigation simply would open a can of worms.

4.      Believing that Fox intended to continue their discussions, Ms. Hughes maintained her silence.

5.      Several days later, however, Fox abruptly reversed its willingness to reach a business solution.  Suddenly, Ms. Hughes's manager received a call from a reporter at the National Enquirer seeking comment on a "breaking story" about Ms. Hughes and Payne.  Fox, through its public relations ("PR") spokesperson, Irena Briganti, leaked Ms. Hughes's name to the National Enquirer, knowing that Ms. Hughes was a victim of a violent sexual assault.

6.      Despicably, Fox leaked Ms. Hughes's identity to the National Enquirer at the same time that Fox emailed the tabloid a "statement," purportedly drafted by Payne that

expressed  Payne's sorrow at having engaged in what he misleadingly described as simply an affair with Ms. Hughes.[1]

7.     Sadly, such a response by the Fox PR team to damaging news is predictable.  For years, Fox repeatedly has attempted to front stories of egregious discrimination by leaking information with its own spin.

8.     At the same time that Fox leaked Ms. Hughes's name, it messaged that it was suspending Payne to conduct an investigation.  Mysteriously, personal emails between Payne and Ms. Hughes that suggested a consensual relationship found their way into the public domain. Even for Fox, such conduct exceeds all bounds of decency.

9.     Despite being humiliated and shamed by Fox's false portrayal of what had happened, Ms. Hughes opted to remain silent, naively believing that Fox would do the right thing and investigate Payne.  On September 8, 2017, Fox announced that Payne would return to anchor his show.  No longer willing to be harmed by Fox's retaliation and victim-shaming, Ms. Hughes was forced to seek refuge in our legal system.

10.    However painful it is to expose the fact that she is a rape victim, and knowing that the Fox PR machine will follow through with its threats to reveal more personal emails, Ms. Hughes cannot allow Fox to victimize her a second time by trampling on her reputation and ruining her career in order to promote the actions of a male on-air talent.  Through Fox's sham investigation of Payne, it opted for business as usual and blamed Ms. Hughes for the discrimination she experienced, retaliated against her in a terrifying manner and restored Payne to his position of power.

---

[1]     As detailed *infra*, Fox's belief that its misrepresentations about the adulterous relationship would somehow negate Ms. Hughes's sexual assault claims speaks volumes about Fox's ignorance about sexual violence against women.

11.     No rational female employee would dare to report sexual assault by a senior male employee if she knew that Fox's response would involve leaking her name to a national tabloid, along with a manipulated, false depiction of events, meant to debase the female employee and protect the male perpetrator.  This is Fox's *modus operandi*.  As seen in the cases involving Bill O'Reilly and Roger Ailes, when public pressure forces Fox to confirm that male executives have committed abhorrent wrongs, it rewards them with mega severance packages in the tens of millions of dollars while the true victims are left to fight their battles in the court system, only to have their confidential monetary demands land in media reports in a further attempt to ridicule and intimidate them.

12.     Fox must be held accountable for its horrific behavior.

## JURISDICTION AND VENUE

13.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a), as Ms. Hughes is a resident of Sumner County, Tennessee and Defendants Twenty-First Century Fox, Inc. and Fox News Network LLC are Delaware corporations with their principal place of business in New York County, New York.  Defendant Dianne Brandi resides in New York County, New York, Defendant Irena Briganti resides in New York County, New York, and Defendant Charles Payne resides in Bergen County, New Jersey.  There is complete diversity.

14.     Pursuant to 28 U.S.C. § 1332(a), the amount in controversy, exclusive of costs and interest, is in excess of $75,000.

15.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this district.

## ADMINISTRATIVE PROCEDURES

16.     On September 27, 2017, Ms. Hughes filed a charge of discrimination and retaliation, arising out of the facts described herein, with the Equal Employment Opportunity Commission ("EEOC") alleging, among other things, violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq*. ("Title VII").

17.     The EEOC issued Ms. Hughes a Notice of Right to Sue ("RTS"), dated November 30, 2017, and received by counsel for Ms. Hughes on December 4, 2017.  Ms. Hughes amends her Complaint to include causes of action pursuant to Title VII.

18.     Pursuant to New York City Human Rights Law ("NYCHRL") § 8-502, Plaintiff will serve a copy of this Amended Complaint upon the New York City Commission on Human Rights and the New York City Law Department, Office of the Corporation Counsel within ten days of its filing, thereby satisfying the notice requirements of this action.

19.     Plaintiff has complied with any and all other prerequisites to filing this action.

## PARTIES

20.     Plaintiff Scottie Nell Hughes is a resident of Sumner County, Tennessee.  During the years 2013 through 2016, Ms. Hughes regularly appeared on Fox programs as a panelist, commentator and journalist.  Many of her appearances were live programs aired by Fox from its principal place of business, 1211 Avenue of the Americas, New York, New York.  At all relevant times, Ms. Hughes meets the definition of an "employee" under all applicable statutes.

21.     Defendant Twenty-First Century Fox, Inc. is duly organized and existing under and by virtue of the laws of the State of Delaware, and has its principal place of business at 1211 Avenue of the Americas, New York, New York.  At all relevant times, Twenty-First Century Fox, Inc. has met the definition of an "employer" of Plaintiff under all applicable statutes.

5

22.     Defendant Fox News Network LLC is a limited liability company duly organized and existing under and by virtue of the laws of the State of Delaware, and has its principal place of business at 1211 Avenue of the Americas, New York, New York.  Fox News Network LLC is a wholly owned subsidiary of Twenty-First Century Fox, Inc.  At all relevant times, Fox News Network LLC has met the definition of an "employer" of Plaintiff under all applicable statutes.

23.     Defendant Dianne Brandi resides in New York County, New York.  Defendant Brandi is employed at Fox as the Executive Vice President, Legal and Business Affairs.  Defendant Brandi has served as Fox's in-house counsel for over twenty years.  In this capacity, she oversees multiple departments and other executives.  At all relevant times, Defendant Brandi has met the definition of an "employer" of Ms. Hughes under all applicable statutes.

24.     Defendant Irena Briganti resides in New York County, New York.  Defendant Briganti has worked at Fox for over twenty years and currently is the Executive Vice President of Corporate Communications for Fox News Network and Fox Business Network.  In this capacity, she oversees multiple departments and other executives.  At all relevant times, Defendant Briganti has met the definition of an "employer" of Ms. Hughes under all applicable statutes.

25.     Defendant Charles Payne resides in Bergen County, New Jersey.  Defendant Payne worked at Fox as an anchor, host and contributor for more than a decade.  In this capacity, Defendant Payne exercised control over numerous subordinate employees, including Ms. Hughes.  By way of example only, in June 2014, Fox gave Payne his own show, *Making Money*.  At all relevant times, Defendant Payne exercised substantial discretion as to who appeared on *Making Money*, and Ms. Hughes appeared four out of five nights a week on his program.  At all relevant times, Defendant Payne has met the definition of an "employer" of Ms. Hughes under all applicable statutes.

## FACTUAL ALLEGATIONS

### I.   SUMMARY OF FACTS

26.    Ms. Hughes is a political strategist and commentator.  From 2013 through 2016, Ms. Hughes appeared on numerous programs at Fox News and Fox Business Network.  In the spring of 2013, she met Charles Payne, a Fox Business Network anchor, contributor and host of the show, *Making Money,* when she and Payne appeared as panelists together on Fox programs *Cavuto* and *Hannity*.

27.    From the beginning, Payne expressed his romantic interest in Ms. Hughes and suggested that he could help advance her career, including by helping her receive a contributor contract at Fox.

28.    In July 2013, while they were both in New York City to appear on a Fox program, Payne pressured his way into Ms. Hughes's hotel room for a "private discussion."

29.    Tragically, Payne sexually assaulted and raped Ms. Hughes.  Despite her clear refusal of his advances and telling him "no" and to "stop," Payne forced Ms. Hughes to engage in sexual intercourse against her will.  Too shocked and ashamed to speak out, Ms. Hughes told no one about what happened.

30.    After the rape, Payne's invitations to Ms. Hughes to appear on Fox shows increased dramatically.  At Payne's suggestion, producers also increased their requests for Ms. Hughes to appear on other Fox shows.  Payne did little to hide his romantic interest in Ms. Hughes or his sexually motivated favoritism.

31.    Despite his sexual assault and rape, he managed to coerce Ms. Hughes, his subordinate, into a sexual relationship in exchange for career opportunities and benefits.  While there are many emails that Fox and Payne will no doubt use to suggest that a consensual

relationship existed after the July 2013 sexual violence, describing what happened here as simply an "affair" or "consensual relationship" is misleading and wrong.  What constitutes a consensual affair between adults in a relationship *outside of the workplace* is not the same as a relationship between *a male employee in a position of authority* and *a female subordinate in the workplace*.

32.     Payne used his position of power to pressure Ms. Hughes into submission.[2]

33.     Payne made clear that her increase in appearances and other employment benefits would have been withdrawn had Ms. Hughes refused his sexual advances.  On those occasions that Ms. Hughes did attempt to terminate the relationship, Payne became enraged and physically violent.  Despite his temper, Ms. Hughes summoned the courage finally to cut off the relationship.

34.     Thereafter, Ms. Hughes went from appearing on Fox programs four or five times a week to only appearing five times in total over a ten-month period.  Eventually, she learned that Fox had blacklisted her.

35.     Payne was not disciplined.  He continues to work as the host of *Making Money*.

---

[2]     Fox's belief that evidence of a consensual relationship will undermine Ms. Hughes's claims demonstrates its ignorance about the fact that a large percentage of reported rapes and sexual assaults happen within the context of relationships between two adults. *See* https://www.law.georgetown.edu/campus-life/advising-counseling/personal-counseling/sarvl/general-information.cfm ("Fact: Most sexual assaults and rapes are committed by someone the victim knows. Among victims aged 18 to 29, **two-thirds had a prior relationship with the offender**. During 2000, **about six in ten rape or sexual assault victims stated the offender was an intimate partner,** other relative, a friend or an acquaintance…. Most often, **a boyfriend, ex-boyfriend**, … sexually victimized the women. Sexual assault can be committed within any type of relationship, **including in marriage, in dating relationships**, or by friends, acquaintances or co-workers."); *see also* https://www.rainn.org/articles/intimate-partner-sexual-violence (discussing rape and sexual assault within the context of partner relationships); *see* https://mainweb-v.musc.edu/vawprevention/research/defining.shtml (Abuse in Intimate Relationships: Defining the Multiple Dimensions and Terms, by Vera E. Mouradian, PhD, National Violence Against Women Prevention Research Center, Wellesley Centers for Women, explaining that within relationships, some individuals, while fulfilling positive needs of their partners, "also behave abusively, causing their partners substantial emotional and/or physical pain and injury.").

II.     **MS. HUGHES'S WORK AT FOX**

36.     Ms. Hughes is a political strategist and commentator.  She has appeared on numerous national television and radio networks to provide her perspective on important political events and to discuss a wide range of topics involving national and foreign affairs.

37.     On March 9, 2013, Ms. Hughes made her first appearance on *Fox & Friends* to discuss and provide commentary on such topics as Obamacare and tax reform.  Fox asked Ms. Hughes to appear on its network because Ms. Hughes's services were valuable to Fox.  Ms. Hughes provided insights and commentary on current political and financial issues that Fox considered important to its viewers.

38.     Over the next three years, Ms. Hughes regularly appeared on multiple Fox programs including *Fox & Friends*, *The O'Reilly Factor*, *Varney & Co.*, *Cavuto*, *Hannity* and *Making Money*.

39.     In connection with her work as a political analyst, commentator and contributor on Fox programs, Ms. Hughes qualifies as an "employee" as that term is used in the applicable federal, state and local discrimination laws.

40.     The label assigned for her work is not dispositive as to whether master-servant doctrine controlled the work relationship.  By way of example only, individuals that provide content to media outlets often are referred to as "contributors" if they contribute to the content of a story, news article or news program.  For example, journalists, reporters, analysts or politicians who appear on news programs to offer their opinions or views, can all be categorized as "contributors."  Work as a contributor can be paid or unpaid.

41.     At all times, common-law agency principles governed the employment relationship between Fox and Ms. Hughes.

42.     When Ms. Hughes worked at Fox's studios located at 1211 Avenue of the Americas for the purpose of appearing on Fox programs, preparing for programs and otherwise collaborating and working with Fox employees, including producers, contributors, and commentators, she was an employee within the meaning of the employment discrimination laws.

43.     Fox and Payne were not free to discriminate against Ms. Hughes on the basis of her sex with impunity.  Fox is liable for Payne's conduct because he worked as the host of the show *Making Money* and supervised Ms. Hughes, as well as other individuals that appeared on his show.

44.     Fox was obligated to take corrective action once it knew that a senior executive was subjecting Ms. Hughes to pervasive gender discrimination.

**Fox and Payne Controlled When, Where and How Ms. Hughes Performed Her Job**

45.     After her first appearance in March 2013, Ms. Hughes appeared more than 240 times on Fox programs.  Specifically, she worked on more than 130 segments for almost every program aired on Fox News and Fox Business Channel.  Ms. Hughes had an additional 110 full-hour appearances on Fox shows.

46.     At all relevant times, Fox and Payne dictated the terms of these appearances.  For example, Ms. Hughes regularly was asked to appear on programs less than twenty-four hours before it was scheduled to air, and expected to be present in Fox studios on just hours' notice to prepare before the program.

47.     Fox and Payne made it clear to Ms. Hughes that if she declined the opportunity to appear she would not be offered the position for months – if again.  As a result, each time Fox asked her to appear on a program, she accepted.

48.     Many times, Fox cancelled a particular program at the last minute but directed her to remain available during the next twenty-four hours in case Fox decided to run the program.

49.     Fox and Payne often told Ms. Hughes that if she was not "willing" to do what they asked, "when" they asked, other female commentators were waiting in line for the opportunity to appear on Fox programs and they would have no problem filling in her role.  In this regard, Fox employees told Ms. Hughes that she should never complain or act upset to Fox producers if a program was cancelled or re-scheduled at the last minute, despite any inconvenience or need for her to clear her schedule in order to be available.

50.     Ms. Hughes was expected to, and did in fact, make sure to send Bill Shine ("Shine"), the former co-President and head of programming, and other producers emails expressing her "loyalty and appreciation" and gratitude for appearances on Fox programs.

51.     At all times, the discretion to offer appearances rested with producers and hosts of the various programs.   Producers regularly referred to what was described as the "host preference" for who would be asked to appear on certain programs, and how often.

52.     Essentially, on call seven days a week, Ms. Hughes's ability to perform work outside of Fox was reduced dramatically.

53.      Further, Ms. Hughes was prevented from working as a paid contributor for other streaming online shows such as Newsmax, The Blaze and NRATV because Fox disapproved of on-air contributors appearing on competing networks.

54.     All of Ms. Hughes's appearances for Fox were at Fox studios, its headquarters at 1211 Avenue of the Americas or other studios, including in Washington, D.C. and Nashville, Tennessee where Fox purchased satellite and studio time for purposes of its programs.

55.     Her work was performed on Fox's premises and Fox provided all of the resources and equipment for the production of its programs.  Accordingly, Fox controlled when and where Ms. Hughes performed her work.

56.     Fox and Payne also directed and controlled *how* Ms. Hughes performed. By way of example only, Fox and Payne controlled and supervised Ms. Hughes in the performance of her work by controlling the content of the conversations on air, including by providing Ms. Hughes with specific talking points and substantive responses.

57.     Before live shows on *Making Money*, Ms. Hughes was required to provide Payne and producers a draft of her talking points for their review and edits.  Depending on the topic, this process could take hours and multiple drafts would be prepared and revised.  The night before shows, producers and Payne would prep Ms. Hughes on the issues and then a final follow-up meeting would take place before the program.

58.     Fox and Payne also told Ms. Hughes what additional subjects, if any, she needed to prepare for her appearances on Fox programs.

59.     When she appeared on Fox programs, Ms. Hughes was always controlled and supervised by the host of the show and the producers.  In addition to controlling the substance of her remarks, Fox controlled Ms. Hughes's appearance and actions on air by telling her that, *inter alia*:

- It was important that she physically "looked like she belonged on Fox;"

- She should wear short, above the knee, solid color (bright) dresses that preferably had a low cut neck-line;

- Never wear pants;

- She should keep her hair long and full, preferably blonde;

- Maintain a tanned skin tone or wear make-up to look like she had a tan;

- It was important to have "nice legs" and she was to wear attractive high heels;

- She should sit in the "leg chair" (the chair typically at the end of the news desk) and look flattering; and

- Fox stylists would do her hair and make-up in line with what Fox producers wanted so that she had the "Fox look" when she appeared on Fox programs.

60.     Payne insisted that Ms. Hughes wear heels at all times, even when she was not on the air.  For example, Payne forbid Ms. Hughes from wearing winter boots even to and from Fox studios because Payne considered them unattractive on women.

61.     Fox molded and branded Ms. Hughes into the "Fox look" that is associated with the females who appear on Fox programs.

62.     By having her appear as often as four to five times a week, Fox branded Ms. Hughes as part of the Fox team.  By way of example only, numerous email exchanges between Ms. Hughes and Fox executives, including Shine, Payne and Fox producers, discuss Ms. Hughes in terms of being "a part of the Fox family," a "true member of the team" and a "house guest of the Fox News family."

63.     Using her conservative views and political connections, Fox wanted the benefit of its association with Ms. Hughes for purposes of increasing its bottom line.  Fox succeeded.  As a direct result of Fox's ability to cast her as a Fox regular, despite not agreeing to monetary exchanges, other networks, such as CNN and MSNBC became less interested in having Ms. Hughes appear on their programs and gradually stopped extending invitations to her.

64.     Fox also controlled her on-air performance by telling Ms. Hughes that while on-air, she was not to challenge the host or pose questions to the host that may appear to be disrespectful or undermine his opinion.

65.     By way of example only, Lou Dobbs berated Ms. Hughes for challenging his point of view during a live segment.  After the program, Mr. Dobbs turned to Ms. Hughes and said, "Don't you ever question me on my show again."  Thereafter, Mr. Dobbs and Fox banned her from appearing on his show.

66.     Fox, as well as the hosts of its programs, such as Mr. Dobbs and Payne, had the ability to ban individuals from appearing on their programs at a moment's notice.  Fox and Payne retained the power to terminate the work relationship, and they controlled the right to extend more opportunities to her.

67.     As such, Fox and Payne controlled the means and manner of Ms. Hughes's work performance, Ms. Hughes did not.  She is a covered employee under the anti-discrimination statutes.

68.     Payne regularly reminded Ms. Hughes that other women were "hustling" to impress Fox's male hosts and executives and it was critical for her to remember to compliment these men on their work.  Payne told Ms. Hughes to communicate to these powerful men that she would welcome any advice or constructive criticism, including to ask if she could do anything "better."

69.     For example, Payne said that Kayleigh McEnany intentionally went out of her way to compliment Stuart Varney and praise him, and that Ms. Hughes needed to act more like Ms. McEnany if she wanted to keep getting appearances on his show.

70.    Payne would single out specific women as examples of those who were "hustling" to try to make Ms. Hughes feel indebted to him for the opportunities that Payne was giving to her.

71.    In connection with Ms. Hughes's appearances, Fox regularly paid for her travel to and from its headquarters at 1211 Avenue of the Americas, as well as covered the cost to do her hair and make-up for all of her appearances on *Making Money*.

72.    Fox knew how valuable an opportunity to appear on one of its nationally televised programs was to analysts and commentators such as Ms. Hughes.  Fox believed that it was providing a valuable benefit to Ms. Hughes simply by asking her to appear.  Indeed, Fox expected Ms. Hughes to embrace the opportunities and be grateful for each appearance – after all, as Fox continuously reminded her, there were "many" female political panelists in line waiting to take her spot.

73.    Because of the high level of competition to appear on news programs of the major networks, only a small percentage of contributors are paid to appear.  For example, at the time that Ms. Hughes was working regularly at Fox, a number of other similarly situated women were operating under the same workplace relationship with Fox.  Although these individuals were not paid to appear, upon information and belief, these women hoped to negotiate a contractual arrangement with Fox.  These unpaid female contributors and commentators included, *inter alia*, Carrie Sheffield, Nomiki Konst, Amber Smith, Ashly Pratte and Gina Loudon.

III.    **CHARLES PAYNE**

74.    During the time that Ms. Hughes appeared on Fox, Payne worked at Fox as an anchor, host and contributor.  Hired in 2007, Payne worked his way up the Fox ladder, and currently hosts a nightly program entitled *Making Money*.

75.     In April 2013, Ms. Hughes made her first appearance with Payne when he hosted the Fox program *Cavuto*.  Shortly thereafter, Ms. Hughes appeared as a panelist alongside Payne on the show *Hannity*.

76.     Over the next several months, Ms. Hughes and Payne corresponded and Payne expressed his willingness to mentor her as a way to help advance her career and opportunities.

77.     On or about July 9, 2013, Ms. Hughes accepted Payne's invitation to accompany him to a Manhattan museum, after which the two shared a taxi back to Fox's headquarters at 1211 Avenue of the Americas.  During this ride, Payne pressured Ms. Hughes to give him her hotel room information.  She refused.

78.     Over the next several hours while at Fox's headquarters, Payne persisted in forcing Ms. Hughes into giving him her hotel room number.  When she continued to refuse, Payne expressed his anger.  Eventually, by way of his pressure and insistence, Ms. Hughes agreed that he could come to her room in order to speak privately.

79.     That night in her room, Payne sexually assaulted and raped Ms. Hughes.

80.     Rape is forcing another person to engage in sexual activity the person does not agree to; including forcing a body part or object into a female's vagina, rectum or mouth against her will.  Ms. Hughes clearly told Payne to "stop," and that she was not willing to have physical contact with him.  Not willing to stop when she said "no," Payne forced her to engage in sexual intercourse against her will.

81.     During his violent tirade, Payne said, "you know you want this," and "you've been teasing me since that first time on set, wearing those short dresses over those long legs with your big boobs hanging out."  When Ms. Hughes again said, "no," and said that she just "wanted to be friends," Payne became more incensed, tightened his grip on her and angrily said, "You

have a bright future but you're not acting like you have the priorities I thought you did; come on girl, you know you want it."  She tried to push him away but Payne was too strong.  Fearing that he would cause her irreparable physical harm, Ms. Hughes stopped physically fighting back.[3]

82.      After he raped her, Payne disturbingly announced on his way out, "This changes things." At the time, she believed that he meant she was fired.

83.      Shocked, humiliated and afraid to speak out, Ms. Hughes told no one about what happened.

84.      After the sexual assault, Payne's invitations to Ms. Hughes to appear on Fox programs increased dramatically.  Requests to appear came directly from Payne or from Dean Sicoli, the executive producer of *Making Money*.

85.      At Payne's suggestion, Fox producers for other programs increased their requests for Ms. Hughes to appear.

86.      Payne did little to hide his romantic interest in Ms. Hughes, and Fox employees, including producers and executives, were aware of his sexually motivated favoritism.  Moreover, it was known that Shine considered Payne a personal favorite and a rising star at Fox.  As the head of programming at Fox, all the producers at Fox ultimately reported to Shine.

87.      At all times, in his position as an anchor and host at Fox, Payne exercised managerial and supervisory authority over Ms. Hughes.  Payne had the discretion to have Ms. Hughes appear more or less frequently on his show, decide what topics he wanted her to discuss, and determine for what length of time she would appear on any given show.  Moreover, Payne regularly critiqued her performance, mentoring her with the purpose of helping her secure appearances on other Fox programs.

---

[3]      In New York, sexual misconduct, rape and criminally sexual acts are felonies.  *See* N.Y. Penal Law, Article 130.

88.     By way of example only, it was Payne's decision to have Tracy Byrnes, a contributor and guest host on Fox programs be removed as a regular panelist on *Making Money*. Shortly after the program began, Payne and Ms. Byrne reportedly clashed on and off the air. Payne went to Shine and said he wanted Ms. Byrnes off the show.  She was removed.

89.     In part because of Ms. Byrne's departure, more opportunities were created for Ms. Hughes to appear.

90.     During the time that Ms. Hughes worked on *Making Money*, Payne removed another female commentator, Hitha Herzog from the program.  Again, Payne objected to things that Ms. Herzog said and as a result, she was cut from future appearances.

91.     Because of Payne's authority and power over Ms. Hughes, his acts of favoritism and preferential treatment affected her work assignments, compensation, treatment at Fox and evaluations of her performance.

92.     Ms. Hughes's willingness to engage in sexual conduct with Payne translated into tangible employment benefits that would have been withdrawn from her had she refused Payne's sexual advances.  Indeed, each time that Ms. Hughes attempted to sever the sexual relationship, Payne refused and responded angrily and violently.  In addition to being prone to angry outbursts and profanity-laced tirades, on several occasions, when Payne was angry at her, he forcibly grabbed Ms. Hughes in such a way that he bruised her arms.  These incidents took place in Payne's office at Fox's headquarters, 1211 Avenue of the Americas.

93.     On another occasion that occurred in Payne's office, by way of example only, he burst into anger and yelled at Ms. Hughes, "Get the fuck out of my office…if you think someone else can get you the contributorship!"

94.     As such, Ms. Hughes knew that if she wanted to continue to appear on Fox programs, and potentially receive a contributor contract, she must continue to submit to Payne's sexual advances.

95.     Numerous other regular on-air guests, panelists and contributors on *Making Money* were aware of Payne's temper and propensity for yelling and screaming at the workplace. By way of example only, a female booking agent for Payne told Ms. Hughes about an incident in Payne's office in 2015 during which Payne inappropriately grabbed her in a "bear hug" and held her there.  Payne was pressed up against her so tightly that this woman felt his penis pressing against her leg.   This same woman also reported incidents in which she witnessed Payne's excessive temper.

96.     Another female Fox employee told Ms. Hughes about personally witnessing Payne's "tantrums" at the workplace, including his yelling and screaming.

97.     Such behavior under any workplace conditions is unsettling, intimidating and unprofessional such that Fox never should have allowed Payne to indulge himself in such conduct.  Such threatening conduct even if directed to multiple employees at once, contributes to and fosters a work environment where reasonable employees feel at risk to speak out or complain.

98.     At 6'4" and 285 pounds, Payne is a physically imposing individual, and particularly threatening to female employees.   Payne's demeaning and menacing behavior created an environment of fear and caused employees, including Ms. Hughes, to not complain to Human Resources ("HR") or to Shine.

99.     Payne engaged in conduct expressly meant to intimidate Ms. Hughes, keep her "in line" and continue to submit to his advances.  For example, in an effort to convince Ms. Hughes

to submit to his advances in exchange for increased on-air visibility, Payne often cited to other "relationships" between certain Fox male hosts and subordinate female employees to suggest that such conduct was acceptable and ratified by Fox.  Payne said that, as a female, it was important to have a male host who would "go to bat" for you.

100.    In an attempt to bully Ms. Hughes, in reference to former Fox employee Andrea Mackris, Payne told Ms. Hughes that Ms. Mackris's career was "over" after she made a sexual harassment complaint against Bill O'Reilly.

101.    In a reference to rumors that Mr. Varney had a longtime affair while at Fox, Payne warned Ms. Hughes a number of times that Mr. Varney would "bury" any woman who crossed him, including by using the public relations team at Fox if necessary.

102.    Payne also told Ms. Hughes about a "special friendship" between a certain male host and a subordinate female panelist that resulted in a vast increase in the female's on-air appearances.

**Fox and Payne Lured Ms. Hughes into Believing that She Would Receive a Contract**

103.    At all relevant times, Fox conveyed to Ms. Hughes that a lucrative contract was going to happen.  Fox encouraged Ms. Hughes to continue appearing on its many programs, and she did so, based on Fox's promises to retain her contractually.   It was Ms. Hughes's understanding that Fox offered multi-year contracts.

104.    In early 2014, after Payne was told that he was getting *Making Money*, he promised Ms. Hughes that he would secure her as a "regular panelist."

105.    In June 2014, *Making Money* launched.  In or about October 2014, Ms. Hughes began appearing four out of five nights a week on Payne's program.

20

106.    As Ms. Hughes's appearances increased on Fox programs, based on ratings and views on other social media outlets, Fox producers suggested the possibility of a permanent contract.  Based on these representations, Ms. Hughes's agent spoke to Fox executives, including Shine, about a contract.  Shine repeatedly told her agent that Fox need to "wait" a little longer and that they could discuss it "next month."

107.    By way of example only, on March 17, 2014, Ms. Hughes's agent at that time, Keith Urbahn wrote to Shine to follow up on their discussions in late 2013 about a possible contributor contract for Ms. Hughes.  On March 19, 2014, Shine wrote back to Mr. Urbahn, "Right now we're not going to be in a position to offer a contributorship but if that changes I'll let you know."

108.    At all relevant times, Ms. Hughes was a covered employee when she appeared on Fox programs.  Simultaneously with her ongoing work, at all times, Ms. Hughes also was considered an applicant for a full-time contract at Fox.  Such a position, whether termed a contributor, commentator or "performer" contract position inferred that Ms. Hughes would secure an agreement to perform exclusive work for Fox in return for a salary.  Unquestionably, a contract position would confer an employment relationship, especially given that Fox generally requires that contract employees agree to appear on Fox networks exclusively.

109.    During her work on the hundreds of Fox segments that she appeared on, Fox executives such as Shine continuously evaluated her performance for purposes of offering a contract.  As set forth *supra*, Ms. Hughes was not unique in this regard.  Numerous other commentators hoped to secure a multi-year contract as well, including Ms. Sheffield, Ms. Konst, Ms. Smith, Ms. Pratte and Ms. Loudon.

110.    On a number of occasions, Ms. Hughes reached out to Shine to discuss her position at Fox and the offer of a contributor contract.  As with her agent, Shine repeatedly made excuses to delay the conversation and avoided meeting in person with Ms. Hughes, despite her multiple requests to do so.  Nevertheless, Fox continued to entice Ms. Hughes with a contract position.

111.    By way of example only, when Ms. Hughes reached out to Shine in December 2014 to see if he had time to discuss her work at Fox for the following year, Shine responded, "Only because every minute of my schedule for the rest of the year really is packed let's talk in early 2015.  I very much appreciate all the time and travel that you're doing for the show."

112.    Although Ms. Hughes continued to work towards obtaining the contract, her candidacy for the position was dealt an unlawful blow when she garnered the strength to tell Payne that she was no longer willing to submit to his sexual demands.

**Ms. Hughes Attempts to End the Discrimination**

113.    In or about June 2015, Ms. Hughes told Payne that she was no longer willing to continue her relationship with him.

114.    Furious, Payne threatened that she must choose between (a) her family and not appearing on Fox, or (b) Payne and continued appearances on Fox.

115.    Ms. Hughes remained steadfast in her decision to end the relationship with Payne despite his violent temper and threats about her continued work at Fox.

116.    It was known throughout Fox that Shine favored Payne and acted as a mentor to him, not just a boss.

117.     Without speaking to Ms. Hughes, Shine decided that she must be to blame for the alleged affair.  Not surprisingly, Shine acted to protect Payne, at Ms. Hughes's expense.  Such blatant gender discrimination is behavior Fox has engaged in for years.

118.     As threatened by Payne, and as orchestrated by Shine, after June 2015, Ms. Hughes appearances on Fox programs dramatically decreased.  After months of appearing four or five times a week on *Making Money*, plus regular and weekly appearances on other Fox programs, suddenly Ms. Hughes's appearances were reduced to a mere five appearances on *The O'Reilly Factor* over the course of the following ten months.

119.     The adverse employment actions suffered by Ms. Hughes, including her reduction in appearances as well as not being offered a contributor contract, were motivated by gender-bias and sexual in nature.

120.     Although Ms. Hughes was aware of the favoritism extended to Payne by Shine, she believed that her past work and political insights would cause Fox to continue her appearances.  Unfortunately, Shine rebutted all attempts by her to meet with him.

121.      Subsequent to Ms. Hughes's decision to sever ties with Payne, and his and Shine's response of denying her opportunities to appear on programs, upon information and belief, Payne's wife contacted Shine in or about February/March 2016 to complain about the relationship.  Purportedly, despite the fact that Ms. Hughes had not worked with Payne in months and only appeared on Fox programs a mere five times in the last ten months, Payne's wife demanded that Shine prevent Ms. Hughes from future appearances on any Fox program.

122.     Ms. Hughes's last Fox appearance was in or about March 2016.

123.     Fox refused to schedule Ms. Hughes for any appearances even after President Trump's administration took over, despite her well-established connections.   Eventually, a

booking agent for Ms. Hughes learned that Fox had messaged to its bookers, as well as other networks, that Ms. Hughes was blacklisted from future appearances because of her alleged affair with Payne.

124.   As a direct result of her refusal to submit to continued sexual relations with Payne, and Shine's decision that she was to blame while Payne was not, Ms. Hughes was blacklisted from Fox.

125.   This decision is sexual in nature, based on gender-bias and motivated to adversely affect Ms. Hughes.   Because Ms. Hughes was the female in the relationship, Fox opted to marginalize and blame her for Payne's conduct, rather than hold Payne accountable.

**Ms. Hughes Reports The Rape To Fox**

126.   Fox claims that it takes claims of sexual discrimination seriously.  To prove that it is "committed to change," Fox points to the fact that it retained Paul Weiss to conduct internal investigations after Gretchen Carlson's filed action against Roger Ailes in July 2016.

127.   Contrary to this claim, on December 14, 2017, in an interview with Sky News TV, Rupert K. Murdoch, head of the media conglomerate, said that the multiple claims of harassment by women at Fox were "all nonsense."  Mr. Murdoch stated:

> "There was a problem with our chief executive, sort of, over the year - isolated incidents.  As soon as we investigated it, he was out of the place in hours, well, three or four days.  **And there has been nothing else since then**.  That was largely political because we're conservative. Now of course the liberals are going down the drain - NBC is in deep trouble.  CBS, their stars.  I mean there are really bad cases and people should be moved aside.  **There are other things which probably amount to a bit of flirting."**

128.   Sexual assault, rape and *quid pro quo* discrimination are not "a bit of flirting."

129.   Long before this interview, Fox executives were aware of the *quid pro quo* sexual discrimination forced upon Ms. Hughes and her retaliatory blacklisting.

130.     Worse, Fox executives knew that the former Senior Vice President and General Counsel, Brandi, participated in the decision to defame Ms. Hughes and leak her identity to a national tabloid, despite the fact that she is a victim of sexual assault.

131.     In the spring of 2017, Ms. Hughes confirmed the truth of her suspicions that Fox had blacklisted her.

132.     In January 2017, Ms. Hughes's booking agent increased her efforts to get Ms. Hughes booked on Fox programs.  However, each time she reached out to Fox to schedule appearances, she repeatedly was told that Fox does "not have anything for Ms. Hughes right now."  Suddenly, other major networks also claimed that they had no appearances for Ms. Hughes despite the fact that previously, many of these same networks made requests for Ms. Hughes to appear.  Aware that the sudden drop-off was unusual, especially since Donald Trump had taken office, Ms. Hughes's booker began pressing her contacts at networks for underlying reasons of the new disinterest.

133.     Finally, "off the record," Ms. Hughes's booker was told by a colleague that Ms. Hughes had "had an affair with someone at Fox and we were told not to book her."

134.     Also during this time, Ms. Hughes learned that she had been in the running for several high profile positions in the Trump administration, but was taken out of consideration once it became known that Fox labeled her as "not bookable."

135.     At all relevant times, Payne continued to appear as the host of *Making Money*. Purportedly, Fox and Payne agreed to a lucrative three-year contract in late spring 2017.

136.     After learning that Fox blacklisted Ms. Hughes and blamed her for reports about an affair while Payne, the male on-air "talent," remained unscathed, Ms. Hughes's manager

contacted Paul Weiss, the outside firm hired to perform internal investigations following the sexual harassment scandals at Fox.

137.     During a series of discussions between Paul Weiss and Ms. Hughes's manager about what had happened to Ms. Hughes, including the sexual assault and rape, the Paul Weiss lawyers suggested a possible business solution to the situation.  A lead lawyer explained to Ms. Hughes's manager that a business solution was preferable to a formal investigation, because a formal investigation would open a can of worms.  Paul Weiss's lawyers said that they would contact the programming organizers as well as Kevin Lord ("Lord"), the newly hired head of Fox's HR department, who would reach out to Ms. Hughes's manager.

138.     Instead of being contacted by Lord to discuss what he thought would be business solutions to get Ms. Hughes off the blacklist, on the morning of June 26, 2017, Ms. Hughes's manager found himself on a call with Brandi, who interrogated him about Ms. Hughes's facts. Aware that Brandi's motivations were not aligned with Ms. Hughes's interests, on this telephone call, he refused to provide the level of detail that Brandi demanded.

## IV.     FOX DEFAMES MS. HUGHES

139.     ***Approximately four to five hours after the call with Brandi***, Ms. Hughes's manager received a call from a reporter at the National Enquirer who was seeking comment about a "breaking story" involving an alleged affair between Ms. Hughes and Payne. Shockingly, Ms. Hughes's manager learned that Briganti leaked Ms. Hughes's identity to the reporter.  The reporter also told Ms. Hughes's manager that Briganti sent the National Enquirer a prepared statement from Payne.

140.    The statement misleadingly categorized their relationship merely as a consensual affair.  Her manager was able to persuade the National Enquirer temporarily to hold off on the story and the inclusion of Ms. Hughes's identity.

141.    The delay was short, however, and on July 5, 2017, the National Enquirer ran the story and included Payne's false account of the events.  Payne wrote:

> "I would like to extend an apology to my family and friends for having been involved in a romantic affair that ended two years ago. My wife and I have worked hard over these past two years to restore the trust in our marriage that I squandered."

142.    Although the statement published on July 5, 2017 did not use Ms. Hughes's name, her agent learned from the National Enquirer that Briganti had supplied Ms. Hughes's identity to the tabloid when it emailed over Payne's statement.

143.    It took reporters mere hours to confirm that Ms. Hughes was woman referred to in Payne's statement.  As multiple media outlets ran reports on the story, the National Enquirer continued to update the online version of the article.

144.    The story was reported on for days, nationally and internationally.

145.    On July 8, 2017, a select group of personal emails between Payne and Ms. Hughes were leaked to social media.  Read in isolation, these emails support Payne's misleading description of his relationship with Ms. Hughes as a consensual affair, garnering such headlines as "Leaked emails cast doubt on Hughes's allegations against Charles Payne."

146.    Ms. Hughes endured horrific humiliation and criticism.

147.    The false statements are defamatory *per se* because they injure Ms. Hughes in her trade, business or profession.  Her ability to secure employment was diminished greatly and she continues to be unemployed.

148.    Just as Fox intended, Payne's false account of what Ms. Hughes experienced at Fox helped sway public opinion that Payne and Ms. Hughes were simply consenting adults in an ordinary, albeit adulterous, "romantic affair."

149.    Statements imputing sexual immorality are defamatory *per se*.

150.    Fox's malicious decision to reveal her identity to the National Enquirer, knowing that she is a rape victim exceeds the bounds of all decency.

151.    Disclosure of a rape victim's identity is a documented re-traumatization that leads to underreporting of rape.[4]

152.    A large percentage of reported rapes and sexual assaults happen within the context of relationships, and workplace relationships involving men in positions of power involve inherent and tangible differences as compared to relationships between private individuals outside of work.  Fox's willingness to follow antiquated myths about gender violence, at Ms. Hughes's expense, supports the claims by Ms. Hughes and the numerous other female employees that allege Fox was knowingly complicit in the ubiquitous sexual harassment.

---

[4]    *See* Paul Marcus & Tara L. McMahon, *Limiting Disclosure on Rape Victims' Identities*, 64 S. CAL. L. REV. 1020, 1030-36 (1991) (discussing the stigma attached to rape, and harm brought to victims by those who "seek routine disclosure of victims' names."); Ann Bartow, *A Feeling of Unease About Privacy Law*, 155 U. PA. L. REV. PENNUMBRA 52, 61 (2007) (victims are "harmed in a significant, cognizable way when their personal information is distributed against their will."); Suzanne M. Leone, *Protecting Rape Victims' Identities: Balance Between the Right to Privacy and the First Amendment*, 27 NEW ENG. L. REV. 883, 909-10 (1993) (quoting Laurence H. Tribe, *American Constitutional Law* § 12-14, at 650 (1st ed. 1978)) (a victim's right to control information about him or herself "constitutes a central part of the right to shape the 'self' that any individual presents to the world.  It is breached most seriously when intimate facts about one's personal identity are made public against one's will . . . in defiance of one's most conscientious efforts to share those facts only with close relatives or friends."); *Protecting Victims' Privacy Rights: The Use of Pseudonyms in Criminal Cases*, NCVLI NEWSLETTER OF CRIME VICTIM LAW, 16th Ed. (Nat'l Crime Victim Law Inst., Portland, Or.), Dec. 2013 ("Refusing victims the opportunity to access justice without sacrificing privacy is one form of re-victimization at the hands of the justice process.").

153.    Given the highly sensitive nature of her claims, and her status as a victim of sexual violence, Fox's retaliatory conduct and disclosure of Ms. Hughes's identity was malicious and indefensible.  The egregiousness of Fox's behavior is heightened by its claims of systemic changes to improve awareness about discrimination, including by supporting women who report sexual discrimination concerns.[5]

154.    Fox and Payne defamed Ms. Hughes by writing a false, untrue depiction of the events surrounding the sex discrimination committed against Ms. Hughes at Fox, and at the hands of Payne, that Defendants intentionally sent to the National Enquirer to publish.

155.    Fox and Payne knowingly and intentionally drafted the false statements about Ms. Hughes and sent them to the National Enquirer because they feared that Ms. Hughes would publically disclose her story about the rape, discrimination and blacklisting *first*, causing another wave of negative publicity against Fox.

156.    Fox suppressed the truth about critical facts that its readers and the public deserved to know, to avoid public scrutiny of its wrongdoing or harm Fox's bottom line.  Fox sacrificed Ms. Hughes's professional and personal reputation to accomplish its self-serving agenda.

157.    Inherent in Payne's description of his "facts," is the undeniable reality that Ms. Hughes was married, as was Payne.  Depicting what happened as consensual adultery necessarily exposed Ms. Hughes to public contempt, ridicule, aversion and disgrace.

---

[5]     Fox executives, including Rupert Murdoch, his sons Lachlan and James, and Gerson Zweifach, the General Counsel of Twenty-First Century Fox, testified under oath to regulatory officials in the U.K. as recently as May 2017, that Fox has engaged in tangible, meaningful change in order to rectify the past abhorrent discrimination.  *See* https://www.ofcom.org.uk/__data/assets/pdf_file/0013/103621/decision-fit-proper.pdf.  Such claims ring hollow, however, as once again, Fox has opted to victimize and bully a female into silence after she reported sexual violence and gender discrimination.

158.    Fox and Payne hoped that their false narrative would marginalize her credibility when and *if* she came public with her claims.

159.    The fact that Defendants were willing to publish a false version of events about what happened between Ms. Hughes and Payne, and the discrimination she experienced at Fox, to gain what they perceived as an advantage, despite ruining Ms. Hughes's reputation, shows an extremely high level of malice.

160.    At all times, Fox and Payne knew that the National Enquirer would publish their false rendition of events.

161.    At the time that Fox and Payne provided the statements to the National Enquirer they knew that the statements were false or in reckless disregard of the truth.  As such, they acted with "actual malice."

162.    On June 26, 2017, when Defendants defamed Ms. Hughes, they did so knowing that only days prior, she had approached Fox with details about what had happened, and that she believed through Fox's outside counsel, Paul Weiss, a "business solution" was being discussed.

163.    Had Ms. Hughes's truthful facts about what happened been provided to the National Enquirer, rather than Defendants' false narrative, the truth would have caused the average reader to arrive at an opposite conclusion about what happened during Ms. Hughes's work on Fox programs, and the nature of the relationship between Ms. Hughes and Payne.

164.    The truth would support her claims of gender discrimination and retaliation.  The truth would have prevented her professional reputation from being decimated.

165.    The truth, as the discovery in this litigation will reveal, is that Payne abused his position of power in the workplace to pressure Ms. Hughes, a subordinate, into sexual compliance.

166.    The truth will expose Payne for his propensity for violence, threats and intimidation made to a junior employee in order to satisfy his lust.

167.    The truth will show that once Ms. Hughes announced her refusal to submit to his sexual advances, Payne, acting in concert with Shine, swiftly and cruelly took steps to remove her from appearing on Fox programs.

168.    Fox and Payne collaborated in order to generate a false account of what happened despite knowing that the truth was being concealed from readers.  The Defendants intended to avoid the truth, and entertained serious doubts about the truth of what they provided to the National Enquirer.  At a minimum, Fox and Payne acted with a high degree of awareness of their drafted statement's probable falsity.

169.    Rather than adhering to civil laws precisely designed to afford Ms. Hughes the protection she deserves, Fox engaged in the same victim shaming and intentional malicious treatment of female employees that has become regular news.

170.    Fox returned Payne to his anchor position on September 8, 2017, and he continues to host *Making Money*.

171.    Fox has done nothing to change.  By viciously defaming Ms. Hughes and retaliating against her in such a public and personally damaging way, Fox shows that it is willing to blame female victims of sexual discrimination, and assault, in order to support male harassers, especially on-air talent.

172.    Unfortunately, since July 2016, too many remnants of the old regime remain at Fox, including Brandi, Briganti, Jack Abernathy and Denise Collins, the long-time head of HR. Clearly, neither Lord's presence at Fox nor Paul Weiss's investigations stopped Fox's default response to women who engage in protected complaints.

173.    Ms. Hughes is outraged.  No longer willing to remain silent, Ms. Hughes intends to hold Fox accountable for its ruthless and intentional quest to victim-blame and shame her.

174.    The public should be outraged and stand by her side – demand Fox be held accountable and demand proof, not mere hollow promises, that Fox's commitment to change is real.

**FIRST CAUSE OF ACTION**
**(Discrimination in Violation of Title VII)**
***Against Defendant Fox***

175.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

176.    By the actions described above, among others, Fox discriminated against Plaintiff on the basis of her gender in violation of Title VII by, *inter alia*, denying her the same terms and conditions of employment available to employees who are male, including, but not limited to, subjecting her to disparate treatment and ultimately blacklisting her from all future appearances.

177.    This discriminatory conduct also includes, but is not limited to: (a) subjecting Plaintiff to sexual advances and physical violence; (b) *quid pro quo* sexual discrimination; (c) failing to offer the promised contract to Plaintiff; and (d) blacklisting Plaintiff after she refused to submit to Payne's sexual demands.

178.    As a direct and proximate result of Fox's unlawful and discriminatory conduct in violation of Title VII, Plaintiff has suffered and continues to suffer monetary and/or economic harm for which she is entitled to an award of damages.

179.    As a direct and proximate result of Fox's unlawful and discriminatory conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer, emotional distress for which she is entitled to an award of compensatory damages.

180.    Fox's unlawful and discriminatory actions were intentional, done with malice and/or showed a deliberate, willful, wanton and reckless indifference to Plaintiff's rights under Title VII, for which Plaintiff is entitled to an award of punitive damages.

181.    Plaintiff is also entitled to an award of attorneys' fees and costs.

### SECOND CAUSE OF ACTION
### (Retaliation in Violation of Title VII)
### *Against Defendant Fox*

182.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

183.    As explained above, Plaintiff engaged in protected activity when she reported to Fox's counsel, and to Fox, the rape and sexual assault inflicted on her by Payne, as well as the continued conditioning of her work at Fox in exchange for sexual relations with Payne.

184.    Fox retaliated against Plaintiff, in violation of Title VII by, *inter alia*, intentionally contacting news outlets about a breaking story, and by sending a false statement about the nature of the relationship between Plaintiff and Defendant Payne to a national tabloid.  Fox further retaliated against Plaintiff by disclosing her name to a national tabloid in connection with the story about Defendant Payne's alleged affair.

185.    No reasonable employee in Plaintiff's position would report such discrimination if she thought that Defendant would respond in the malicious manner that Defendant did here.

186.    Fox engaged in additional retaliation against Plaintiff by drastically reducing her appearances on Fox programs immediately after she told Payne that she was unwilling to submit to his sexual advances any longer.  After months of appearing four or five times a week on *Making Money*, plus regular and weekly appearances on other Fox programs, suddenly Plaintiff's

appearances were reduced to a mere five appearances over the course of the following ten months because she objected to the continuing sexual discrimination.

187.     No reasonable employee in Plaintiff's position would dare object to such sexual advances and pressure if she thought that Defendants would respond in the retaliatory manner that they did.

188.     The adverse employment actions suffered by Plaintiff included Fox's continued promises to offer her a contract, and Fox's failure to make her an offer, including after she informed Payne that she was no longer willing to submit to his sexual advances.

189.     Fox retaliated against Plaintiff when it blacklisted her from the network and openly messaged that Plaintiff was not bookable.

190.     As a direct and proximate result of Fox's unlawful retaliatory conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, for which she is entitled to an award of damages.  As detailed above, because of Fox's retaliatory conduct, Plaintiff has suffered, and continues to suffer, immeasurable reputational harm, professionally and personally, as well as relentless vitriol from a public that was given false information about her and what she experienced at Fox.

191.     As a direct and proximate result of Fox's unlawful retaliatory conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress, for which she is entitled to an award of damages.

192.     Plaintiff is also entitled to an award of attorneys' fees and costs.

### THIRD CAUSE OF ACTION
### (Discrimination in Violation of the NYSHRL)
### *Against all Defendants*

193.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

194.    Defendants have discriminated against Plaintiff on the basis of her gender in violation of the NYSHRL by denying her the same terms and conditions of employment available to employees who are male, including, but not limited to, subjecting her to disparate treatment, and ultimately blacklisting her from all future appearances. This includes, but is not limited to: (a) subjecting Plaintiff to sexual advances and physical violence; (b) *quid pro quo* sexual discrimination; (c) failing to offer the promised contract to Plaintiff; and (d) blacklisting Plaintiff after she refused to submit to Payne's sexual demands.

195.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered and continues to suffer monetary and/or economic harm for which she is entitled to an award of damages.

196.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, emotional distress for which she is entitled to an award of compensatory damages.

197.    Defendants' unlawful and discriminatory actions were intentional, done with malice and/or showed a deliberate, willful, wanton and reckless indifference to Plaintiff's rights under the NYSHRL, for which Plaintiff is entitled to an award of punitive damages.

### FOURTH CAUSE OF ACTION
### (Retaliation in Violation of the NYSHRL)
### *Against All Defendants*

198.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

199.    As explained above, Plaintiff engaged in protected activity when she reported to Fox's counsel, and to Fox, the rape and sexual assault inflicted on her by Payne, as well as the continued conditioning of her work at Fox in exchange for sexual relations with Payne.

200.    Fox retaliated against Plaintiff, in violation of the NYSHRL by, *inter alia*, intentionally contacting news outlets about a breaking story, and by sending a false statement about the nature of the relationship between Plaintiff and Defendant Payne to a national tabloid. Fox further retaliated against Plaintiff by disclosing her name to a national tabloid in connection with the story about Defendant Payne's alleged affair.

201.    No reasonable employee in Plaintiff's position would report such discrimination if she thought that Defendant would respond in the malicious manner that Defendant did here.

202.    Fox engaged in additional retaliation against Plaintiff by drastically reducing her appearances on Fox programs immediately after she told Payne that she was unwilling to submit to his sexual advances any longer.  After months of appearing four or five times a week on *Making Money*, plus regular and weekly appearances on other Fox programs, suddenly Plaintiff's appearances were reduced to a mere five appearances over the course of the following ten months because she objected to the continuing sexual discrimination.

203.    No reasonable employee in Plaintiff's position would dare object to such sexual advances and pressure if she thought that Defendants would respond in the retaliatory manner that they did.

204.    The adverse employment actions suffered by Plaintiff included Fox's continued promises to offer her a contract, and Fox's failure to make her an offer, including after she informed Payne that she was no longer willing to submit to his sexual advances.

205.   Fox retaliated against Plaintiff when it blacklisted her from the network and openly messaged that Plaintiff was not bookable.

206.   As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, for which she is entitled to an award of damages.  As detailed above, because of Fox's retaliatory conduct, Ms. Hughes has suffered, and continues to suffer, immeasurable reputational harm, professionally and personally, as well as relentless vitriol from a public that was given false information about her and what she experienced at Fox.

207.   As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress, for which she is entitled to an award of damages.

**FIFTH CAUSE OF ACTION**
**(Aiding and Abetting in Violation of the NYSHRL)**
*Against Defendants Dianne Brandi and Irena Briganti*

208.   Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

209.   Defendants Brandi and Briganti knowingly and maliciously aided and abetted the unlawful employment practices, discrimination and retaliation, as described herein, committed against Plaintiff in violation of the NYSHRL.

210.   As a direct and proximate result, Plaintiff has suffered and continues to suffer monetary and/or economic harm, including, but not limited to, loss of past income, future income, compensation and benefits, for which she is entitled to an award of monetary damages and other relief.

211.    As a direct and proximate result, Plaintiff has suffered, and continues to suffer, emotional distress, for which she is entitled to an award of monetary damages and other relief.

**SIXTH CAUSE OF ACTION**
**(Discrimination in Violation of the NYCHRL)**
*Against all Defendants*

212.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

213.    Defendants have discriminated against Plaintiff on the basis of her gender in violation of the NYCHRL by denying her the same terms and conditions of employment available to employees who are male, including, but not limited to, subjecting her to disparate treatment and compensation, and ultimately blacklisting her from all future appearances. This includes, but is not limited to: (a) subjecting Plaintiff to sexual advances and physical violence; (b) *quid pro quo* sexual discrimination; (c) failing to offer the promised contract to Plaintiff; and (d) blacklisting Plaintiff after she refused to submit to Payne's sexual demands.

214.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, including, but not limited to, loss of future income, compensation and benefits for which she is entitled to an award of damages.

215.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, emotional distress for which she is entitled to an award of damages.

216.    Defendants' unlawful and discriminatory actions constitute malicious, willful and wanton violations of the NYCHRL, for which Plaintiff is entitled to an award of punitive damages.

## SEVENTH CAUSE OF ACTION
### (Retaliation in Violation of the NYCHRL)
### *Against All Defendants*

217.   Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

218.   As explained above, Plaintiff engaged in protected activity when she reported to Fox's counsel, and to Fox, the rape and sexual assault inflicted on her by Payne, as well as the continued conditioning of her work at Fox in exchange for sexual relations with Payne.

219.   Fox retaliated against Plaintiff, in violation of the NYCHRL by, *inter alia*, intentionally contacting news outlets about a breaking story, and by sending a false statement about the nature of the relationship between Plaintiff and Defendant Payne to a national tabloid. Fox further retaliated against Plaintiff by disclosing her name to a national tabloid in connection with the story about Defendant Payne's alleged affair.

220.   No reasonable employee in Plaintiff's position would report such discrimination if she thought that Defendant would respond in the malicious manner that Defendant did here.

221.   Fox engaged in additional retaliation against Plaintiff by drastically reducing her appearances on Fox programs immediately after she told Payne that she was unwilling to submit to his sexual advances any longer.   After months of appearing four or five times a week on *Making Money*, plus regular and weekly appearances on other Fox programs, suddenly Plaintiff's appearances were reduced to a mere five appearances over the course of the following ten months because she objected to the continuing sexual discrimination.

222.   No reasonable employee in Plaintiff's position would dare object to such sexual advances and pressure if she thought that Defendants would respond in the retaliatory manner that they did.

223.    The adverse employment actions suffered by Plaintiff included Fox's continued promises to offer her a contract, and Fox's failure to make her an offer, including after she informed Payne that she was no longer willing to submit to his sexual advances.

224.    Fox retaliated against Plaintiff when it blacklisted her from the network and openly messaged that Plaintiff was not bookable.

225.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, for which she is entitled to an award of damages.

226.    As a direct and proximate result of Defendants' unlawful discriminatory retaliation in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress, for which she is entitled to an award of damages.

227.    Defendants' unlawful and retaliatory actions constitute malicious, willful and wanton violations of the NYCHRL, for which Plaintiff is entitled to an award of punitive damages.

### EIGHTH CAUSE OF ACTION
**(Gender Motivated Violence Pursuant to NYC Admin. Code §§ 8-901, *et seq.*)**
*Against Defendant Charles Payne*

228.    Plaintiff hereby repeats and re-alleges each and every allegation in the preceding paragraphs as if set forth fully herein.

229.    The above-described conduct of Defendant Payne, including, but not limited to, Defendant Payne's sexual assault and rape of Plaintiff, constitutes a "crime of violence" and a "crime of violence motivated by gender" against Plaintiff as defined by NYC Admin. Code § 8-903.

230.   In New York, sexual misconduct, rape and criminally sexual acts are felonies. *See* N.Y. Penal Law, Article 130.

231.   The above-described conduct of Defendant Payne, including, but not limited to, Defendant Payne's sexual assault of Plaintiff, constitutes a "crime of violence" against Plaintiff motivated: (i) by her gender; (ii) on the basis of her gender; and/or (iii) due, at least in part, to an animus based on her gender.

232.   Defendant Payne committed a "crime of violence" against Plaintiff because she is a woman and, at least in part, because he has an animus towards women.  Defendant Payne's gender-motivated animus towards women is demonstrated by, among other things: (i) his sexually violent treatment of women; and/or (ii) his repeated discriminatory, misogynistic conduct towards women.

233.   As a direct and proximate result of the aforementioned gender-motivated violence, Plaintiff has sustained in the past and will continue to sustain, monetary damages, physical injury, pain and suffering, and serious psychological and emotional distress, entitling her to an award of compensatory damages.

234.   Defendant Payne's gender-motivated violence against Plaintiff entitles her to punitive damages and an award of attorneys' fees and costs.

### NINTH CAUSE OF ACTION
**(Defamation *per se*)**
***Against All Defendants***

235.   Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

236.   As set forth above, Fox, including Briganti and Brandi, and Payne knowingly issued false statements to the National Enquirer about Plaintiff and Defendant Payne.  Fox,

41

including Briganti and Brandi, and Payne knowingly revealed Plaintiff's identity to the National Enquirer even though they knew that Plaintiff was sexually assaulted and raped by Defendant Payne, and had submitted a protected complaint about these facts to Fox.

237.    Fox approved and ratified the defamatory statements about Plaintiff when it ratified Payne's statement and Briganti emailed it to the National Enquirer on or about June 26, 2017.

238.    Fox, Briganti, Brandi and Payne acted with malice because they knew that they were sending a false statement of facts to the National Enquirer, or sent them intending they be published by the National Enquirer with reckless disregard for their truth.

239.    The false and defamatory statements exposed Plaintiff to hostility, contempt, ridicule and professional disgrace.

240.    The false and defamatory statements imputed sexual immorality in connection with Plaintiff.

241.    Upon information and belief, Payne knowingly disseminated private emails between he and Plaintiff that supported his misleading and false narrative as depicted in the statement.

242.    Plaintiff has suffered harm as a result of the defamatory statements, including to her trade, business and profession.

243.    Plaintiff has suffered harm as a result of the defamatory statements, including, but not limited to, economic damages, professional and reputational harm, emotional distress and mental anguish.   These damages are ongoing and will continue to be suffered by Plaintiff.

244.    As such, Plaintiff is entitled to monetary and punitive damages.

## TENTH CAUSE OF ACTION
### (Defamation)
### *Against All Defendants*

245.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

246.    As set forth above, Fox, including Briganti and Brandi, and Payne knowingly issued false statements to the National Enquirer about Plaintiff and Defendant Payne.  Fox, including Briganti and Brandi, and Payne knowingly revealed Plaintiff's identity to the National Enquirer even though they knew that Plaintiff was sexually assaulted and raped by Defendant Payne, and had submitted a protected complaint about these facts to Fox.

247.    Fox approved and ratified the defamatory statements about Plaintiff when it ratified Payne's statement and Briganti emailed it to the National Enquirer on or about June 26, 2017.

248.    Fox, Briganti, Brandi and Payne acted with malice because they knew that they were sending a false statement of facts to the National Enquirer, or sent them intending they be published by the National Enquirer with reckless disregard for their truth.

249.    The false and defamatory statements exposed Plaintiff to hostility, contempt, ridicule and professional disgrace.

250.    The false and defamatory statements imputed sexual immorality in connection with Plaintiff.

251.    Upon information and belief, Payne knowingly disseminated private emails between he and Plaintiff that supported his misleading and false narrative as depicted in the statement.

252.    Plaintiff has suffered harm as a result of the defamatory statements, including to her trade, business and profession.

253.    Plaintiff has suffered harm as a result of the defamatory statements, including, but not limited to, economic damages, professional and reputational harm, emotional distress and mental anguish.  These damages are ongoing and will continue to be suffered by Plaintiff.

254.    As such, Plaintiff is entitled to monetary and punitive damages.

**ELEVENTH CAUSE OF ACTION**
**(Libel by Implication)**
***Against All Defendants***

255.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

256.    As set forth above, Fox, including Briganti and Brandi, and Payne knowingly issued false statements to the National Enquirer about Plaintiff and Defendant Payne.  Fox, including Briganti and Brandi, and Payne knowingly revealed Plaintiff's identity to the National Enquirer even though they knew that Plaintiff was sexually assaulted and raped by Defendant Payne, and had submitted a protected complaint about these facts to Fox.

257.    Payne's statement to the National Enquirer about Plaintiff can be reasonably read to impart a defamatory inference and to affirmatively suggest that Payne intended or endorsed that inference.

258.     Fox approved and ratified the defamatory statements about Plaintiff when it ratified Payne's statement, and Briganti emailed it to the National Enquirer on June 26, 2017.

259.    The false and defamatory statements exposed Plaintiff to hostility, contempt, ridicule and professional disgrace.

260.    The false statements imputed sexual immorality in connection with Plaintiff.

261.    Upon information and belief, Payne knowingly disseminated private emails between he and Plaintiff that supported his false narrative as depicted in the statement.

262.    Plaintiff has suffered harm from the defamatory statements, including to her trade, business and profession. She has suffered economic damages, professional and reputational harm, emotional distress and mental anguish.  These damages are ongoing and will continue to be suffered by Plaintiff. Plaintiff is entitled to monetary and punitive damages.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that the Court enter judgment in her favor and against Defendants, containing the following relief:

A.    An injunction and order permanently restraining Defendants and their partners, officers, owners, agents, successors, employees, representatives or persons acting in concert with them, from engaging in any such further unlawful conduct, including the policies and practices complained of herein;

B.    An order directing Defendants to place Plaintiff in the position she would have occupied but for Defendants' discriminatory and retaliatory treatment and otherwise unlawful conduct, and to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices are eliminated and do not continue to affect Plaintiff;

C.    A declaratory judgment that the actions, conduct and practices of Defendants complained of herein violate the applicable federal, state and city laws;

D.    An award of damages in an amount to be determined at trial, plus pre-judgment interest, to compensate Plaintiff for all monetary and/or economic damages;

E.    An award of damages in an amount to be determined at trial, plus pre-judgment interest, to compensate Plaintiff for all non-monetary and/or compensatory damages, including,

but not limited to, compensation for her mental anguish and emotional distress, emotional pain and suffering and any other physical and mental injuries;

F.  An award of damages to be determined at trial, plus pre-judgment interest, to compensate Plaintiff for harm to her professional and personal reputation and loss of career fulfillment;

G.  An award of punitive damages;

H.  An award of costs that Plaintiff has incurred in this action, as well as reasonable attorneys' fees to the fullest extent permitted by law; and

I.  Such other and further relief as the Court may deem just and proper.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: December 28, 2017
        New York, New York

Respectfully submitted,

**WIGDOR LLP**

By: _____

        Douglas H. Wigdor
        Jeanne M. Christensen
        Michael J. Willemin

        85 Fifth Avenue
        New York, NY 10003
        Telephone: (212) 257-6800
        Facsimile: (212) 257-6845
        dwigdor@wigdorlaw.com
        jchristensen@wigdorlaw.com
        mwillemin@wigdorlaw.com

        *Counsel for Plaintiff*

46