UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

SCOTTIE NELL HUGHES,                                    :
                                                        :
                                    Plaintiff,          :
                                                        :
                    - against -                         :
                                                        :          17 Civ. 07093 (WHP)
TWENTY-FIRST CENTURY FOX, INC., FOX NEWS                :
NETWORK, LLC, DIANNE BRANDI, in her individual and      :
professional capacities, IRENA BRIGANTI, in her individual :
and professional capacities and CHARLES PAYNE, in his   :
individual and professional capacities,                 :
                                                        :
                                    Defendants.         :
                                                        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**JOINT MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT**


DECHERT LLP                              FOLEY & LARDNER LLP
Andrew J. Levander                       Jonathan N. Halpern
Linda C. Goldstein                       Jonathan L. Israel
Nicolle L. Jacoby                        Rachel E. Kramer
1095 Avenue of the Americas              90 Park Avenue
New York, New York 10036                 New York, New York 10016
(212) 698-3500                           (212) 682-7474

*Attorneys for Defendants Twenty-First*      *Attorneys for Defendant Charles Payne*
*Century Fox, Inc., Fox News Network, LLC,*
*Dianne Brandi and Irena Briganti*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................ iv

INDEX OF EXHIBITS ................................................................. ix

PRELIMINARY STATEMENT ........................................................ 1

STATEMENT OF FACTS ............................................................. 4

    A.    Plaintiff's Unpaid Appearances on Fox Television Shows ................................... 4

    B.    Plaintiff's Paid Appearances on CNN During the 2016 Election .......................... 7

    C.    Tabloid Disclosure in 2017 of Payne's Affair with an Unnamed Colleague ........ 9

    D.    Plaintiff's Relentless Bid for the Media Spotlight ............................................. 11

    E.    Plaintiff's Amended Complaint .......................................................... 12

ARGUMENT ................................................................ 13

I.    The Employment Discrimination and Retaliation Claims Fail Because The Amended Complaint Does Not Establish That Plaintiff Was A Fox Employee Or Job Applicant ............................................................... 13

    A.    Plaintiff's Concession That She Was Not Paid by Fox Is Fatal to Her Claim that She Was a Fox Employee ................................................ 14

    B.    Plaintiff May Not Assert a Claim in the Guise of a Job Applicant ..................... 16

    C.    Plaintiff's Claims Are Largely Time-Barred ...................................... 20

II.    Even If Plaintiff Were A Fox Employee, Her Retaliation Claims Still Should Be Dismissed Because She Does Not Allege Any Retaliatory Conduct That Was Causally Connected To Any Alleged Protected Activity ............................................. 21

    A.    The Alleged Blacklisting Is Not Causally Connected to Any Protected Activity ................................................................. 22

    B.    The Alleged Leak to the National Enquirer Was Not Retaliatory ...................... 23

# TABLE OF CONTENTS
### (continued)

**Page**

III.    The Amended Complaint Does Not Allege Facts That Would Subject The
        Individual Defendants To Direct Liability For Employment Discrimination Or To
        Aiding And Abetting Liability .......................................................................................... 25

IV.     The National Enquirer Article Cannot Be the Basis Of A Defamation Claim ................ 27

        A.      The National Enquirer Article Was Not "Of and Concerning" Plaintiff ............ 27

        B.      The Amended Complaint Does Not Make Factual Allegations Showing
                the Defendants Acted With Actual Malice .......................................................... 29

                1.      Hughes Is a Limited Public Figure ........................................................ 29
                2.      The Alleged Facts Do Not Plausibly Allege Actual Malice .................. 32

V.      Plaintiff's Claim Of Gender-Motivated Violence Under The New York City
        Administrative Code Should Be Dismissed Because Plaintiff Fails To Allege
        Facts Sufficient To State A Claim And Because The Statute Is Unconstitutionally
        Vague ............................................................................................................................... 35

        A.      Plaintiff Has Failed To Plead Sufficient Facts of Gender Animus Under
                the GMVA. ........................................................................................................... 35

        B.      In Enacting the GMVA, the New York City Council Improperly
                Delegated Legislative Power to the Judiciary in Violation of the
                Separation of Powers Mandate of the New York Constitution ............................ 39

CONCLUSION ......................................................................................................................... 40

# TABLE OF AUTHORITIES

**Cases**

*Adams v. Jenkins*,
  No. 115745/03, 2005 WL 6584554 (Sup. Ct. N.Y. Cty. Apr. 22, 2005) ................................37

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) .................................................................................................6, 32, 37, 38

*Batchelor v. City of New York*,
  No. 11-CV-2058 (MKB) (VMS), 2014 U.S. Dist. LEXIS 46921 (E.D.N.Y.
  Feb. 16, 2014) ...........................................................................................................................23

*Bd. of Tr. of the Jud. Form Ret. Sys. v. Attorney General*,
  132 S.W.3d 770 (Ky. 2003) ......................................................................................................39

*Biro v. Condé Nast*,
  807 F.3d 541 (2d Cir. 2015) ......................................................................................................32

*Biro v. Condé Nast*,
  963 F. Supp. 2d 255 (S.D.N.Y. 2013) ............................................................................4, 30, 31

*Bliss v. MXK Rest. Corp.*,
  220 F. Supp. 3d 419 (S.D.N.Y. 2016) .......................................................................................22

*Breland-Starling v. Disney Publ'g Worldwide*,
  166 F. Supp. 2d 820 (S.D.N.Y. 2001) .......................................................................................19

*Brink v. Union Carbide Corp.*,
  41 F. Supp. 2d 406 (S.D.N.Y. 1999) .........................................................................................19

*Cabello-Rondón v. Dow Jones & Co.*,
  No. 16 Civ. 3346 (KBF), 2017 WL 3531551 (S.D.N.Y. Aug. 16, 2017) ................................30

*Carr v. N. Shore–Long Island Jewish Health Sys.*,
  No. 14 Civ. 3257 (JS), 2016 WL 3527585 (E.D.N.Y. Jun. 23, 2016) .....................................17

*Carr v. N. Shore—Long Island Jewish Health Sys.*,
  14 Civ. 3257 (JS), 2015 WL 4603389 (E.D.N.Y July 30, 2015) .............................................18

*Celle v. Filipino Reporter Enters., Inc.*,
  209 F.3d 163 (2d Cir. 2000) ..........................................................................................27, 29, 30

*Church of Scientology Int'l v. Behar*,
  238 F.3d 168 (2d Cir. 2001) ......................................................................................................32

*Cifra v. GE*,
  252 F.3d 205 (2d Cir. 2001) .................................................................................................22

*Colliton v. Cravath, Swaine & Moore LLP*,
  No. 08 Civ. 0400 (NRB), 2008 WL 4386764 (S.D.N.Y. Sept. 24, 2008) ...............................7

*Cordero v. Epstein*,
  22 Misc. 3d 161 (Sup. Ct. N.Y. Cty. 2008) ..........................................................................37

*Corley v. United States*,
  556 U.S. 303 (2009) ...............................................................................................................36

*Cortes v. Twenty-First Century Fox America, Inc.*,
  No. 17 Civ 5634 (RWS), 2018 WL 348862 (S.D.N.Y. Jan. 9. 2018) .....................................28

*Del Castillo v. Pathmark Stores, Inc.*,
  941 F. Supp. 437 (S.D.N.Y. 1996) .........................................................................................34

*Dixon v. Int'l Bhd. of Police Offics.*,
  504 F.3d 73 (1st Cir. 2007) .........................................................................................3, 23, 24

*Dongguk Univ. v. Yale Univ.*,
  734 F.3d 113 (2d Cir. 2013) ...................................................................................................34

*Elias v. Rolling Stone LLC*,
  872 F.3d 97 (2d Cir. 2017) .........................................................................................3, 27, 28

*Erasmus v. Deutsche Bank Ams. Holding Corp.*,
  No. 15 Civ. 1398 (PAE), 2015 WL 7736554 (S.D.N.Y. Nov. 30, 2015) ...............................27

*Fletcher v. Dakota, Inc.*,
  99 A.D.3d 43 (1st Dep't 2012) ...............................................................................................21

*Garrigan v. Ruby Tuesday, Inc.*,
  No. 13 Civ. 1196 (GBD), 2013 WL 3946223 (S.D.N.Y. Jul. 30, 2013) ...............................24

*GlobalNet Financial.Com, Inc. v. Frank Crystal & Co.*,
  449 F.3d 377 (2d Cir. 2006) ...................................................................................................28

*Gottwald v. Sebert*,
  No. 653118/2014, 2016 WL 1365969 (Sup. Ct. N.Y. Cty. Apr. 6, 2016) ........................36, 37

*Hibdon v. Grabowski*,
  195 S.W.3d 48 (Tenn. Ct. App. 2005) ...................................................................................29

*Hicks v. Baines*,
  593 F.3d 159 (2d Cir. 2010) ...................................................................................................21

*Holmes v. Lorch*,
    329 F. Supp. 2d 516 (S.D.N.Y. 2004)......................................................................34

*Ibraheem v. Wackenhut Servs., Inc.*,
    29 F. Supp. 3d 196, 217 (E.D.N.Y. 2014) ..............................................................33

*Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*,
    62 F.3d 69 (2d Cir. 1995)........................................................................................10

*Jablonski v. Special Counsel, Inc.*,
    No. 16 Civ. 5243 (ALC), 2017 WL 4342120 (S.D.N.Y. Sept. 28, 2017) .........17, 20

*James v. Gannett Co.*,
    40 N.Y.2d 415 (1976) .............................................................................................30

*Kahn v. Objective Sols., Int'l*,
    86 F. Supp. 2d 377 (S.D.N.Y. 2000).......................................................................24

*Kassner v. 2nd Ave. Delicatessen Inc.*,
    496 F.3d 229 (2d Cir. 2007)....................................................................................20

*Kirch v. Liberty Media Corp.*,
    449 F.3d 388 (2d Cir. 2006)....................................................................................28

*Krasner v. Episcopal Diocese of Long Island*,
    328 F. Supp. 2d 367 (E.D.N.Y. 2004) ....................................................................14

*Lerman v. Flynt Distrib. Co.*,
    745 F.2d 123 (2d Cir. 1984)..........................................................................29, 30, 31

*Levine v. Whalen*,
    39 N.Y.2d 510 (1976) .............................................................................................39

*Lippold v. Duggal Color Projects, Inc.*,
    No. 96 Civ. 5869 (JSM), 1998 WL 13854 (S.D.N.Y. Jan. 15, 1998).....................14

*Lore v. City of Syracuse*,
    670 F.3d 127 (2d Cir. 2012)....................................................................................24

*Mauro v. Orville*,
    259 A.D.2d 89 (3d Dep't 1999) ..............................................................................24

*Mendelsohn v. Univ. Hosp.*,
    178 F. Supp. 2d 323 (E.D.N.Y. 2002) ....................................................................19

*Mistretta v. United States*,
    488 U.S. 361 (1989)................................................................................................39

*N.X. v. Cabrini Med. Ctr.*,
  97 N.Y.2d 247 (2002) ...........................................................................................34

*N.Y. Times Co. v. Sullivan*,
  376 U.S. 254 (1964) .............................................................................................32

*New York v. United Parcel Serv., Inc.*,
  253 F. Supp. 3d 583, 670 (S.D.N.Y. 2017) ........................................................34

*O'Connor v. Davis*,
  126 F.3d 112 (2d Cir. 1997) .....................................................................2, 14, 16

*Perez v. Harbor Freight Tools*,
  698 F. App'x 627 (2d Cir. 2017) .........................................................................20

*Petrosino v. Bell Atl.*,
  385 F.3d 210 (2d Cir. 2004) ..........................................................................17, 18

*Petyan v. N.Y. City Law Dep't*,
  No. 14 Civ. 1434 (GBD) (JLC), 2015 WL 1855961 (S.D.N.Y. Apr. 23, 2015 ...........22, 23

*Priore v. New York Yankees*,
  307 A.D.2d 67 (1st Dep't 2003) .....................................................................25, 26

*Reed v. A.W. Lawrence & Co.*,
  95 F. 3d 1170 (2d Cir. 1996) ...............................................................................14

*Reino de España v. Am. Bureau of Shipping, Inc.*,
  691 F.3d 461 (2d Cir. 2012) .................................................................................34

*Rojas v. Roman Catholic Diocese of Rochester*,
  660 F.3d 98 (2d Cir. 2011) ...................................................................................14

*Shih v. JPMorgan Chase Bank, N.A.*,
  No. 10 Civ. 9020 (JGK), 2013 WL 842716 (S.D.N.Y. Mar. 7, 2013) ..................23

*Stones River Motors, Inc. v. Mid-S. Publ'g Co.*,
  651 S.W.2d 713 (Tenn. Ct. App. 1983) ...............................................................28

*Sweeney v. Bd. of Educ.*,
  112 A.D.2d 240 (2d Dep't 1985) .........................................................................15

*Taylor v. City of New York*,
  207 F. Supp. 3d 293, 306 (S.D.N.Y. 2016) .........................................................18

*Torres v. New York Methodist Hosp.*,
  No. 15 Civ. 1264 (PK), 2016 WL 3561705 (E.D.N.Y. Jan. 7, 2016) ..................26

*Totalplan Corp. of Am. v. Colborne*,
  14 F.3d 824 (2d Cir. 1994)............................................................................28

*Townsend v. Benjamin Enters, Inc.*,
  679 F.3d (2d Cir. 2012)................................................................................25

*Travelers Ins. Co. v. 633 Third Assoc.*,
  14 F.3d 114 (2d Cir. 1994)............................................................................40

*Trigg v. Lakeway Publishers, Inc.*,
  720 S.W.2d 69 (Tenn. Ct. App. 1986) ..........................................................30

*TufAmerica, Inc. v. Diamond*,
  968 F. Supp. 2d 588 (S.D.N.Y. 2013)...........................................................7

*Tulino v. City of New York*,
  No. 15 Civ. 7106, 2016 WL 2967847 (S.D.N.Y. May 19, 2016)...........................18

*United States v. City of New York*,
  359 F.3d 83 (2d Cir. 2004)............................................................................14

*United States v. N.Y.C. Transit Auth.*,
  97 F.3d 672 (2d Cir. 1996)............................................................................23

*Wadler v. E. College Ath. Conf.*,
  No. 00 Civ. 5671 (JSM), 2003 WL 21961119 (S.D.N.Y. Aug. 14, 2003) ...............14

*Wang v. Phoenix Satellite TV US, Inc.*,
  976 F. Supp. 2d 527 (S.D.N.Y. 2013)......................................................14, 17

*White v. Pacifica Found.*,
  973 F. Supp. 2d 363 (S.D.N.Y. 2013)...........................................................26

*Wimmer v. Suffolk Cty. Police Dep't*,
  176 F.3d 125 (2d Cir. 1999)..........................................................................17

*York v. Ass'n of the Bar of the City of N.Y.*,
  286 F.3d 122 (2d Cir. 2002)..........................................................................15

**Statutes/Rules**

42 U.S.C. § 13981.............................................................................................40

42 U.S.C. § 2000e-5(e)(1).................................................................................20

Fed. R. Civ. P. 12(b)(6)......................................................................................37

Fed. R. Evid. 201(b)(2) .......................................................................................4

N.Y. Const. art. III, § 1 ................................................................................................39

N.Y.C. Admin. Code § 8–107................................................................................17, 21

N.Y.C. Admin. Code § 8–903................................................................................36

N.Y.C. Admin. Code § 8–904................................................................................36

N.Y. Penal L. § 130.05 ......................................................................................24

## INDEX OF EXHIBITS

A        *Fox* Rocked *by Another Sex Scandal*, NATIONAL ENQUIRER, July 5, 2017.

B        Certified transcript of a video segment from *Making Money with Charles Payne* (Fox Business Network television broadcast March 26, 2015), http://video.foxbusiness.com/v/ 4137174181001/?%20-%20sp=show-clips.

C        Certified transcript of a video segment from *Making Money with Charles Payne* (Fox Business Network television broadcast April 14, 2015), http://video.foxbusiness.com/v/ 4173490067001/?#sp=show-clips.

D        Olivia Nuzzi, *The Desperate Gamble of Scottie Nell Hughes, World's Most Loyal Trump Surrogate*, GQ (October 19, 2016), https://www.gq.com/story/desperate-gamble-of-scottie-nell-hughes-trump-surrogate.

E        Matthew Dessem, *Cecily Strong Skewers Trump Supporter Scottie Nell Hughes, but the Real Hughes Puts Her to Shame*, SLATE (April 3, 2016), http://www.slate.com/blogs/ browbeat/2016/04/03/cecily_strong_plays_scottie_nell_hughes_but_underplays _the_role.html.

F        Erik Wemple, *CNN Management Is Determined to Torture Its Anchors*, THE WASHINGTON POST (July 5, 2016) https://www.washingtonpost.com/blogs/erik-wemple/wp/2016/07/05/cnn-management-is-determined-to-torture-its-anchors/?utm_term=.e56fd407496a.

G        *Scottie Nell Hughes Announces New Gig at CNN in Most Ostentatious Way Possible*, MEDIAITE (July 5, 2016) https://www.mediaite.com/online/scottie-nell-hughes-announces-new-gig-at-cnn-in-most-ostentatious-way-possible/.

H        Ben Mathis-Lilley, *CNN Trump Hack Condemns Jay Z Video for Celebrating 'Mazel Tov' Cocktails*, SLATE (November 7, 2016) http://www.slate.com/blogs/the_slatest/ 2016/11/07/cnn_s_scottie_nell_hughes_condemns_jay_z_s_mazel_tov_cocktail_ video.html.

I        Ron Dicker, *Scottie Nell Hughes Called Molotov Cocktail A 'Mazel Tov Cocktail' On CNN*, THE HUFFINGTON POST (November 7, 2016) https://www.huffingtonpost.com/ entry/scottie-nell-hughes-mazel-tov-cocktail_us_58205c91e4b0e80b02cb01a6.

J        Excerpts of a certified transcript of an audio segment from *How Journalists Are Rethinking Their Role Under A Trump Presidency,* THE DIANE REHM SHOW (November 30, 2016), https://dianerehm.org/shows/2016-11-30/how-journalists-are-rethinking-their-role-under-a-trump-presidency.

K        Erik Wemple, *CNN commentator Scottie Nell Hughes: Facts no longer exist*, THE WASHINGTON POST (December 1, 2016), https://www.washingtonpost.com/blogs/erik-wemple/wp/2016/12/01/cnn-commentator-scottie-nell-hughes-facts-no-longer-exist/?utm_term=.26bde0b8be95.

L Jack Holmes, *A Trump Surrogate Drops the Mic: 'There's No Such Thing as Facts'*, ESQUIRE (December 1, 2016), http://www.esquire.com/news-politics/videos/a51152/trump-surrogate-no-such-thing-as-facts/.

M Certified transcript of a video segment from *Erin Burnett OutFront* (CNN television broadcast October 13, 2016), https://www.youtube.com/watch?v=So_zF8WuzAM.

N Lindsey Ellefson, *CNN Not Renewing Scottie Nell Hughes' Contract*, MEDIAITE (January 12, 2017), https://www.mediaite.com/online/cnn-not-renewing-scottie-nell-hughes-contract/.

O Joe Concha, *Trump Supporter Scottie Nell Hughes to Part Ways with CNN*, THE HILL (January 12, 2017), http://thehill.com/homenews/media/314119-trump-supporter-scottie-nell-hughes-to-part-ways-with-cnn.

P Ryan Girdusky, *"Female Predator": Former colleagues, leaked emails cast doubt on Scottie Hughes allegation against Charlie Payne*, RED ALERT (July 8, 2017), http://redalertpolitics.com/2017/07/08/female-predator-former-colleagues-leaked-emails-cast-doubt-scottie-hughes-allegations-charles-payne.

Q Emily Steel, *Woman Says Fox News Banned Her After She Accused Charles Payne of Rape*, THE NEW YORK TIMES (September 18, 2017), https://www.nytimes.com/2017/09/18/business/media/fox-news-lawsuit-charles-payne.html.

R *I Was Raped By Sick Fox News Sex Fiend!*, NATIONAL ENQUIRER (October 16, 2017).

S Margaret Sullivan, *Conservative media was Scottie Nell Hughes's world. Now it's her enemy*, THE WASHINGTON POST (October 22, 2017), https://www.washingtonpost.com/lifestyle/style/conservative-media-was-scottie-nell-hughess-world-now-its-her-enemy/2017/10/21/7b938ed4-b5a8-11e7-9e58-e6288544af98_story.html?utm_term=.8fc1c5ddf8c5.

T Cari Wade Gervin, *Why Doesn't Anyone Believe Scottie Nell Hughes?*, THE NASHVILLE SCENE (November 30, 2017), https://www.nashvillescene.com/news/cover-story/article/20983970/why-doesnt-anyone-believe-former-fox-pundit-scottie-nell-hughes.

U Excerpts from Scottie Nell Hughes, Roar: The Conservative Woman Speaks Out (Worthy Publishing 2014).

## PRELIMINARY STATEMENT

Plaintiff Scottie Nell Hughes is an unlikely champion for victims of sexual harassment and assault.  A conservative political pundit and early Trump campaign surrogate, she railed *against* the women who accused then-candidate Trump of sexual assault.  Sitting in a television studio alongside Defendant Charles Payne—the man she accuses of raping her and coercing her into a two-year sexual relationship—she excoriated a gender discrimination plaintiff for purportedly succumbing to pressure to engage in a workplace affair.

Plaintiff did not tell Defendants Twenty-First Century Fox, Inc. ("21CF") or Fox News Network, LLC ("Fox") about any purported sexual misconduct until four years after the alleged rape (in July 2013), two years after her affair with Payne ended (allegedly in June 2015) and 15 months after her last appearance on any Fox show (allegedly in March 2016).  Purportedly, she chose to speak when she learned that Fox had caused "other major networks" to "blacklist" Plaintiff after her affair with Payne ended.  Amended Complaint ("Am. Compl."), ECF Doc. 29, ¶ 132.  But concessions in Plaintiff's own pleadings refute every part of this bogus contention.

Plaintiff admits that she became a paid CNN contributor in July 2016—*after* she stopped appearing on Fox—and that she "regularly appeared" on that rival cable network.  Complaint ("Compl."), ECF Doc. 1, ¶¶ 34, 55.  Only *after* CNN dropped Plaintiff in January 2017 did "other major networks" allegedly express "disinterest" in featuring her on their shows.  Am. Compl. ¶ 132.  Even then, it was not until June 2017 that Plaintiff's manager contacted counsel to Fox and—for the first time ever—professed that Plaintiff had been subjected to "sexual assault and rape" four years earlier.  Am. Compl. ¶ 3; *see also id.* ¶ 137.  Her "blacklisting" claims are foreclosed by her admission that before June 2017, she *never told anyone at Fox* about this alleged assault or any other sexual misconduct; as a result, nothing occurring before then can possibly be considered retaliation for allegations she had not made.  *Id.* ¶¶ 29; 83; 98.

The phony "blacklist" is just one of Plaintiff's many fabrications.  But more important at this juncture, each of the 11 causes of action for employment discrimination and retaliation, defamation and gender-motivated violence is legally defective and should be dismissed.

*First*, and fundamentally, Plaintiff cannot assert claims of discrimination or retaliation under federal, state or city law because she was not a Fox employee.  The Second Circuit has held that payment is an "essential condition to the existence of an employer-employee relationship."  *O'Connor v. Davis*, 126 F.3d 112, 115–16 (2d Cir. 1997).  But, as the Amended Complaint concedes, Fox never paid Plaintiff for appearing on its shows.  Am. Compl. ¶ 63.  Plaintiff cannot cure this failing by asserting that she was instead a job "applicant," because she does not allege that she applied for an open position at Fox, has not even tried to allege the elements of a "failure to hire" claim, and, as a non-employee, is precluded from pursuing claims for other forms of discrimination.  Even if she did have standing, the Title VII claims are time-barred to the extent they are based on conduct that allegedly occurred before December 1, 2016; the NYCHRL and NYSHRL claims based on conduct before September 18, 2014—such as the alleged July 2013 rape—are time-barred as well.  *See* Section I, below.

*Second*, there is no actionable retaliation.  The supposed "blacklisting" took place *before* Plaintiff's manager first reported the alleged sexual misconduct in June 2017; thus, it could not have been caused by the report.  The other form of retaliation alleged in the Amended Complaint—a story in the National Enquirer about Payne's affair with an unnamed colleague—cannot be deemed "retaliatory."  Plaintiff concedes, as she must, that the National Enquirer did not publish her name in its story about *Payne's* "romantic affair."  Am. Compl. ¶¶ 141–42; *see* Ex. A.[1]  Moreover, Defendants accused of discrimination may defend themselves by setting forth

---

[1]     All exhibits ("Ex. _") are attached to the Declaration of Linda C. Goldstein.

their account of the facts at issue.  *See Dixon v. Int'l Bhd. of Police Offics.*, 504 F.3d 73, 84 (1st Cir. 2007).  *See* Section II, below.

  ***Third***, all claims of employment discrimination and retaliation should be dismissed against each of the individual Defendants.  Because Plaintiff was not a Fox employee or job applicant, the individuals cannot be alleged to have acted on behalf of an employer or prospective employer (as required under applicable law), and accordingly, cannot be held individually liable.  In addition, Plaintiff does not—and cannot—plead that Defendant Irena Briganti (Fox's head of media relations) and Defendant Dianne Brandi (Fox's general counsel) acted as "employers" under the state and city employment discrimination statutes.  Moreover, in the absence of a viable state discrimination or retaliation claim, the aiding and abetting claim against them also should be dismissed.  *See* Section IV, below.

  ***Fourth,*** the defamation claims, all based on the National Enquirer article, are fatally flawed.  A defamatory statement must be "of and concerning" the plaintiff to be actionable. *Elias v. Rolling Stone LLC*, 872 F.3d 97, 104 (2d Cir. 2017).  The National Enquirer article is not "of and concerning" Plaintiff because it does not provide her name or any other details that could identify her.  *See* Ex. A.  In addition, the Amended Complaint does not plead the "actual malice" required to defame a public figure such as Plaintiff.  *See* Section IV, below.

  ***Fifth,*** Plaintiff's gender-motivated violence ("GMVA") claim fails because the statute requires a showing that a defendant committed a violent act *both* because of the victim's gender or on the basis of gender *and* "due, at least in part, to *animus* based on gender"; yet Plaintiff has failed to plead *any* facts sufficient to demonstrate "animus."  Indeed, every New York court to have addressed the sufficiency of a GMVA claim has dismissed it, based on far more extensive allegations than made here, holding that the plaintiffs had not sufficiently pleaded "animus."

Plaintiff's GMVA claim also fails on constitutional grounds.  In enacting the GMVA, the New York City Council failed to provide any intelligible principle for the term "animus," thereby rendering the statute unconstitutionally vague and improperly delegating its legislative function to the judiciary, in violation of the separation of powers mandate of the New York Constitution. *See* Section V, below.

The Amended Complaint should be dismissed in its entirety, with prejudice.

## STATEMENT OF FACTS

This recitation of the facts is drawn from the allegations of the Amended Complaint—assumed, solely for purposes of this motion, to be true—and the documents that are integral to it. In considering whether Plaintiff is a public figure, the Court may also take judicial notice of media reports about Plaintiff and public statements she has made.[2]

### A. Plaintiff's Unpaid Appearances on Fox Television Shows

Plaintiff Scottie Nell Hughes is a self-styled "political strategist and commentator" who has appeared on "numerous national television and radio networks."  Am. Compl. ¶ 36.  In about March 2013, she appeared on Fox News Channel for the first time as a guest on the morning show *Fox & Friends*.  *Id.* ¶ 37.  From then until about March 2016, she continued to appear on various Fox News Channel and Fox Business Network shows.  *Id.* ¶¶ 26, 37–38.  Plaintiff concedes that there were no "monetary exchanges," and that, in fact, "only a small percentage" of guests who appear on "news programs at the major networks" are paid to do so.  *Id.* ¶¶ 63, 73. Indeed, the Amended Complaint alleges merely that Fox "covered the cost to do her hair and

---

[2]      *See Biro v. Condé Nast*, 963 F. Supp. 2d 255, 271 n.9 (S.D.N.Y. 2013) (taking judicial notice of articles written about a defamation plaintiff to determine whether plaintiff is a public figure), *aff'd*, 622 F. App'x 67 (2d Cir. 2015); Fed. R. Evid. 201(b)(2) (court "may judicially notice a fact that is not subject to reasonable dispute because it … can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned").

make-up" (meaning, "Fox stylists would do her hair and make-up," *id.* ¶ 59) and "regularly paid for her  travel to and from its headquarters at 1211 Avenue of the Americas," *id.* ¶ 71, where its New York studios are located, *id.* ¶ 42 (meaning, car services were provided).[3]

In April 2013, during one of her guest appearances, Plaintiff met Defendant Charles Payne, alleged to be an "anchor, contributor and host"—but not an officer or executive—at Fox. *Id.* ¶¶ 26, 74–75.  In July 2013, when they were both in New York City to appear on a Fox program, Plaintiff and Payne had "sexual intercourse" in her hotel room, purportedly without her consent. *Id.* ¶¶ 28–29.  At the time, Payne did not yet have his own show. *Id.* ¶ 25.  Plaintiff and Payne continued their sexual relationship for about two years, until at least June 2015. *Id.* ¶¶ 31, 113.  Plaintiff concedes she exchanged personal emails with Payne "that suggested a consensual relationship." *Id.* ¶¶ 8, 31.  Plaintiff alleges that her appearances on Fox shows increased after mid-2013, at least in part because of her relationship with Payne. *Id.* ¶ 30.  She concedes that the appearances were a "valuable benefit" to her career as an analyst and commentator. *Id.* ¶ 72.

In June 2014, Payne began to host his own show, *Making Money*. *Id.* ¶ 25.  Plaintiff alleges that in October 2014, she "began appearing four out of five nights a week" on that program, but does not contend that Fox paid her for any of those appearances. *Id.* ¶ 105.  On the show, Plaintiff not only commented on "current political and financial issues" *id.* ¶ 37, but also voiced her opinions on relationships between men and women in the workplace.  For instance, while she was on the air with Payne, Plaintiff opined that women should leave their jobs rather than submit to sexual advances:

> She was having the affair.  You make your bed you have to lie on
> it and it's not a $60 million bed. . . . If she really has these great

---

[3]     The Amended Complaint cannot and does not allege that Fox paid to fly Plaintiff from her home in Sumner County, Tennessee, *id.* ¶ 13, to New York.  Indeed, Plaintiff has previously implied that she was responsible for her own travel and lodging. *Id.*  ¶ 83 (alleging that Fox required Plaintiff "to travel and stay in Manhattan").

> qualifications and felt so pressured to have an affair and go to that
> extent:  go get another job; there's other opportunities.

Ex. B at 3:11-13, 7:7-10.  In another appearance on Payne's show, Plaintiff defended women

"golddiggers": "It wouldn't necessarily be my path to wealth, but you have to admit, they've got

an entrepreneurial spirit."  Ex. C at 3:13-16.

Plaintiff's central allegation in her own lawsuit is that she "submit[ted] to Payne's sexual

advances" in order to "continue to appear on Fox programs, and potentially receive a contributor

contract."  Am. Compl. ¶ 94.  But the Amended Complaint cannot—and more importantly, does

not—assert that Payne was authorized to offer a contract to her.  *See id.* ¶ 27 (Payne "suggested

that he could *help* advance her career, including by *helping* her receive a contributor contract at

Fox") (emphasis added); ¶ 76 ("Payne expressed his willingness to mentor her as a way to *help*

advance her career and opportunities.") (emphasis added); ¶ 87 (stating that Payne "mentor[ed]

her with the purpose of *helping* her secure appearances on other Fox programs.") (emphasis

added).  Plaintiff concedes that she *never* met with the senior executive in charge of

programming at Fox, Bill Shine, and she does not allege that she met with any other executive

authorized to offer her a contributor contract.[4]  *Id.* ¶¶ 110, 120.  When Plaintiff's agent asked

about the possibility of a contributor contract in March 2014, Mr. Shine told him that Fox was

"not going to be in a position to offer a contributorship but if that changes I'll let you know."  *Id.*

¶ 107.  Plaintiff's hopes of being offered a contract by Fox were never realized.  *Id.* ¶ 119.

---

[4]     Plaintiff contends that "Fox" made "promises to retain her contractually," but does not allege who at "Fox" made these purported "promises," when and how he or she made them or whether the putative promisor was authorized to award contracts on Fox's behalf.  Am. Compl. ¶ 103.  At most, she asserts that unidentified "producers *suggested the possibility* of a permanent contract," which is not the same as a "promise."  *Id.* ¶ 106 (emphasis added).  Plaintiff does not need any discovery to say who made any purported "promises" to her or what exactly they said; the Amended Complaint's conclusory allegation of "promises to retain her contractually" is not well-pleaded and should be disregarded.  *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (holding that pleadings that "are no more than conclusions, are not entitled to the assumption of truth").

Plaintiff alleges that she "told Payne that she was no longer willing to continue her relationship with him" in June 2015. *Id.* ¶ 113. The Amended Complaint does not allege that any Fox executive then had reason to believe that her affair with Payne purportedly had been "coerce[d]"—a conclusion wholly at odds with Plaintiff's emails to Payne. *Id*. ¶ 31. Plaintiff concedes that she did not speak to Mr. Shine about the relationship or why she purportedly was ending it. *Id*. ¶ 117. In fact, Plaintiff—who was not a Fox employee—admits that she never complained to either Human Resources or to Mr. Shine about Payne. *Id*. ¶ 98.

After the affair ended, Plaintiff stopped appearing on *Making Money*; she alleges that her appearances on other Fox shows "dramatically decreased." Am. Compl. ¶ 118. Her last appearance on Fox was allegedly in March 2016, allegedly after "Payne's wife demanded that Shine prevent Ms. Hughes from future appearances on any Fox program." *Id*. ¶ 121–22.

### B. Plaintiff's Paid Appearances on CNN During the 2016 Election

From March 2013 until March 2016, when she appeared as an unpaid guest on Fox programs, Plaintiff also appeared on "countless televised programs across many networks"; later, she "regularly appeared on CNN." Compl. ¶¶ 34, 57.[5] Indeed, as "one of the first surrogates for the 'Donald J. Trump for President' campaign," she appeared on other television networks throughout the 2016 Presidential campaign. *Id.* ¶ 55. Her "ubiquity on America's cable

---

[5]     The factual allegations in the original Complaint are "a judicial admission by which [the plaintiff] normally is bound throughout the course of the proceeding." *TufAmerica, Inc. v. Diamond*, 968 F. Supp. 2d 588, 600 (S.D.N.Y. 2013) (citation omitted). Where, as here, an amended complaint "directly contradicts the facts set forth in [the] original complaint,' a court is authorized 'to accept the facts described in the original complaint as true.'" *Colliton v. Cravath, Swaine & Moore LLP*, No. 08 Civ. 0400 (NRB), 2008 WL 4386764, at *13 (S.D.N.Y. Sept. 24, 2008), *aff'd*, 356 F. App'x 535 (2d Cir. 2009). Here, the allegation that "other networks, such as CNN and MSNBC became less interested in having Ms. Hughes appear on their programs" when she appeared on Fox, Am. Compl. ¶ 63, directly contradicts the original Complaint's allegations that she appeared on "countless televised programs across many networks" from March 2013 through March 2016, Compl. ¶ 57, and "regularly appeared on CNN" afterwards, *id*. ¶ 34.

airwaves" as a Trump campaign surrogate itself attracted media attention.  Ex. D.  NBC's *Saturday Night Live* parodied Plaintiff's outspoken support for her candidate.[6]

In July 2016, Plaintiff became a paid "political contributor for CNN election coverage"— a status she had never attained at Fox.  Compl. ¶ 55.  By this time, Plaintiff was so public a figure that her contract with CNN itself attracted press coverage.  Exs. F–G.  At CNN, Plaintiff's celebrity (or notoriety) only grew.  Plaintiff was pilloried when she erroneously referred to Molotov cocktails as "Mazel Tov" cocktails.  Exs. H–I.  When she proclaimed on NPR that "there's no such thing, unfortunately more, of facts," Ex. J at 14:5-6, journalists ridiculed her comments as, among other things, "gobbledygook," Exs. K–L.  Plaintiff continued to express her opinions on gender issues as well:  when over a dozen women accused then-candidate Trump of sexual assault after publication of the infamous *Access Hollywood* tape, Plaintiff took to the airwaves to attack the women's credibility.  Ex. M at 7:25-9:13.

In January 2017, after the November 2016 election, the press reported that CNN would not renew Plaintiff's contract.  Exs. N–O.  That news coincides with Plaintiff's allegations that in January 2017, her booker observed a "sudden drop-off" in her television bookings.  Am. Compl. ¶ 132.  The booker "reached out to Fox to schedule appearances" for Plaintiff, but was told that "Fox does 'not have anything for Ms. Hughes right now.'"  *Id.*  Plaintiff allegedly "learned that Fox had messaged to its bookers, as well as other networks, that Ms. Hughes was blacklisted from future appearances because of her alleged affair with Payne."  *Id.* ¶ 123.  Plaintiff speculates that due to this purported "message," she was blacklisted by "other major networks," but this speculation is squarely refuted by her admissions that after she purportedly ended the affair with Payne, she "regularly appeared on CNN," as well as on other networks, and that CNN

---

[6]     *See* SNL, Apr. 3, 2016, https://www.youtube.com/watch?v=r4q1L_JtMiI.  The parody attracted its own press coverage.  *See* Ex. E.

awarded her a paid contributorship.  Compl. ¶¶ 34, 55, 57, 91.  Nor can she even begin to explain why, nearly two years *after* the affair ended, and *after* she had blanketed the airwaves during the 2016 Presidential campaign, and *after* CNN had decided to let her go, Fox would have asked other networks to ban her.  *Id.* ¶ 132.  Nor does Plaintiff elaborate upon which of Fox's competitors agreed to such a request or why they would have done so.  Just as improbably, Plaintiff blames Fox for her failure to secure a "high profile position[]" in the Trump administration.  *Id.* ¶ 134.

### C.  Tabloid Disclosure in 2017 of Payne's Affair with an Unnamed Colleague

In late June 2017, Plaintiff's manager contacted Fox's outside counsel at Paul Weiss.  *Id.* ¶ 136.  He described Plaintiff's allegation that she had been sexually assaulted by Payne in July 2013.  *Id.* ¶ 137.  Outside counsel arranged for him to speak by phone with Fox's General Counsel, Defendant Dianne Brandi.  *Id.* ¶ 138.  When Ms. Brandi questioned the manager about Plaintiff's allegations, he "refused to provide the level of detail that [she] demanded."  *Id.*

The manager's call was implicitly a prelude to a public lawsuit; the Amended Complaint claims that Plaintiff only "maintained her silence" in the hope of reaching "a business solution" with Fox.  *Id.* ¶¶ 3–4.  Shortly after that call, Plaintiff alleges that her manager "received a call from a reporter at the National Enquirer who was seeking comment about a 'breaking story' involving an alleged affair" between Plaintiff and Payne.  *Id.* ¶ 139.  Fox's Executive Vice President of Corporate Communications, Defendant Irena Briganti, allegedly "leaked Ms. Hughes's identity to the reporter," along with "a prepared statement from Payne" that "misleadingly categorized their relationship merely as a consensual affair."  *Id.* at ¶¶ 139–40.

About 10 days later, in early July 2017, The National Enquirer published a story headlined "Fox Rocked by *Another* Sex Scandal!"  *See* Ex. A; Am. Compl. ¶ 141.  The article exclaimed that "a married male anchor has confessed to cheating with a married colleague!" and

published Payne's name and photo, but not the name or photo of his paramour.[7]  Ex. A; Am. Compl. ¶ 142.  Instead, the National Enquirer identified the "married colleague" only as a "former CNN and Fox News contributor."  Ex. A.  No reader could infer that the article was referring to Plaintiff because *she never contracted to be a Fox contributor*.  Am. Compl. ¶ 119. The article does not attribute any statement to Fox, 21CF, Briganti or Brandi, but publishes a five-sentence apology from Payne that admits to a "romantic affair that ended two years ago." Ex. A; Am. Compl. ¶ 141.  Payne's statement does not refer to Plaintiff by name or otherwise. The Amended Complaint alleges "[i]t took reporters mere hours to confirm that Ms. Hughes was [the] woman referred to in Payne's statement," but it does not address which reporter first published Plaintiff's name, nor does it contend that any Defendant gave her name to that sleuth. *Id*. ¶ 143.  Indeed, because Plaintiff concedes that Payne "did little to hide his romantic interest in" her, the information would not have been hard to find.  *Id*. ¶ 30.

A few days later, an online publication published "a select group of personal emails between Payne and Ms. Hughes."  *Id*. ¶ 145; Ex. P.  With uncharacteristic understatement, the Amended Complaint admits that the emails "suggest[] a consensual relationship."  *Id*. ¶ 8.  But these emails do far more than just "suggest" consent.  In one of them, dated barely two months after Payne purportedly raped her, Plaintiff told him:

> Do you know what I keep dreaming about..  You and I in the pool… My legs wrapped around your waste [sic] and you have me pressed up against the wall of the pool.  Skin glistening and smelling of coconut…. You thrusting yourself deeper inside with each push… And your fingers grasping each of my cheeks

---

[7]     On a motion to dismiss pursuant to Rule 12(b)(6), the court may properly consider any documents, such as the National Enquirer Article, that are integral to the plaintiff's allegations, even if not explicitly incorporated by reference.  *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co*., 62 F.3d 69, 72 (2d Cir. 1995).

Holding me to you.

Ex. P at 2 (ellipses in original).[8]  A few days later, Plaintiff sent Payne another email:  "You are going to need every once [sic] of energy if we are ever given the chance of lots of time and no commitments."  *Id*.

### D.  Plaintiff's Relentless Bid for the Media Spotlight

On September 18, 2017, Plaintiff filed the Complaint.  That same day, The New York Times published an interview with Plaintiff—with a posed photograph—in which she aired her allegations about Payne and Fox.  *See* Ex. Q.  Since then, Plaintiff has given a "blockbuster world exclusive interview" to the National Enquirer itself, in which she claimed that Payne "hinted her unpaid appearances would lead to a paying gig if they socialized outside the office." Ex. R.  She also spoke with the Washington Post.  Ex. S.  Most recently, Plaintiff invited a reporter from the Nashville Scene (her hometown paper) into her kitchen for an interview in which she tried to explain away her erotic love-notes to Payne as "fake flirtatious emails."  Ex. T at 19.  She also addressed rumors that she "had regularly slept with powerful conservative men in the industry to work her way up the ladder," which had "long dogged" her career.  *Id*. at 14.

Indeed, long before the National Enquirer article was published, Plaintiff voluntarily put her own sexual and romantic history into the public domain.  In 2014, she published a book titled *Roar:  The New Conservative Woman Speaks Out* (Worthy Publishing 2014).[9]  In one chapter,

---

[8]    By alleging that these emails were "leaked," Plaintiff concedes that they are authentic. Am. Compl. ¶ 145.  *See also* Am. Compl. ¶¶ 241, 251, 261 (alleging that Payne disclosed "private emails between he [sic] and Plaintiff").

[9]    Relevant chapters from the book are attached as Exhibit U.  Significantly, the author's biography does not identify Plaintiff as a Fox employee, but describes her as "the news director for the Tea Party News Network," and touts her appearances on *CNN Newsroom*, *Piers Morgan Live*, *CBS This Morning*, the Canadian Broadcasting Company and the BBC, in addition to several Fox shows.  *Id*. at 278.  In the book's acknowledgments, Plaintiff thanks her "current boss" at the Tea Party News Network, but does not refer to anyone at Fox as her "boss" or "supervisor."  *Id*. at 275.

titled "First Comes Love, then Comes Marriage," Plaintiff offered up her own romantic history, admitting that "I find men who hold power within their own environment to be attractive." *Id*. at 53. Plaintiff also opined that a woman who is "not afraid to actually be a woman" could overcome workplace sexism:

> Sure, sexism exists in the workplace, but so do a lot of other things that affect both men and women. . . . [F]rankly, as any woman knows, men are pretty easy to persuade if you're wickedly smart and not afraid to actually be a woman.

*Id*. at 197–98; *see also id*. at 174 (asserting that hostile work environment claims are most often brought by "a woman who has a chip on her shoulder and is looking to make a point"). Plaintiff also explained she had been bred to "avoid situations" that could lead to sexual assault. *Id*. at 169. Plaintiff delivered this homily about how women could avoid "nonconsensual sexual relations" one year *after* she claims Payne raped her in her hotel room. *Id*. In light of her allegations in this case, it is also remarkable that in that same book, *she thanked Payne for his "kindness" as one of her many "mentors" in the "broadcast business." Id*. at 276.

### E.  Plaintiff's Amended Complaint

After Defendants filed letters detailing the Complaint's legal defects, Plaintiff filed the Amended Complaint, which now asserts 11 causes of action. The First Cause of Action alleges that Fox and 21CF violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e ("Title VII") by discriminating against her on the basis of her gender by "(a) subjecting Plaintiff to sexual advances and physical violence; (b) *quid pro quo* sexual discrimination; (c) failing to offer the promised contract to Plaintiff; and (d) blacklisting Plaintiff after she refused to submit to Payne's sexual demands." Am. Compl. ¶ 177. The Second Cause of Action alleges that Plaintiff engaged in "protected activity" when she reported Payne's alleged assault in June 2017 and that Fox and 21CF retaliated against her by, among other things, "sending a false statement

about the nature of the relationship between Plaintiff and Defendant Payne to a national tabloid." *Id.* ¶¶ 183–84. The Third, Fourth, Sixth and Seventh Causes of Action make the same discrimination and retaliation claims against all Defendants under the New York State Human Rights Law (the "NYSHRL"), N.Y. Exec. L. § 296, and the New York City Human Rights Law (the "NYCHRL"), N.Y.C. Admin. Code § 8–107. The Fifth Cause of Action alleges that Defendants Briganti and Brandi aided and abetted the alleged NYSHRL violations.

The Ninth, Tenth and Eleventh Causes of Action assert that all Defendants are liable for Defamation Per Se, Defamation and Libel by Implication. These claims are all based on the National Enquirer's publication of Payne's statement apologizing for a "romantic affair" with an unnamed person, and on the purported revelation of Plaintiff's "identity" to the National Enquirer, which did not publish it. Am. Compl. ¶¶ 236, 246, 256. The Eighth Cause of Action is asserted only against Defendant Payne, and seeks damages for "gender motivated violence" under N.Y.C. Admin. Code § 8–903.

## ARGUMENT

## I. The Employment Discrimination and Retaliation Claims Fail Because The Amended Complaint Does Not Establish That Plaintiff Was A Fox Employee Or Job Applicant

Plaintiff's allegations of employment discrimination and retaliation under Title VII, the NYSHRL and the NYCHRL all expressly turn on Plaintiff's status as an "employee" or "job applicant." *See* Am. Compl. ¶ 20 (alleging that Plaintiff "meets the definition of an 'employee' under all applicable statutes"); ¶¶ 176, 185, 187, 194, 201, 203, 213, 220, 222 (relying upon Plaintiff's status as an "employee" in asserting all discrimination and retaliation counts under Title VII, NYSHRL and NYCHRL ); ¶ 108 (alleging Plaintiff was an "applicant" for a contributorship). But Fox concededly never paid Plaintiff. She cannot be deemed a Fox employee subject to any statutory protections; accordingly, the First, Second, Third, Fourth,

Sixth, and Seventh Causes of Action should be dismissed.  Plaintiff's half-hearted claim that "[s]imultaneously with her ongoing work, at all times, Ms. Hughes also was considered an applicant for a full-time contract at Fox" does not cure this core defect.  *Id.* ¶ 108.  And even if Plaintiff were permitted to bring an employment discrimination or retaliation claim, much of the conduct at issue is nevertheless time-barred.

### A. Plaintiff's Concession That She Was Not Paid by Fox Is Fatal to Her Claim that She Was a Fox Employee

To be considered an employee under Title VII, the NYSHRL or the NYCHRL, a plaintiff must "establish that she received remuneration in some form for her work."  *United States v. City of New York*, 359 F.3d 83, 91–92 (2d Cir. 2004) (citation omitted);[10] *accord O'Connor*, 126 F.3d at 116 (holding that "the absence of either direct or indirect economic remuneration" is fatal to claim that plaintiff was an employee); *Krasner v. Episcopal Diocese of Long Island*, 328 F. Supp. 2d 367, 371 (E.D.N.Y. 2004) (dismissing Title VII and NYSHRL claims on Rule 12(b) motion where plaintiff did not allege that she received salary or substantial benefits from putative employer); *Wang v. Phoenix Satellite TV US, Inc.*, 976 F. Supp. 2d 527, 535 (S.D.N.Y. 2013) (under NYSHRL and NYCHRL, "remuneration is a threshold inquiry in establishing the existence of an employment relationship"); *Wadler v. E. College Ath. Conf.*, No. 00 Civ. 5671 (JSM), 2003 WL 21961119, at *3 (S.D.N.Y. Aug. 14, 2003) (holding that "control of [plaintiff's] work, in the absence of compensation" did not make the defendant an employer under Title VII or the NYSHRL); *Lippold v. Duggal Color Projects, Inc.*, No. 96 Civ. 5869 (JSM), 1998 WL 13854, at *2 (S.D.N.Y. Jan. 15, 1998) (dismissing plaintiff's NYSHRL and NYCHRL claims

---

[10]    Claims brought under the NYSHRL are "analytically identical to claims brought under Title VII."  *Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 107 n.10 (2d Cir. 2011).  Hence, "New York courts rely on federal law when determining claims under the New York Human Rights Law."  *Reed v. A.W. Lawrence & Co.*, 95 F. 3d 1170, 1177 (2d Cir. 1996).

against defendant who did not pay plaintiff); *Sweeney v. Bd. of Educ.*, 112 A.D.2d 240, 240–41 (2d Dep't 1985) (holding that NYSHRL does not apply to claims by unpaid volunteer).

The Amended Complaint concedes that no "monetary exchanges" were made to Plaintiff for her appearances.  Am. Compl. ¶¶ 63, 73.  Instead, the only benefit alleged in the Amended Complaint is "for travel to and from" Fox's studios and "the cost to do her hair and make-up for all of her appearances on *Making Money*."  *Id.* ¶ 71.  But "benefits must meet a minimum level of 'significance,' or substantiality, in order to find an employment relationship in the absence of more traditional compensation."  *York v. Ass'n of the Bar of the City of N.Y.*, 286 F.3d 122, 126 (2d Cir. 2002) (affirming dismissal of employment claims brought by volunteer attorney).  The benefits that the Second Circuit considers significant include "salary or other wages; employee benefits, such as health insurance; vacation; sick pay; or the promise of any of the foregoing." *Id.* (citing *O'Connor*, 126 F.3d at 116).  Mere "[c]lerical support, limited tax deductions, and 'networking opportunities'" are "not sufficiently substantial to meet the remuneration test[]." *York*, 286 F.3d at 126.  Critically, the putative employee must "come forward with substantial benefits *not merely incidental* to the activity performed in order to satisfy this Circuit's remuneration test."  *Id.* (emphasis added).

Hair and make-up services and travel expenses plainly do not rise to this "minimum level of significance."  They were "merely incidental" to Plaintiff's unpaid appearances and are no more "remuneration" to Plaintiff than the striped aprons provided to hospital volunteers, the safety goggles used by laboratory interns, or the clerical supplies used by office volunteers.  Nor does Plaintiff allege that anyone at Fox promised her wages or benefits for any of her appearances; at most, she asserts that Fox made "promises" of a *future* contract in which she would be paid for *future* appearances.  Am. Compl. ¶ 103.

Plaintiff expounds on how Fox "controlled" when, where and how she appeared on its shows, Am. Compl ¶¶ 45–67, in an effort to argue that "common-law agency principles governed the employment relationship between Fox and Ms. Hughes," *id.* ¶ 41.  This spurious reasoning, however, is foreclosed by the Second Circuit's decision in *O'Connor*.  There, the Court of Appeals held that the "common-law agency analysis" of factors such as "the hiring party's right to control the manner" of work should not be undertaken until the putative employee has shown that "a 'hire' has occurred":

> [C]ourts turn to common-law principles to analyze the character of an economic relationship 'only in situations that plausibly approximate an employment relationship.'  Where no financial benefit is obtained by the purported employee from the employer, no 'plausible' employment relationship of any sort can be said to exist because although 'compensation by the putative employer to the putative employee in exchange for his services is not a sufficient condition, . . . it is an essential condition to the existence of an employer-employee relationship.'

*O'Connor*, 126 F.3d at 115–16 (citations omitted).  Absent payment by Fox, Plaintiff cannot establish "an essential condition to the existence of an employer-employee relationship."

### B.  Plaintiff May Not Assert a Claim in the Guise of a Job Applicant

Plaintiff contends that she "was considered" to be an "applicant" for a contributorship while she was "simultaneously" working as a Fox employee.  Am. Compl. ¶ 108. This position is inherently implausible:  Plaintiff was not a Fox employee (*see* Section A, above); and even if Plaintiff had hoped her appearances as an unpaid guest could serve as a springboard to a paid contributor contract with Fox, that aspiration does not make her a perennial "job applicant."  If it could, every politician, actor or academic who appears as an unpaid guest on a television show would be a protected "job applicant."  Moreover, while *bona fide* job applicants may assert failure to hire claims under Title VII, the NYSHRL and NYCHRL, by casting herself as a job applicant, Plaintiff must admit she was not an employee, precluding pursuit of employment-

related claims such as hostile work environment.  *See Wimmer v. Suffolk Cty. Police Dep't*, 176

F.3d 125, 136 (2d Cir. 1999) ("It is inherent in the definition of a racially hostile work

environment, however, that the person against whom the hostility is directed must be in an

employment relationship with the employer.").  Indeed, courts in this Circuit routinely reject

non-employees' discrimination claims other than failure to hire.  *See*, *e.g.*, *Carr v. N. Shore–*

*Long Island Jewish Health Sys.*, No. 14 Civ. 3257 (JS) (SIL), 2016 WL 3527585 at *4 (E.D.N.Y.

Jun. 23, 2016) (unpaid extern "cannot maintain a claim for discrimination separate and apart

from her failure to hire allegations"); *Wang*, 976 F. Supp. 2d at 537 (holding that unpaid intern

could not bring hostile work environment claim under the NYCHRL because she was not an

employee).[11]

To establish *a prima facie* case for failure to hire or promote under Title VII and the

NYSHRL, a plaintiff must show:  "(1) she is a member of a protected class; (2) she applied and

was qualified for a job for which the employer was seeking applicants; (3) she was rejected for

the position; and (4) the position remained open and the employer continued to seek applicants

having the plaintiff's qualifications."  *Petrosino v. Bell Atl.*, 385 F.3d 210, 226 (2d Cir. 2004)

(internal quotation marks omitted).  Under the NYCHRL, plaintiffs "must plead facts sufficient

to support an inference that they have been treated less well at least in part because of a protected

trait."  *Jablonski v. Special Counsel, Inc.*, No. 16 Civ. 5243 (ALC), 2017 WL 4342120, at *5

(S.D.N.Y. Sept. 28, 2017) (internal quotation marks omitted) (dismissing NYCHRL claim for

same reasons as NYSHRL claims, because plaintiff had not alleged "differential treatment

between her and other similarly situated individuals" or any facts linking her treatment to her

---

[11]     After *Wang* was decided, the NYCHRL was amended to permit unpaid interns to assert
claims challenging discrimination in the "terms, conditions or privileges" of their internships.
N.Y.C. Admin. Code § 8–107(2)(c).  Plaintiff does not, however, assert that she was an intern.

protected trait).  Plaintiff's failure to hire claims under Title VII, the NYSHRL and the NYCHRL are all fatally flawed.

First, Plaintiff has not alleged that she actually applied for a job for which Fox was seeking applicants.[12]  "[I]f plaintiff was qualified for the position, yet she never applied, she was never rejected under circumstances that would give rise to an inference of sex discrimination." *Taylor v. City of New York*, 207 F. Supp. 3d 293, 306 (S.D.N.Y. 2016) (rejecting failure to promote claims under NYSHRL and NYCHRL where plaintiff merely made inquiries and expressed a general interest in two positions); *Tulino v. City of New York*, No. 15 Civ. 7106, 2016 WL 2967847, at *5-6 (S.D.N.Y. May 19, 2016) (dismissing failure to promote claim under NYCHRL because plaintiff did not apply for a vacant position).  Mere expressions of interest in working for an employer do not constitute a job application.  *Petrosino*, 385 F.3d at 227 (requiring more than request for promotion to establish application).  And Plaintiff's concession that the overwhelming majority of guests on Fox shows do *not* get paid contributorships, *see* Am. Compl. ¶ 73, is fatal to any claim that her guest appearances could be part of an "informal" hiring custom and practice.  *Compare Carr v. N. Shore—Long Island Jewish Health Sys.*, 14 Civ. 3257 (JS) (SIL), 2015 WL 4603389, at *3 (E.D.N.Y July 30, 2015) (finding plaintiff "informally applied" for employment by completing externship where she alleged "it is Defendant's custom and practice to employ externs" after graduation and "all or nearly all" of her extern peers were hired).

---

[12]     Where, unlike here, there is an open position, plaintiffs may be excused from the application requirement by showing  "that (1) the vacancy at issue was not posted, and (2) the employee either had (a) no knowledge of the vacancy before it was filled or (b) attempted to apply for it through informal procedures endorsed by the employer."  *Petrosino*, 385 F.3d at 227. This exception is not available to Plaintiff, who has not alleged that there was an unposted vacancy for a Fox contributor with her qualifications.

At most, Plaintiff has alleged that she (or her agent) reached out to Mr. Shine to express her hopes of getting a contributor contract.  But that is not an application.  *See Brink v. Union Carbide Corp.*, 41 F. Supp. 2d 406, 416 (S.D.N.Y. 1999) (holding superiors' knowledge of plaintiff's interest in promotion insufficient where plaintiff did not claim that he took further action to be promoted), *aff'd*, 210 F.3d 354 (2d Cir. 2000).  Moreover, Plaintiff admits not only that she never met with Mr. Shine, but also that he explicitly told her agent there were no openings.  *See* Am. Compl. ¶ 106 ("Shine repeatedly told [Plaintiff's] agent that Fox needed to 'wait' a little longer and that they could discuss [a contract] 'next month.'"), ¶ 107 (Shine told Plaintiff's agent "Right now we're not going to be in a position to offer a contributorship but if that changes I'll let you know.").

Second, even if there were an open position for which Plaintiff applied, Plaintiff has not made even a conclusory allegation that she was qualified to fill an open position at Fox.  *See Mendelsohn v. Univ. Hosp.*, 178 F. Supp. 2d 323, 328–29 (E.D.N.Y. 2002) (dismissing failure to promote claim for failure to plead that plaintiff was qualified for the position or "a description of the responsibilities or duties of the [position] from which one could infer that the plaintiff was qualified for that position"); *Breland-Starling v. Disney Publ'g Worldwide*, 166 F. Supp. 2d 820, 824 (S.D.N.Y. 2001) ("Plaintiff cannot establish her *prima facie* case without setting forth either the responsibilities of [the] position or plaintiff's skills applicable to this position.").

Third, Plaintiff fails to plead that the contributor position that she claims to have wanted was ever available and remained open at Fox, and that Fox continued to seek applications from those with Plaintiff's qualifications for that position.

Plaintiff's failure to hire claim would fail under any standard, including the NYCHRL, because Plaintiff has failed to plead any facts showing that she was treated less favorably than

similarly situated individuals seeking a contributor position at Fox.  *Jablonski*, 2017 WL 4342120, at *4 (dismissing complaint for failing to plead that plaintiff "applied for position X and position X was filled by" someone without her protected trait).  Without any status as a protected employee or job applicant, Plaintiff's Title VII, NYSHRL and NYCHRL claims against all of the Defendants in the First, Second, Third, Fourth, Sixth, and Seventh Causes of Action should be dismissed.

### C.  Plaintiff's Claims Are Largely Time-Barred

To bring a claim under Title VII, a plaintiff must first file a timely charge with the Equal Employment Opportunity Commission ("EEOC").  42 U.S.C. § 2000e-5(e)(1).  In New York, where a state agency has the authority to address charges of discrimination, the charge must be filed with the EEOC within 300 days from the alleged unlawful actions.  *Perez v. Harbor Freight Tools*, 698 F. App'x 627 (2d Cir. 2017).  Because Plaintiff did not file any charge with the EEOC until September 27, 2017, *see* Am. Compl. ¶ 16, all Title VII claims arising from alleged discriminatory actions that occurred before December 1, 2016, are time-barred.

Claims brought under the NYSHRL and NYCHRL must be filed within three years of the discrete discriminatory acts.  *Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 238 (2d Cir. 2007).  Because Plaintiff did not file her Complaint until September 18, 2017, all of Plaintiff's allegations stemming from conduct that occurred before September 18, 2014—including, in particular, the alleged July 2013 rape—are time-barred under the state and city statutes.  Am. Compl. ¶¶ 28-29.  *See Kassner*, 496 F.3d at 238-39 (dismissing discrete claims as untimely where plaintiff alleged a mix of timely and untimely claims).

**II.  Even If Plaintiff Were A Fox Employee, Her Retaliation Claims Still Should Be Dismissed Because She Does Not Allege Any Retaliatory Conduct That Was Causally Connected To Any Alleged Protected Activity**

The Second, Fourth and Seventh Causes of Action allege retaliation under Title VII, the NYSHRL and the NYCHRL.  To establish a prima facie case of retaliation under the Title VII and the NYSHRL, a plaintiff must show:  (1) "participation in a protected activity"; (2) "that the defendant knew of the protected activity"; (3) "an adverse employment action"; and (4) "a causal connection between the protected activity and the adverse employment action." *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010).  A retaliation claim under the NYCHRL is similar, except that the third prong may be satisfied by an action "reasonably likely to deter a person from engaging in protected activity."  N.Y.C. Admin. Code § 8–107(7); *see also Fletcher v. Dakota, Inc.*, 99 A.D.3d 43, 51–52 (1st Dep't 2012) (NYCHRL prohibits retaliation of any kind "that disadvantaged" plaintiff, even if it does "not result in an ultimate action [] or in a materially adverse change").

The so-called "blacklisting" alleged in the Amended Complaint—"drastically reducing her appearances on Fox programs" and "blacklist[ing] her from the network," *id.* ¶¶ 186, 189, 202, 205, 221, 224—pre-dates the June 2017 report that Plaintiff's manager made to Fox.  Since that report is the only "protected activity" she alleges, *id.* ¶¶ 183, 199, 218, those purported actions cannot be causally related to it.  The other form of retaliation alleged in the Amended Complaint—"sending a false statement about the nature of the relationship between Plaintiff and Defendant Payne" to the National Enquirer, Am. Compl. ¶¶ 184, 299, 218—cannot be deemed "retaliatory."  The Amended Complaint acknowledges that the purportedly false narrative goes directly to refuting "the discrimination she experienced at Fox."  *Id.* ¶159.  Even defendants accused of employment discrimination are entitled to speak in their own defense.

### A. The Alleged Blacklisting Is Not Causally Connected to Any Protected Activity

The only "protected" conduct that Plaintiff has alleged to support her retaliation claim is the June 2017 "report[] to Fox's counsel, and to Fox, [of] the rape and sexual assault inflicted on her by Payne, as well as the continued conditioning of her work at Fox in exchange for sexual relations with Payne."  Am. Compl. ¶¶ 183, 199, 218.  *See Bliss v. MXK Rest. Corp.*, 220 F. Supp. 3d 419, 425 (S.D.N.Y. 2016) (Pauley, J.) (explaining that "protected activity" consists of opposition to an unlawful practice or participation in an investigation, proceeding, or hearing). Because there must be a "causal connection" between protected activity and purportedly retaliatory acts under each of Title VII, the NYSHRL and the NYCRHL, to be actionable, a purportedly retaliatory act must occur *after* the protected activity.  *See Petyan v. N.Y. City Law Dep't*, No. 14 Civ. 1434 (GBD) (JLC), 2015 WL 1855961, at *13 (S.D.N.Y. Apr. 23, 2015) ("To constitute retaliation, the alleged protected activity must predate evidence of the alleged retaliatory animus."), *report and recommendation adopted,* No. 14 Civ. 1434 (GBD) (JLC), 2015 WL 4104841 (S.D.N.Y. July 2, 2015); *see also Cifra v. GE*, 252 F.3d 205, 217 (2d Cir. 2001) (explaining that the causal connection can be established "indirectly by showing that the protected activity was closely followed in time by the adverse action.") (citation and internal quotation marks omitted).

The blacklisting said to have resulted when Plaintiff allegedly ended her affair with Payne occurred *before* June 2017, which is when Plaintiff first disclosed to Fox the alleged rape and coercion.  *See, e.g.*, Am. Compl. ¶ 124 (alleging that she was "blacklisted from Fox" after ending her relationship with Payne in June 2015); ¶ 186 (alleging Fox reduced her appearances "immediately after" she ended her relationship with Payne); ¶¶ 131-33 (alleging that she was blacklisted by other networks in January 2017).  Thus, even if taken as true, the alleged

blacklisting is not causally connected to Plaintiff's protected activity and cannot constitute retaliation under any of the statutes. *See, e.g.*, *Petyan*, 2015 WL 1855961, at *13 (dismissing retaliation claim because conduct before plaintiff lodged complaint "cannot be considered the result of retaliation for that complaint"); *Batchelor v. City of New York*, No. 11-CV-2058 (MKB) (VMS), 2014 U.S. Dist. LEXIS 46921, at *141-161 (E.D.N.Y. Feb. 16, 2014) (rejecting plaintiff's Title VII, NYSHRL, and NYCHRL claims because the alleged retaliatory conduct predated the protected activity), *adopted by* 12 F. Supp. 3d 458 (E.D.N.Y. 2014).

### B.  The Alleged Leak to the National Enquirer Was Not Retaliatory

The alleged dissemination of Defendants' account of Plaintiff's relationship with Payne to the National Enquirer cannot be considered retaliatory, for nothing in the anti-discrimination statutes is intended to prevent employers from defending themselves. *See, e.g.*, *United States v. N.Y.C. Transit Auth.*, 97 F.3d 672, 677 (2d Cir. 1996) ("Reasonable defensive measures do not violate the anti-retaliation provision…even though such steps are adverse to the charging employee and result in differential treatment."); *Shih v. JPMorgan Chase Bank, N.A.*, No. 10 Civ. 9020 (JGK), 2013 WL 842716, at *8 (S.D.N.Y. Mar. 7, 2013) (holding that plaintiff did not allege *prima facie* case of retaliation under Title VII, NYSHRL or NYCHRL where it merely responded to plaintiff's demands for allegedly unpaid severance).  Making statements to the press cannot be considered "retaliation" unless the statements go beyond "defending oneself" and veer into "threatening, intimidating, or otherwise interfering with someone's right to pursue a discrimination claim."  *Dixon*, 504 F.3d at 84.

Here, while acknowledging that anyone familiar with her email correspondence to Payne might well conclude that her affair with him was consensual, Am. Compl. ¶¶ 8, 31, Plaintiff claims that it was coerced.  Undeniably, the nature of that relationship is central both to her

allegations, and to any defense to those allegations.[13]  Consent is a defense to her allegation of

rape.  *See* N.Y. Penal L. § 130.05 ("[w]hether or not specifically stated, it is an element of every

offense defined in this article that the sexual act was committed without consent of the victim").

And a voluntary sexual relationship with Payne is a defense to her claims of employment

discrimination.  *See Garrigan v. Ruby Tuesday, Inc.*, No. 13 Civ. 1196 (GBD), 2013 WL

3946223, at *3 (S.D.N.Y. Jul. 30, 2013) (granting motion to dismiss because "[i]t is well

established in this Circuit that the termination of a voluntary romantic relationship cannot form

the basis of a sex discrimination suit under Title VII") (citation omitted); *Kahn v. Objective Sols.,

Int'l*, 86 F. Supp. 2d 377, 381 (S.D.N.Y. 2000) (rejecting plaintiff's employment discrimination

claims under Title VII, NYSHRL and NYCHRL where plaintiff's employment was terminated at

the end of an affair because "[r]ejection and discrimination are not synonymous."); *Mauro v.

Orville*, 259 A.D.2d 89, 92 (3d Dep't 1999) (dismissing plaintiff's sexual harassment claim

under the NYSHRL because "discrimination against an employee on the basis of a failed

voluntary sexual relationship does not of itself constitute discrimination because of sex").

Nothing that Defendants are alleged to have said or done can be considered "threatening,

intimidating or otherwise interfering" with Plaintiff's assertion of her claim.  *Dixon*, 504 F.3d at

84.  Defendants are not alleged to have disclosed that Plaintiff had an adulterous affair with a

third person who was a stranger to her claims; they are alleged to have said only that an affair

that she calls "coerced" was, in fact, "romantic" and Plaintiff herself repeatedly asserts that

Payne's interest in her was, in fact, "romantic."  Am. Compl. ¶¶ 27, 30, 86.  Indeed, Payne chose

---

[13]      Contrast, for example, *Lore v. City of Syracuse*, 670 F.3d 127, 164 (2d Cir. 2012), where
the Second Circuit suggested that "a public comment by the municipality's top lawyer implying
or confirming that Lore, a police officer, had stolen fellow officers' paychecks," could be
actionable retaliation.  In *Lore*, the purported theft was not a defense to Lore's allegations of
employment discrimination.

to not even mention her name in his statement to the National Enquirer, the paper did not publish it, and the publication of Plaintiff's name by other news organizations is not attributed to any of the Defendants.  None of Plaintiff's allegations can be the basis of a retaliation claim.

Plaintiff's repeated invocation of the trauma resulting from the "[d]isclosure of a rape victim's identity," Am. Compl. ¶ 151, is a red herring.  According to the Amended Complaint, Defendants disclosed that Plaintiff had an affair with Payne, not that he raped her.  *See* Am. Compl. ¶ 139 (alleging that National Enquirer sought comment on a story about an "alleged affair").  It is Plaintiff, not any of the Defendants, who portrays herself as a rape victim in her legal pleadings and press interviews and shares intimate details of the alleged encounter.  *See* Exs. Q–T.  All of the retaliation claims against all of the Defendants should be dismissed.

## III. The Amended Complaint Does Not Allege Facts That Would Subject The Individual Defendants To Direct Liability For Employment Discrimination Or To Aiding And Abetting Liability

If Fox never employed Plaintiff (which it did not) and if Plaintiff never applied for a job at Fox (which she did not), then *none* of the individual Defendants could have acted on behalf of an employer or prospective employer, and Plaintiff's discrimination and retaliation claims against them should be dismissed for that reason.  *See Priore v. New York Yankees*, 307 A.D.2d 67, 74 (1st Dep't 2003) (under the NYCHRL, liability attaches to individuals who "act[ed] with or on behalf of the *employer* in hiring, firing, paying or in administering the 'terms, conditions or privileges of *employment*'") (emphasis added).

In addition, neither Defendant Brandi (Fox's general counsel) nor Defendant Briganti (Fox's head of media relations) can be liable under the NYSHRL or NYCHRL because the Amended Complaint does not allege any facts that would permit them to be treated as an "employer" under those statutes.  *See Townsend v. Benjamin Enters., Inc.*, 679 F.3d, 41, 57 (2d Cir. 2012) (explaining that direct liability under the NYSHRL requires an individual to qualify as

an "employer" and "ha[ve] an ownership interest in the relevant organization or the 'power to do more than carry out personnel decisions made by others.'") (citation omitted); *Priore*, 307 A.D.2d at 74 (individuals may be liable for discrimination under the NYCHRL "only where they act with or on behalf of the employer in hiring, firing, paying, or in administering the 'terms, conditions or privileges of employment'—in other words, in some agency or supervisory capacity") (citation omitted).

The Amended Complaint does not plead that Defendant Brandi or Briganti had an ownership interest in the corporate defendants; it pleads only that they "oversee[] multiple departments and other executives."  Am. Compl. ¶¶ 23–24.  Plaintiff does not allege that she had any interaction with either Defendant during the three years that she appeared as an unpaid guest on Fox shows.  Nor does she allege that they supervised her or had the authority to offer her a contributor contract.  Thus, even accepting Plaintiff's conclusory allegations as true, Defendants Brandi and Briganti do not meet the legal definition of "employer," and the Third, Fourth, Sixth and Seventh Causes of Action for employment discrimination and retaliation under the NYSHRL and NYCHRL should be dismissed as to them.  *See Torres v. New York Methodist Hosp.*, No. 15 Civ. 1264 (PK) (CPK), 2016 WL 3561705, at *12 (E.D.N.Y. Jan. 7, 2016) (dismissing NYSHRL discrimination claim against individual employee); *Priore*, 307 A.D.2d at 75 (reversing Supreme Court's order and dismissing employment discrimination claims against defendant-employees because they lacked supervisory capacity).

Moreover, the Fifth Cause of Action for Aiding and Abetting against Defendants Brandi and Briganti under the NYSHRL should be dismissed because the Amended Complaint does not state an NYSHRL cause of action.  There is no aiding and abetting liability under Section 296(6) of the NYSHRL without a direct violation of the NYSHRL.  *See White v. Pacifica Found.*, 973

F. Supp. 2d 363, 378 (S.D.N.Y. 2013) (dismissing the aiding and abetting claim because where "[p]laintiff has not demonstrated a primary violation, there can be no liability for aiding and abetting."); *Erasmus v. Deutsche Bank Ams. Holding Corp.*, No. 15 Civ. 1398 (PAE), 2015 WL 7736554, at *8 (S.D.N.Y. Nov. 30, 2015) (dismissing plaintiff's aiding and abetting claim because his discrimination claim fell short).

## IV. The National Enquirer Article Cannot Be the Basis Of A Defamation Claim

The Amended Complaint's Ninth, Tenth and Eleventh Causes of Action charge the Defendants with defamation for presenting an account of Plaintiff's sexual relationship with Payne that differs from Plaintiff's own account of that relationship.  *See* Am. Compl. ¶¶ 235–62. To establish defamation, a plaintiff must plead (i) a false and defamatory statement of fact (ii) concerning the plaintiff that was publicized to a third party (iii) with either negligence as to the truth of the statement or actual malice, depending on the status of the libeled party, and (iv) that either caused the plaintiff damages (for claims of defamation) or was per se actionable (for claims of defamation per se).  *See, e.g.*, *Celle v. Filipino Reporter Enters., Inc.*, 209 F.3d 163, 176 (2d Cir. 2000).  Although Plaintiff cannot prove any of these elements, her failure to properly plead two of them requires dismissal of all three defamation claims.  First, the allegedly defamatory statements do not refer to Plaintiff.  In addition, the Amended Complaint does not plead the "actual malice" required to defame a public figure such as Plaintiff.

### A.   The National Enquirer Article Was Not "Of and Concerning" Plaintiff

A claim of defamation is not actionable unless it is based on a defamatory statement that is specifically "of and concerning plaintiff."  *See, e.g.*, *Elias*, 872 F.3d at 104 (affirming dismissal of defamation claim brought by plaintiff who claimed that article about a bicycle-riding former UVA student and fraternity member concerned him).  Under New York law, to be "of and concerning" a plaintiff, the allegedly defamatory statement must be such "that '[t]he

reading public acquainted with the parties and the subject' would recognize the plaintiff as a person to whom the statement refers." [14]  *Id*. at 104–05 (citing *Carlucci v. Poughkeepsie Newspapers, Inc.*, 57 N.Y.2d 883, 885 (1982)).[15]  *See also Cortes v. Twenty-First Century Fox America, Inc.*, No. 17 Civ 5634 (RWS), 2018 WL 348862, at *9 (S.D.N.Y. Jan. 9. 2018) (dismissing defamation claim where there was "no reference or description of Plaintiff" in allegedly defamatory statement and it was "implausible that an 'average reader would understand the statement' to be a reference to Plaintiff") (citations omitted).  As Judge Sack has held in affirming the dismissal of a defamation claim, this requirement is intended to be "a significant limitation on the universe of those who may seek a legal remedy for communications they think to be false and defamatory and to have injured them."  *Kirch v. Liberty Media Corp*., 449 F.3d 388, 399–400 (2d Cir. 2006).  This issue is "typically resolved by the court at the pleading stage."  *Elias*, 872 F.3d at 105.

The Amended Complaint concedes that the National Enquirer article *did not name Plaintiff*.  Am. Compl. ¶ 142.  In fact, the article discloses only Payne's name and refers to his paramour as a "married colleague" and "former CNN and Fox News contributor."  *See* Ex. A. This description cannot be "of and concerning" Plaintiff because Plaintiff was never contracted

---

[14]     Where, as here, jurisdiction is based on both a federal question and diversity, the court should apply the choice of law rules of the forum state.  *Totalplan Corp. of Am. v. Colborne*, 14 F.3d 824, 832 (2d Cir. 1994).  Under New York choice of law rules, New York law should apply unless there is an actual conflict with the law of the other potentially applicable jurisdiction. *GlobalNet Financial.Com, Inc. v. Frank Crystal & Co.*, 449 F.3d 377, 382 (2d Cir. 2006). Plaintiff is a resident of Tennessee.  Am Compl. ¶ 20.  As addressed in notes 15–16, below, Tennessee law is substantially the same as New York law for these two issues; hence, New York law should apply.

[15]     Under Tennessee law, the requirement that an allegedly defamatory statement concerns the plaintiff "may be satisfied by evidence that the verbiage would have identified the plaintiff to a reasonable reader."  *Stones River Motors, Inc. v. Mid-S. Publ'g Co.*, 651 S.W.2d 713, 717 (Tenn. Ct. App. 1983) (holding that a reference to a "local import dealer" did not concern a specific car dealership where many local dealerships sold imported cars).

to be a Fox contributor; readers who were "acquainted with" Fox and with Plaintiff could not have thought the article referred to her.  Nor does the article give any other factual details that would have permitted readers to infer that Plaintiff was the unidentified "married colleague"; indeed, while the article expressly refers to Payne as a "male anchor," it does not provide even the gender of the "married colleague."  *See* Ex. A.  Nor does the article state where the "married colleague" lived, how old the colleague was, any details about the colleague's physical attributes or whether the colleague had been on Payne's show.  No National Enquirer reader could have figured out that Payne's "romantic affair" was with Plaintiff.

## B.   The Amended Complaint Does Not Make Factual Allegations Showing the Defendants Acted With Actual Malice

Defamation claims require proof that the defendants acted with the requisite state of mind which, in the case of a public figure plaintiff, is "actual malice."  *See, e.g.*, *Celle*, 209 F.3d at 176.  By her own account, Plaintiff is a cable television celebrity and a limited public figure who must plead facts from which the court can infer that the Defendants acted with "actual malice." The Amended Complaint does not allege any facts that could support that showing.

### 1.   Hughes Is a Limited Public Figure

A defamation plaintiff is deemed a limited public figure if she has: "(1) successfully invited public attention to [her] views in an effort to influence others prior to the incident that is the subject of litigation; (2) voluntarily injected [her]self into a public controversy related to the subject of the litigation; (3) assumed a position of prominence in the public controversy; and (4) maintained regular and continuing access to the media."[16]  *Lerman v. Flynt Distrib. Co.*, 745

---

[16]     Tennessee determines whether a plaintiff is a public figure by "looking to three factors: the extent to which participation in the controversy is voluntary, the extent to which there is access to channels of effective communication [in] order to counteract false statements, and the prominence of the role played in the public controversy."  *Hibdon v. Grabowski*, 195 S.W.3d 48,

F.2d 123, 136–37 (2d Cir. 1984).  The Court "may deem a plaintiff a public figure at the motion

to dismiss stage." *Biro*, 963 F. Supp. 2d at 270.  Each of those attributes is readily satisfied here.

 *Plaintiff Successfully Invited Public Attention To Her Views Before the Alleged*

*Defamation*.  At the heart of the public figure designation is the fact that the plaintiff voluntarily

courted and secured public attention.  *See, e.g.*, *James v. Gannett Co.*, 40 N.Y.2d 415, 422

(1976) (holding that a "professional belly dancer" was a public figure).  Generally, "those who

have voluntarily sought and attained influence or prominence in matters of social concern are

generally considered public figures." *Celle*, 209 F.3d at 176–177 (holding that a "'well known

radio commentator' within the Metropolitan Filipino-American community" was a public

figure).  The Amended Complaint itself alleges that Plaintiff is a "political strategist and

commentator," Am. Compl. ¶¶ 26, 36, who appears "on numerous national television and radio

networks to provide her perspective on important political events and to discuss a wide range of

topics involving national and foreign affairs," *id.* ¶ 36.  These media appearances predate the

alleged defamatory statements at issue here.  *See id.* ¶ 26.  Plaintiff's book, published in 2014,

also predates those statements.  Ex. U.  The press also reported the beginning and end of

Plaintiff's contributor contract with CNN, *see* Exs. F–G, and the parody of her advocacy for

then-candidate Trump on Saturday Night Live, *see* Ex. E.

 *Plaintiff Voluntarily Made Her Views on Sexual Harassment and Assault A Matter of*

*Public Interest.*  A public controversy is a "topic upon which sizeable segments of society have

different, strongly held views." *Lerman*, 745 F.2d at 138.  Alternatively, it is a topic that is "a

matter of public interest or concern." *Id.*; *see also Cabello-Rondón v. Dow Jones & Co.*, No. 16

Civ. 3346 (KBF), 2017 WL 3531551, at *4 (S.D.N.Y. Aug. 16, 2017) (referring to matters of

---

59 (Tenn. Ct. App. 2005) (citation omitted).  Public figures must allege "actual malice" to state a
claim.  *See Trigg v. Lakeway Publishers, Inc.*, 720 S.W.2d 69, 72 (Tenn. Ct. App. 1986).

"social concern") (citation omitted).  Currently, one cannot overstate the public's concern with the relationships between men and women in the workplace.  Plaintiff publicly positioned herself as a putative expert on Payne's show over many months.  Am. Compl. ¶ 118.  During those appearances, and in her later paid appearances on CNN, she often opined on gender issues, including the credibility of women who accuse men of sexual harassment or assault.  *See* Exs. B–D.  She did the same in her book.  *See* Ex. U at 169, 174, 197–98.  Thus, she "purposefully surrendered part of what would otherwise have been her protectable privacy rights" related to her own accusations against Payne, her purported co-worker and supervisor.  *Lerman*, 745 F.2d at 137 (privacy rights related to authorship of books and screenplays surrendered "through extensive writing on this topic, reaping profits and wide notoriety for herself in the process").

   ***Plaintiff Has Assumed A Position of Prominence In The Public Controversy and Maintains Regular And Continuing Access To The Media***.  Even before the allegedly defamatory statement, Plaintiff's appearances on television generally, and her comments on sexual harassment and assault specifically, were the subject of extensive public comment and debate.  *See* Exs. B–C, E.  Here, Plaintiff's own prominence on the issue is made manifest by the website that chose to publish Plaintiff's erotic emails to Payne, Ex. P, and the extensive publication of Plaintiff's version of their relationship in The New York Times, the National Enquirer, the Washington Post and the Nashville Scene, Exs. Q–T. These interviews also establish Plaintiff's own ready access to public media outlets.  Because of her status as a public figure, Plaintiff "ha[d] a more realistic opportunity to counteract false statements than private individuals normally enjoy."  *Biro*, 963 F. Supp. 2d at 275.

   In sum, Plaintiff is plainly a limited public figure who must allege and prove "actual malice" to state a defamation claim.

### 2.  The Alleged Facts Do Not Plausibly Allege Actual Malice

To establish "actual malice," the Complaint must make factual allegations showing that the Defendants made an alleged defamatory statement "with knowledge that it was false or with reckless disregard of whether it was false or not."  *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279–80 (1964); *accord Church of Scientology Int'l v. Behar*, 238 F.3d 168, 173-74 (2d Cir. 2001).  The well-known plausibility standard of *Iqbal*, 556 U.S. at 678—"factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged"—applies to the pleading of actual malice.  *Biro v. Condé Nast*, 807 F.3d 541, 544 (2d Cir. 2015), *cert. denied*, 136 S. Ct. 2015 (2016).  Generalized allegations of ill will (such as the Amended Complaint's conclusory allegation that Defendants' conduct was "malicious," Am. Compl. ¶¶ 150, 153, 169) do not suffice.  Instead, the Second Circuit instructs that "'[d]espite its name, the actual malice standard does not measure malice in the sense of ill will or animosity, but instead the speaker's subjective doubts about the truth of the publication.'"  *Biro,* 807 F.3d at 546 (quoting *Behar*, 238 F.3d at 174).  A defamation claim should be dismissed unless "there is sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication."  *Behar*, 238 F.3d at 174 (internal quotation marks omitted).

***Defendant Brandi.***  The Amended Complaint shows that Brandi had no reason to entertain "serious doubts" about the veracity of Payne's claim that his sexual relationship with Plaintiff was a "romantic affair."  To the contrary, Brandi heard two competing narratives: Plaintiff's manager described Plaintiff's relationship with Payne as coerced, but refused to provide any factual details, Am. Compl. ¶ 138; and Payne denied the allegation, *id.* ¶ 6.  On these facts, Brandi cannot be said to have been "highly aware" that Payne's account of his relationship with Plaintiff was untrue.  *Ibraheem v. Wackenhut Servs., Inc.*, 29 F. Supp. 3d 196, 217 (E.D.N.Y. 2014) (explaining that "there is a critical difference between not knowing whether

something is true and being highly aware that it is probably false.  Only the latter establishes

reckless disregard in a defamation action.") (internal quotation marks and citation omitted).

   ***Defendant Briganti.***  The Amended Complaint does not even try to explain how Briganti

would have known that Plaintiff's relationship with Payne was not a "romantic affair."  Instead,

the Amended Complaint states only that Briganti transmitted Payne's statement to the National

Enquirer, Am. Compl. ¶¶ 6, 139, and then repeats that Briganti knew the statement was false,

without providing any facts supporting that claim, *id.* ¶¶ 236, 246, 256.  Mere repetition of the

legal standard is no substitute for the required factual allegations.

   ***Defendant Payne.***  The Amended Complaint also shows that Payne had no reason

seriously to doubt that he had engaged in a "romantic affair" with Plaintiff.  Even taking

Plaintiff's allegation that Payne raped her in July 2013 as so, for the purposes of the instant

motion, what followed for the ensuing two years, as Plaintiff concedes, was a "sexual

relationship" characterized by Plaintiff's exchange of erotic emails and expressions of affection

for Payne.  Am. Compl. ¶ 31.  Plaintiff alleges that Payne continually expressed "romantic

interest" in her, *id.* ¶ 27, 30, 86, and she acknowledges her "willingness to engage in sexual

conduct with" him, *id.* 92.  Under these circumstances, Payne's characterization of the

relationship as a "romantic affair"—if assumed not to be an unactionable opinion—can hardly be

characterized as a false statement of fact.  Indeed, at the very least, Plaintiff's allegations

establish that Payne could reasonably have believed the relationship was "romantic," and they

fall far short of establishing that he had any "serious doubts" about the statement's truth.

   ***Defendants 21CF and Fox.***  To establish "actual malice" by the corporate defendants,

the Amended Complaint must allege facts showing a corporate agent whose acts can be imputed

to them acted with actual malice.  *See, e.g., Dongguk Univ. v. Yale Univ.*, 734 F.3d 113, 123 (2d

Cir. 2013) ("When there are multiple actors involved in an organizational defendant's publication of a defamatory statement, the plaintiff must identify the individual responsible for publication of a statement, and it is that individual the plaintiff must prove acted with actual malice.").  There is no individual whose actual malice can be imputed to the corporate defendants because, as discussed above, the Amended Complaint cannot establish actual malice on the part of Defendants Briganti, Brandi or Payne.

In addition, under the principles of agency law, Payne's state of mind regarding the alleged defamatory statements cannot be imputed to 21CF and Fox.  It is axiomatic that the knowledge of a corporation's employee can be imputed to the corporation only when the employee is acting within the scope of his authority.  *See Reino de España v. Am. Bureau of Shipping, Inc.*, 691 F.3d 461, 473 (2d Cir. 2012).  As a result, facts hidden from an employer cannot be imputed to the employer.  *See New York v. United Parcel Serv., Inc.*, 253 F. Supp. 3d 583, 670 (S.D.N.Y. 2017).  Moreover, under the adverse interest exception, where the agent has completely abandoned the employer's interests and is acting entirely for his own purposes, he cannot be said to be acting within the scope of his employment.  *Id.*  Thus, courts have ruled that the knowledge of employees accused of sexually abusive behavior cannot be imputed to employers.  *See, e.g.*, *Holmes v. Lorch*, 329 F. Supp. 2d 516, 531–532 (S.D.N.Y. 2004); *Del Castillo v. Pathmark Stores, Inc.*, 941 F. Supp. 437, 439 (S.D.N.Y. 1996); *N.X. v. Cabrini Med. Ctr.*, 97 N.Y.2d 247, 251–252 (2002).  Payne's knowledge of the nature of his sexual encounters with Hughes cannot be imputed to 21CF and Fox, and cannot establish their actual malice.

**V.  Plaintiff's Claim of Gender-Motivated Violence Under the New York City Administrative Code Should Be Dismissed Because Plaintiff Fails to Allege Facts Sufficient to State a Claim, and Because the Code Provision Is Unconstitutionally Vague**

The Court also should dismiss Plaintiff's claim against Payne under the Victims of Gender-Motivated Violence Act, N.Y.C. Admin. Code §§ 8-901 *et seq.* (the "GMVA").[17]  As a matter of pleading, Plaintiff's claim fails because Plaintiff has not alleged facts legally sufficient to establish the requisite element of gender animus. Indeed, every New York court that has addressed the pleading requirements under the GMVA has dismissed the claim, having concluded that the plaintiffs had failed to viably plead "animus."  While these prior cases readily disposed of the GMVA claim because the factual allegations were legally insufficient, none of them (and no other New York court has) addressed what criteria *would* be required to satisfy the GMVA's "animus" element.  That unresolved issue, in turn, creates an independent basis for dismissal of Plaintiff's GMVA claim on constitutional grounds.  Specifically, in enacting the GMVA, the New York City Council failed to provide any intelligible standard to apply to the incurably vague term "animus," and, in doing so, improperly delegated its legislative function to the judiciary in violation of the New York Constitution's requirements concerning separation of powers.

**A.  Plaintiff Has Failed To Plead Sufficient Facts of Gender Animus Under the GMVA**

The GMVA claim should be dismissed because Plaintiff has failed to allege facts legally sufficient to sustain her claim.  The GMVA requires that the plaintiff plead and prove three elements: (1) the defendant committed "a crime of violence;" (2)  the defendant committed the

---

[17]     Payne vehemently denies Plaintiff's allegations, including, specifically, the allegations of rape and sexual assault, but acknowledges that, for the purpose only of considering the dispositive motion, the Court is required to accept the allegations as so.

"crime of violence because of gender or on the basis of gender" ***and*** (3) the "crime of violence" was "due, at least in part, to an animus based on the victim's gender." § 8-903.[18]  The GMVA does not define the term "animus."  Under well-established principles of statutory construction, courts are required to give effect  to all words in a statute,  and, therefore, "animus" must have a meaning independent of—and in addition to—the GMVA's requirement that the act be committed "because of" or "on the basis of gender."  *See Corley v. United States*, 556 U.S. 303, 314 (2009) (noting "one of the most basic interpretive canons" that a "statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant") (citation omitted).  In short, under the GMVA, "[e]very rape is not a gender-motivated hate crime."  *Gottwald v. Sebert*, No. 653118/2014, 2016 WL 1365969, at *9 (Sup. Ct. N.Y. Cty. Apr. 6, 2016).  In the three reported cases involving GMVA claims, each New York court concluded that the additional element of "animus" required that the defendant act with something more than just motivation based on gender, and in each case, the court found that the plaintiff had failed to allege sufficient facts of gender-specific animus.

In *Gottwald*, 2016 WL 1365969, at *4, *9, the court dismissed a GMVA claim where the plaintiff alleged that the defendant repeatedly had drugged and raped her, made negative comments about plaintiff's body, told her to lose weight, and threatened to destroy her career if she reported him.  These allegations were held insufficient to demonstrate "animus," and the claim was dismissed.  *Id.*

---

[18]     Plaintiff erroneously contends that proof of "animus" is *optional* if the plaintiff pleads or proves that the alleged conduct was based on gender.  The Amended Complaint conveniently and incorrectly casts the "animus" requirement of the GMVA in the disjunctive with the "gender basis" requirement by using the term "***and/or***."  *See* Am. Compl. ¶ 231 (emphasis added). That is not what the statute says.  To satisfy the GMVA, the plaintiff must prove ***both*** that (i) the defendant committed the "crime of violence" "because of [plaintiff's] gender or on the basis of gender" ***and*** (ii) "the crime of violence" "was "due, at least in part, to an animus based on the victim's gender."  §§ 8-903(b), 904.

In *Cordero v. Epstein*, 22 Misc. 3d 161, 163 (Sup. Ct. N.Y. Cty. 2008), the plaintiff, a transgender woman, alleged that the defendant had "forcibly touched her private parts" and forced her "to perform oral sex."  The Court dismissed on the pleadings because the complaint had failed "to state any facts showing that [defendant]'s alleged acts demonstrated any hostility based on gender."  *Id.* at 168.  In *Adams v. Jenkins*, No. 115745/03, 2005 WL 6584554 (Sup. Ct. N.Y. Cty. Apr. 22, 2005), the plaintiff alleged that the defendant slapped and pushed her, called her a "bitch," threatened to kill her, and referred to her in gender-demeaning language.  She also claimed that previously she and defendant had been romantically involved and, during that time, the defendant had raped and sexual assaulted her.  *Id.* at *1.  On these allegations, the Court held that plaintiff had failed to plead that the "alleged assault was motivated by gender bias" and dismissed the GMVA claim.  *Id.* at *4.

As against these decisions, Plaintiff here alleges that, in July 2013, at the outset of a two-year sexual relationship, Payne sexually assaulted and raped her.  Am. Compl. ¶¶ 79, 92, 113.  Plaintiff offers a single, conclusory allegation concerning Payne's "sexually violent treatment of women; and/or (ii) his repeated, discriminatory, misogynistic conduct towards women," *id.* ¶ 232, but alleges no *facts* to demonstrate "animus."  Strikingly absent from the Amended Complaint are additional factual allegations that qualitatively differ from those that simply cite the statutory language.  Plaintiff's conclusory and "naked assertion devoid of further factual enhancement" does not suffice under Rule 12(b)(6).  *Iqbal,* 556 U.S. at 678 (alterations and internal quotation marks omitted).

Moreover, Plaintiff's allegations of gender-based animus are even more lacking than the allegations that failed the plaintiffs in the above-cited New York cases.  *See Gottwald,* 2016 WL 1365969 at *4, 9; *Cordero*, 22 Misc. 3d at 168; *Adams*, 2005 WL 6584554 at *4.  Here, Plaintiff

does not allege that Payne ever insulted her, used gender-demeaning language or otherwise demonstrated "animus" toward women as a class.  On the contrary, Plaintiff acknowledges that, "[f]rom the beginning" Payne "expressed his romantic interest" in Plaintiff and offered to "help advance her career."  Am. Compl. ¶ 27.  Plaintiff asserts that, dating back to the spring of 2013, she and Payne had corresponded with each other and he "expressed his willingness to mentor [Plaintiff] as a way to help advance her career and opportunities"—and that he continued to openly display "his romantic interest in" her.  *Id.* ¶¶ 76, 86.  Plaintiff fully acknowledges that she was the beneficiary of Payne's allegedly "sexually motivated favoritism."  *Id.* ¶ 86.  She also concedes that she wrote personal emails to Payne—two months after she alleges he had raped her—in which she expressed explicit sexual interest in Payne.  *Id*. ¶ 8; Ex. P.  Such allegations hardly support—and in fact are entirely inconsistent with—any conceivable interpretation of the term "animus" and thus render Plaintiff's GMVA claim fatally implausible. *See Iqbal*, 556 U.S. at 678 (requiring a plaintiff to "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable").

The original Complaint alleged that, on various occasions, Payne expressed anger at Plaintiff by yelling or grabbing her arm.  Compl. ¶¶ 79, 80.  The Amended Complaint adds new allegations concerning Payne's expressions of anger, without identifying the gender of those to whom the expressions were allegedly directed, including that others "were aware of Payne's temper and propensity for yelling and screaming at the workplace," Am. Compl. ¶ 95, and that another Fox employee "witnessed Payne's 'tantrums' at the workplace" on unspecified dates.  *Id.* ¶ 96.  But such allegations do not support any inference that Payne harbored an animus or hostility against women.  Plaintiff's allegation that Payne's behavior "created an environment of fear" was made without regard to gender.  Plaintiff also points out Payne's physically imposing

stature.  *See id.* ¶ 98.  A finding of "animus" cannot logically be based merely on the physical size of a defendant.  In addition, Plaintiff's vague allegation that Payne gave an "inappropriate" hug to a female colleague, *id.* at 95, is, at most, neutral on the issue of gender animus.  Plaintiff does not allege that the hug reflected some sort of hostility or animosity toward the colleague or her, let alone toward women as a class.  Given that Plaintiff now has had the opportunity to amend her complaint in response to Defendants' arguments concerning its deficiencies, the absence of any facts suggesting gender "animus" is striking.  Plaintiff's pleading failure is fatal to her claim.

### B. In Enacting the GMVA, the New York City Council Improperly Delegated Legislative Power to the Judiciary Branch in Violation of the Separation of Powers Mandate of the New York Constitution

The Court also should dismiss Plaintiff's GMVA claim because it is unconstitutionally vague.  In enacting the GMVA, the New York City Council provided no definition or guidance on the meaning of the term "animus."  Where, as here, a statute is so vague that a court has no legislative guidance or intelligible principle other than conjecture on which to base its ruling, the legislature has violated the constitutional mandate of separation of powers by improperly delegating legislative authority to the judicial branch.  *See* N.Y. Const. art. III, § 1 ("The legislative power of this state shall be vested in the senate and assembly."); *Levine v. Whalen*, 39 N.Y.2d 510, 516 (1976) (a statute is invalid if it is "so vague and indefinite as to set no standard or to outline no policy"); *see also Mistretta v. United States*, 488 U.S. 361, 372 (1989) (under the U.S. Constitution, "legislative action is not a forbidden delegation of legislative power" so long as the legislature provides "an intelligible principle to which the person or body authorized to [exercise the delegated authority] is directed to conform") (citation omitted); *Bd. of Tr. of the Jud. Form Ret. Sys. v. Attorney General*, 132 S.W.3d 770, 785 (Ky. 2003) (statute held so unintelligible as to constitute an unconstitutional delegation).

Likewise, here, there is no intelligible principle or discernible standard for the term

"animus" when it is considered as part of the statute's text.  Neither the GMVA nor its legislative

history (which is silent as to "animus"), the legislative history of its federal analog, *see* 42 U.S.C.

§ 13981, or any canon of statutory construction, provides a workable definition.  *See Travelers*

*Ins. Co. v. 633 Third Assoc.*, 14 F.3d 114, 119 (2d Cir. 1994) (in considering unclear state

statute, federal courts are to review, *inter alia*, statutory language, pertinent legislative history,

and state and federal decisional law).  Accordingly, the GMVA is an improper delegation of the

City Council's legislative authority, in violation of the New York Constitution, requiring

dismissal of Plaintiff's claim.

## CONCLUSION

As set forth above, Defendants' motion pursuant to Federal Rule of Civil Procedure

12(b)(6) to dismiss the Amended Complaint with prejudice should be granted.

Dated: New York, New York
　　　　January 26, 2018

DECHERT LLP                                           FOLEY & LARDNER LLP


By  /s/ Linda C. Goldstein            　　By   /s/ Jonathan N. Halpern (with permission)
　　Andrew J. Levander                          Jonathan N. Halpern
　　Linda C. Goldstein                             Jonathan L. Israel
　　Nicolle L. Jacoby                               Rachel E. Kramer

1095 Avenue of the Americas               90 Park Avenue
New York, New York 10036                  New York, New York 10016
(212) 698-3500                                        (212) 682-7474

*Attorneys for Defendants Twenty-First*      *Attorneys for Defendant Charles Payne*
*Century Fox, Inc., Fox News Network, LLC,*
*Dianne Brandi and Irena Briganti*