**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------ X

SCOTTIE NELL HUGHES,                            :
                                                :
                              Plaintiff,         :        Civil Action No.: 17-cv-07093 (WHP)
                                                :
              v.                                :
                                                :
TWENTY-FIRST CENTURY FOX, INC., FOX             :
NEWS NETWORK LLC, DIANNE BRANDI, in             :
her individual and professional capacities, and :
IRENA BRIGANTI, in her individual and           :
professional capacities, CHARLES PAYNE, in his  :
individual and professional capacities,         :
                                                :
                              Defendants.        :
------------------------------------------------------------ X

### PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' JOINT MOTION TO DISMISS THE AMENDED COMPLAINT

Submitted by:

**WIGDOR LLP**

Jeanne M. Christensen
Michael J. Willemin

85 Fifth Avenue
New York, NY 10003
Telephone:  (212) 257-6800
Facsimile:  (212) 257-6845

*Counsel for Plaintiff*

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..................................................................................... ii

PRELIMINARY STATEMENT.................................................................................1

ARGUMENT ...........................................................................................................4

I.      LEGAL STANDARD FOR A RULE 12(b)(6) MOTION ..................................4

II.     DEFENDANTS IMPROPERLY ATTACHED TWENTY-ONE EXHIBITS TO THEIR
        MOTION.....................................................................................................4

III.    THE COMPLAINT PROPERLY PLEADS CLAIMS UNDER THE FEDERAL,
        STATE AND CITY DISCRIMINATION LAWS ................................................7

IV.     THE AGENCY RELATIONSHIP DOES NOT HINGE ON THE EXISTENCE
        OF MONETARY PAYMENTS......................................................................11

        A.      State and City Claims.....................................................................13

        B.      Promise of Payment .......................................................................14

V.      MS. HUGHES WAS A CANDIDATE FOR  POSITION AT FOX ....................17

VI.     PAYNE HAD THE POWER TO SUBJECT MS. HUGHES TO
        ADVERSE EMPLOYMENT ACTIONS .........................................................20

VII.    MS. HUGHES'S CLAIMS ARE NOT TIME-BARRED....................................22

VIII.   THE COMPLAINT ALLEGES RETALIATION CLAIMS.................................23

IX.     BRANDI AND BRIGANTI ARE PROPER DEFENDANTS ............................30

X.      COMMUNICATIONS TO THE NATIONAL ENQUIRER THAT
        WERE KNOWINGLY FALSE AND MALICIOUS ARE DEFAMATORY ..........33

XI.     THE COMPLAINT ESTABLISHES A CLAIM UNDER THE
        GENDER-MOTIVATED VIOLENCE ACT ...................................................35

CONCLUSION.......................................................................................................38

i

## **TABLE OF AUTHORITIES**

**Cases**

Amaker v. Weiner,
    179 F.3d 48 (2d Cir. 1999)..................................................................... 6

Ashcroft v. Iqbal,
    556 U.S. 662 (2009).................................................................... 2, 4, 8

Aymes v. Bonelli,
    980 F.2d 857 (2d Cir. 1992)................................................................. 12

Bray v. Alexandria Women's Health Clinic,
    506 U.S. 263 (1993)................................................................... 36, 37

Burlington Northern & Santa Fe Railway Co. v. White,
    548 U.S. 53 (2006)...................................................................... 32

Cadet-Legros v. New York Univ. Hosp. Ctr.,
    2015 N.Y. Slip. Op. 08984 (1st Dep't 2015)..................................................... 7

Community for Creative Non–Violence v. Reid,
    490 U.S. 730 (1989)............................................................ 8, 11, 12, 13

Courtenay Commc'ns Corp. v. Hall,
    334 F.3d 210 (2d Cir. 2003)............................................................. 4, 5, 6

Dawson v. N.Y. City Transit Auth.,
    624 F. App'x 763 (2d Cir. 2015) ........................................................... 2, 3

Doe v. Columbia University,
    831 F.3d 46 (2d Cir. 2016).......................................................... 2, 3, 4, 7

Eisenberg v. Advance Relocation & Storage, Inc.,
    237 F.3d 111 (2d Cir. 2000)............................................................... 12

Faulkner v. Beer,
    463 F.3d 130 (2d Cir. 2006)................................................................ 4

Gallagher v. AEG Mgmt. Brooklyn, LLC,
    No. 16 Civ. 4779, 2017 WL 2345658 (E.D.N.Y. May 30, 2017)......................................... 12

Gentile v. State Bar of Nev.,
    501 U.S. 1030 (1991)..................................................................... 37

Gorokhovsky v. New York City Housing Auth.,
    552 Fed. App'x 100 (2d Cir. 2014)................................................................ 7

Hassanein v. Gino's Italian Rest. on 5th,
    No. 16 Civ. 3365 (AMD)(ST), 2017 WL 4350515 (E.D.N.Y. Mar. 27, 2017) ...................... 8

Knight v. State Univ. of New York at Stony Brook,
    No. 13 Civ. 0481 (JS)(GRB), 2014 WL 4639100 (E.D.N.Y. Sept. 16, 2014) ...................... 8

Knight v. State Univ. of New York at Stony Brook,
    No. 17 Civ. 54 (JS), 2018 WL 576703 (2d Cir. Jan. 29, 2018) ........................................... 3, 9

Littlejohn v. City of New York,
    795 F.3d 297 (2d Cir. 2015)................................................................... 2, 4

McDonnell Douglas Corp. v. Green,
    411 U.S. 792 (1973)........................................................................... 2, 7

Mihalik v. Credit Agricole Cheuvreux,
    715 F.3d 102 (2d Cir. 2013).................................................................. 7

Miller v. California,
    413 U.S. 15 (1973)............................................................................ 36

Nat'l R.R. Passenger Corp. v. Morgan,
    536 U.S. 101 (2002)........................................................................... 23

New York State Nat. Org. for Women v. Terry,
    886 F.2d 1339 (2d Cir. 1989)................................................................ 37

O'Connor v. Davis,
    126 F.3d 112 (2d Cir. 1997).................................................................. 14

People v. Fox,
    844 N.Y.S. 2d 627 (N.Y. Sup. Ct., Kings Cty. 2007)............................................. 36

People v. Illardo,
    48 N.Y.2d 408 (1979) ....................................................................... 36

People v. New York Trap Rock Corp.,
    57 N.Y.2d 371 (1982) ........................................................................ 37

Pietras v. Bd. of Fire Comm'rs of the Farmingville Fire Dist.,
    180 F.3d 468 (2d Cir. 1999)................................................................ 12

Reynolds v. Barrett,
    685 F.3d 193 (2d Cir. 2012)..................................................................................7

Salamon v. Our Lady of Victory Hosp.,
    No. 06 Civ. 1707, 2008 WL 2609712 (2d Cir. Jan. 16, 2008)...............................12

Schwab v. Smalls,
    435 F. App'x 37 (2d Cir. 2011) ............................................................................4

Sellers v. M.C. Floor Crafters, Inc.,
    842 F.2d 639 (2d Cir. 1988)..................................................................................6

Speedmark Transp., Inc. v. Mui,
    778 F. Supp. 2d 439 (S.D.N.Y. 2011)................................................................5, 6

Swierkiewicz v. Sorema, N.A.,
    534 U.S. 506 (2002)..............................................................................................4

United States v. Brennan,
    650 F.3d 65 (2d Cir. 2011)....................................................................................7

Vega v. Hempstead Union Free Sch. Dist.,
    801 F.3d 72 (2d Cir. 2015)....................................................................................4

Wadler v. E. Coll. Athletic Conference,
    No. 00 Civ. 5671 (JSM) 2003 WL 21961119 (S.D.N.Y. Aug. 14, 2003) .......................14, 15

Wang v. Phoenix Satellite Television US, Inc.,
    976 F. Supp. 2d 527 (S.D.N.Y. 2013)................................................................13

Williams v. N.Y.C. Hous. Auth.,
    61 A.D.3d 62 (1st Dep't 2009) .............................................................................7

York v. Ass'n of Bar of City of New York,
    286 F.3d 122 (2d Cir. 2002)................................................................................14

**Other Authorities**

42 U.S.C. § 2000e ...................................................................................11, 22, 23

Fed. R. Civ. P. 8(a)(2) ...................................................................................2, 37

NYC Admin. Code §§ 8-901 ...................................................................................3

N.Y. Penal Law, Article 130........................................................................36

In a story that is becoming all too familiar, Fox is protecting a male on-air talent accused of sexually predatory behavior by messaging that his female accuser is to blame.  Here, Fox's motivations are transparent:  Protect Charles Payne in order to protect Fox.  It is clear that Fox values its own protection more highly than the need to punish Charles Payne.  To succeed, Fox must discredit the female victim by casting doubt on her moral character and spin her legal claims as mere attempts to capture the limelight.  Disgracefully, that *modus operandi* is at play in this litigation.

## PRELIMINARY STATEMENT

Plaintiff Scottie Nell Hughes ("Ms. Hughes" or "Plaintiff") commenced this action against Defendants Twenty-First Century Fox, Inc. ("21st Century Fox"), Fox News Network LLC ("Fox News," and, together, "Fox" or the "Company"), Dianne Brandi ("Brandi"), Irena Briganti ("Briganti") and Charles Payne ("Payne") (collectively with Fox, "Defendants"), after Fox maliciously leaked a false story to the National Enquirer about Ms. Hughes and Payne, the host of Fox's program *Making Money*.  Just days before Fox provided information to the National Enquirer, Ms. Hughes contacted Fox to report that she had been sexually assaulted and raped by Payne several months after she started appearing on Fox programs.  Ms. Hughes disclosed other facts that reasonably placed Fox on notice of her legally protected complaints, including that she experienced *quid pro quo* sexual discrimination by Payne.  Flouting the protections afforded to Ms. Hughes under the federal, state and city discrimination laws, Fox recklessly opted to retaliate.

1

The retaliation is not over.  Fox uses this motion to shamelessly attack Ms. Hughes's character and employs classic victim-shaming.[1]  By not disputing whether the Complaint[2] gives Defendants "fair notice" of the basis of her claims, Fox fails to analyze Ms. Hughes's allegations against the applicable law, and instead, argues their motion under summary judgment standards.[3]

The principal question on a motion to dismiss for failure to state a claim is whether the complaint contains a "short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. ("Rule") 8(a)(2).  The standard prohibits plaintiffs from submitting pleadings that contain little more than "threadbare recitals" of causes of action supported by broad, conclusory statements.  Recently, the Second Circuit issued a number of decisions emphasizing the lenient pleading standard plaintiffs face in employment discrimination cases.  Specifically, the Second Circuit reminds courts that the temporary presumption under McDonnell Douglas that reduces the facts a plaintiff needs to defeat a motion for summary judgment, similarly works to "reduce the facts needed to be pleaded under Iqbal."  Doe v. Columbia University, 831 F.3d 46, 54 (2d Cir. 2016) (quoting Littlejohn v. City of New York, 795 F.3d 297, 307-08 (2d Cir. 2015)); Dawson v. N.Y. City Transit Auth., 624 F. App'x 763, 770 (2d Cir. 2015)

---

[1]     For example, in reference to a book authored by Ms. Hughes, Defendants write: "**In light of her allegations in this case, it is also remarkable that in that same book, she thanked Payne for his 'kindness' as one of her many 'mentors' in the 'broadcast business.'**"  Dkt. No. 35, Defendants' Joint Memorandum of Law in Support of Defendants' Motion to Dismiss the Amended Complaint ("Defs' Br."), at p. 12.

[2]     All references to the Complaint refer to the Amended Complaint filed on or about December 29, 2017.  See Dkt. No. 29.

[3]     It is standard operating procedure for Fox to act as if it is entitled to operate above the law.  For years, Fox's approach to litigation has been to bully and threaten.  Already in this case, Fox has sent information subpoenas to former male associates of Ms. Hughes seeking information about Ms. Hughes's "sexual or romantic" communications; relationships "with persons other than her husband;" and "video or audio recordings" of Ms. Hughes of "a sexual or romantic nature."  Notably, these subpoenas were directed to persons who have no relationship to Fox, Charles Payne or the claims in this litigation.  See Dkt. No. 37.

("At the pleading stage, district courts would do well to remember this exceedingly low burden that discrimination plaintiffs face.").

Here, to grant Defendants' dismissal as requested, the Court must "evaluate the truth as to what really happened." Doe, 831 F.3d at 59. Such an analysis is prohibited on a Rule 12(b)(6) motion. Id. Defendants dispute that Ms. Hughes was an employee for purposes of federal, state or city discrimination law. This is a question of fact. As the Hon. Joanna Seybert recently ruled, and the Second Circuit affirmed, the question of whether an individual is an employee of a defendant for the purposes of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq*. ("Title VII") is a fact-sensitive inquiry reserved for the jury. See Knight v. State Univ. of New York at Stony Brook, No. 17 Civ. 54 (JS), 2018 WL 576703, at *5 (2d Cir. Jan. 29, 2018). This is the precise issue here. Such a fact intensive inquiry can be made only after discovery. The Complaint contains more than ample allegations to properly notice Defendants of Ms. Hughes's claims and plausibly support her causes of action. However, discovery has not occurred and this is not a Rule 56 motion.

Ms. Hughes's allegations are much more than "thread-bare" and provide substantial facts that, if proven, substantiate her causes of action. Defendants' other arguments in support of dismissal fail. The Complaint contains multiple allegations setting forth "fair notice" of Ms. Hughes's claims for retaliation against Fox and the individually named Defendants. Outside of the unlawful employment practice claims, the Complaint also provides ample facts in support of defamation claims. Finally, the Gender Motivated Violence Act, NYC Admin. Code §§ 8-901, *et seq*. (the "GMVA"), was enacted in order to protect women from precisely the harm as alleged by Ms. Hughes against Payne.

3

## ARGUMENT

### I.      LEGAL STANDARD FOR A RULE 12(b)(6) MOTION

In reviewing a motion for dismiss under Rule 12(b)(6), all factual allegations in the complaint are accepted as true and all reasonable inferences are drawn in the plaintiff's favor. Vega v. Hempstead Union Free Sch. Dist., 801 F.3d 72, 78 (2d Cir. 2015). To survive a motion to dismiss, the complaint must "state a claim to relief that is plausible on its face," which requires the plaintiff to plead facts permitting "'the reasonable inference that the defendant is liable for the misconduct alleged.'" Schwab v. Smalls, 435 F. App'x 37, 39 (2d Cir. 2011) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)). The complaint should not be dismissed unless it appears beyond doubt that the plaintiff can prove no set of facts in support of her claim which would entitle her to relief. See, e.g., Swierkiewicz v. Sorema, N.A., 534 U.S. 506, 508 (2002); Littlejohn, 795 F.3d at 307-08. The issues raised by Defendants impose "too high a burden on plaintiffs alleging discrimination at the 12(b)(6) stage." Doe, 831 F.3d at 55 n.8. In Doe, the Second Circuit held:

> The role of the court at this [Rule 12(b)(6)] stage of the proceedings *is not in any way to evaluate the truth as to what really happened*, but merely to determine whether plaintiff's factual allegations are sufficient to allow the case to proceed.

Doe, 831 F.3d at 59 (emphasis added).

### II.     DEFENDANTS IMPROPERLY ATTACHED TWENTY-ONE EXHIBITS TO THEIR MOTION

"[C]onsideration of a motion to dismiss under Rule 12(b)(6) is limited to consideration of the complaint itself." Faulkner v. Beer, 463 F.3d 130, 134 (2d Cir. 2006). Second Circuit precedent holds that "the district court may not consider matters outside the pleadings without converting the motion into a motion for summary judgment." Courtenay Commc'ns Corp. v.

Hall, 334 F.3d 210, 213 (2d Cir. 2003); see also Speedmark Transp., Inc. v. Mui, 778 F. Supp. 2d 439, 440 n.1 (S.D.N.Y. 2011) ("The Court declines to consider these extraneous materials and will not convert defendants' motion to dismiss into one for summary judgment, since plaintiffs have not had the opportunity to take discovery from defendants.").

In support of its motion to dismiss, Defendants attach twenty-one exhibits. See Dkt. No. 36, Declaration of Linda Goldstein, at Exs. A-U. These materials were submitted outside the pleadings in support of the Rule 12(b)(6) motion to dismiss. Without reviewing each exhibit, the attachments include such improper items as:

- Transcripts from Fox programs that are included in an effort to show Ms. Hughes's opinions on relationships between men and women in the workplace, Id. at Exs. B-C;

- News articles ridiculing Ms. Hughes included to humiliate and bully her for bringing this litigation, Id. at Exs. F-L;

- A Saturday Night Live segment mocking Ms. Hughes as if to show that her short-comings caused the alleged blacklisting by Fox, Id. at Exs. D-E; and

- Excerpts from a book written by Ms. Hughes to purportedly evidence her "relentless bid for the media spotlight." Id. at Ex. U.

Incredulously, Defendants include a number of exhibits they claim are necessary to an analysis of whether Ms. Hughes is a "public figure" in connection with the defamation claims. It is uncontested that Ms. Hughes is a public figure, and the Complaint does not attempt to classify Ms. Hughes as anything but a public figure. As clearly discernable from the defamation causes of action, the elements are pleaded for purposes of a public figure to recover for defamatory conduct. There can be no other interpretation. Ignoring this truth, Defendants attach exhibits that are meant for no other purpose than to humiliate, embarrass, and punish Ms. Hughes for

bringing this action.[4]  These exhibits are a feigned attempt to discredit Ms. Hughes's character and cast doubt on her credibility.  The decision to attach these exhibits exceeds mere inappropriateness or reprehensible conduct.

Under Rules 12(b) and 12(c) applicable to motions to dismiss generally, a court must not consider matters submitted *outside the pleadings*, unless notice is given to all parties that the motion is being converted to a motion for summary judgment and the parties are afforded a reasonable opportunity to present additional evidentiary information.  See, e.g., Hall, 334 F.3d at 213; Sellers v. M.C. Floor Crafters, Inc., 842 F.2d 639, 642 (2d Cir. 1988); Mui, 778 F. Supp. 2d at 440 n.1.  Moreover, the Second Circuit has strictly enforced "the conversion requirement of a Rule 12(b)(6) motion where there is a legitimate possibility that the district court relied on inappropriate material in granting the motion."  Amaker v. Weiner, 179 F.3d 48, 50 (2d Cir. 1999).

Plaintiff respectfully requests, pursuant to Rule 12(d)(2), that the Court determine that Defendants' exhibits must be excluded in deciding this motion to dismiss.  However, if the Court considers this additional documentation, conversion of the instant motion from a Rule 12(b)(6) motion to a summary judgment motion is necessary.  Should conversion to a summary judgment motion occur, Plaintiff requests a reasonable opportunity to present material pertinent to a summary judgment motion.

---

[4]   Fox attaches exhibits such as "erotic emails" between Plaintiff and Payne, media accounts of the sexual nature of the relationship between Plaintiff and Payne, as well as commentary Ms. Hughes made about women that are irrelevant to the claims in this action.  See Dkt. No. 36, at Exs. B-C, E, P.

III.   **THE COMPLAINT PROPERLY PLEADS CLAIMS UNDER THE FEDERAL, STATE AND CITY DISCRIMINATION LAWS**

Ms. Hughes need not plead a *prima facie* case of discrimination and retaliation to survive a motion to dismiss.  However, for purposes of establishing a claim of intentional discrimination under Title VII, the complaint must allege that Ms. Hughes: (1) is a member of a protected class; (2) was qualified for the position she held; (3) suffered an adverse employment action; and (4) the adverse action took place under circumstances giving rise to [an] inference of discrimination. See, e.g., Reynolds v. Barrett, 685 F.3d 193, 202 (2d Cir. 2012); United States v. Brennan, 650 F.3d 65, 93 (2d Cir. 2011).[5]  At the pleading stage, if a plaintiff sets forth "plausible support to a minimal inference of discriminatory motivation," a presumption of discrimination arises, which the defendant must then rebut by offering legitimate and non-discriminatory reasons for the adverse employment action demonstrated in the plaintiff's allegations.  See Doe, 831 F.3d at 53-54 (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973)).

Unquestionably, the Complaint sets forth numerous facts that support claims under Title VII, the New York State Human Rights Law ("NYSHRL"), as well as the New York City Human Rights Law ("NYCHRL").  Ms. Hughes provides details showing that Defendants subjected her to pervasive discrimination, adverse employment actions and that the adverse actions took place under circumstances giving rise to inferences of discrimination.  Her detailed allegations are specific, non-conclusory facts that place Defendants on notice of the claims against them, and if

---

[5]     The standard under New York City law is less stringent.   "To state a claim for discrimination under the NYCHRL, a plaintiff must only show differential treatment of any degree based on a discriminatory motive; 'the NYCHRL does not require either materially adverse employment actions or severe and pervasive conduct.'"  Gorokhovsky v. New York City Housing Auth., 552 Fed. App'x 100, 102 (2d Cir. 2014) (quoting Mihalik v. Credit Agricole Cheuvreux, 715 F.3d 102, 114 (2d Cir. 2013)); see Williams v. N.Y.C. Hous. Auth., 61 A.D.3d 62 (1st Dep't 2009); Cadet-Legros v. New York Univ. Hosp. Ctr., 2015 N.Y. Slip. Op. 08984 (1st Dep't 2015) (noting that the NYCHRL "does not set forth a requirement that an adverse action be 'materially' adverse'")).

taken as true, plausibly suggest her entitlement to relief.  In connection with the appalling conduct that Payne inflicted on Ms. Hughes, within his role of supervisor and host of a program that reaches millions of viewers on a regular basis, the Complaint details facts that go far beyond reciting the elements of a claim of discrimination, including *quid pro quo* discrimination and retaliation.  Such allegations are neither "bald" nor "conclusory," and therefore entitled to a presumption of the truth.  Iqbal, 556 U.S. at 681.

Not surprisingly, the gravamen of Defendants' motion to dismiss does not concern the crux of the discrimination claims or the retaliation inflicted after Ms. Hughes engaged in protected complaints.  Weakly, Defendants argue that all causes of action relating to Title VII, the NYSHRL and the NYCHRL warrant dismissal because Ms. Hughes cannot prove that she is properly classified as an "employee" as that term is defined in Title VII, the NYSHRL and the NYCHRL.  It is well-settled that the question of whether or not an employee-employer relationship exists for purposes of discrimination or retaliation under federal, state or city law, is a "factual inquiry" that is inappropriate at the pleading stage of litigation.  See, e.g., Hassanein v. Gino's Italian Rest. on 5th, No. 16 Civ. 3365 (AMD)(ST), 2017 WL 4350515, at *7 (E.D.N.Y. Mar. 27, 2017); Knight v. State Univ. of New York at Stony Brook, No. 13 Civ. 0481 JS GRB, 2014 WL 4639100, at *3 (E.D.N.Y. Sept. 16, 2014) (denying defendant's motion to dismiss despite the absence of allegations pertaining to several Reid factors in an amended complaint); Harrington v. Potter, No. 09 Civ. 1322, 2010 WL 2178504, at *3 (N.D.N.Y. May 28, 2010) (holding that a decision on a worker's employment status is a factual determination that cannot be made on a motion to dismiss because it requires a court to review evidence beyond the allegations in a complaint).

Thus, the question is an issue for the trier of fact.  Knight, 2018 WL 576703, at *5.  For Rule 8(a) pleading purposes, the Complaint includes far more facts than necessary to show that, pursuant to common law agency principles, Ms. Hughes was an employee for purposes of holding Defendants accountable for their reprehensible conduct in violation of discrimination laws.  For example, the allegations include *inter alia*:

- Ms. Hughes worked as a political analyst, commentator and contributor on Fox programs.  Dkt. No. 29 at ¶ 39.

- Regardless of compensation arrangements, media outlets regularly label journalists, reporters, analysts or politicians who appear on programs to offer their opinions or views as "contributors."  Dkt. No. 29 at ¶ 40.

- In connection with her appearances on Fox programs, Ms. Hughes engaged in work with other Fox employees, producers, contributors, and commentators, to prepare for programs and otherwise collaborate for the substantive content of a program.  Dkt. No. 29 at ¶ 41.

- Ms. Hughes appeared more than 240 times on Fox programs and Fox and Payne dictated the terms of these appearances including the where and when, and by holding her "on call" to appear for 24-hours or more, cancelling last minute or rescheduling, warning that her noncompliance would result in no further appearances.  Dkt. No. 29 at ¶¶ 45-48, 55.

- Fox actively restricted Ms. Hughes's work outside of Fox by threatening no future appearances if she worked as a paid contributor for other streaming online shows such as Newsmax, The Blaze and NRATV because Fox considered these show competitors.  Dkt. No. 29 at ¶ 53.

- Ms. Hughes's work was performed on Fox's premises and Fox provided all of the resources and equipment for the production of its programs.  Dkt. No. 29 at ¶ 55.

- Fox and Payne also directed and controlled *how* Ms. Hughes performed, by controlling the content of the conversations on air and by providing Ms. Hughes with specific talking points and substantive responses; she was required to send talking points and

drafts of content to producers before programs for their edits and
revisions.  Dkt. No. 29 at ¶¶ 56-59.

- Fox controlled Ms. Hughes's appearance and actions on air by
  dictating the clothes she wore, her hair, make-up, and overall sex
  appeal to meet the "Fox look."  Dkt. No. 29 at ¶¶ 59-62.

- Fox and its hosts, such as Lou Dobbs and Payne, had the ability to
  ban individuals from appearing on their programs at a moment's
  notice, and Mr. Dobbs in fact "banned" Ms. Hughes from his
  shows after she disagreed with him on air.  Dkt. No. 29 at ¶¶ 64-
  66.

- At all times, Fox and Payne retained the power to terminate the
  work relationship, and used this power to threaten Ms. Hughes into
  her continued performance according to their directives.  Dkt. No.
  29 at ¶¶ 66-67.

- In connection with Ms. Hughes's appearances, Fox regularly paid
  for her travel to and from its headquarters at 1211 Avenue of the
  Americas, as well as covered the cost to do her hair and make-up
  for all of her appearances on Making Money.  Dkt. No. 29 at ¶ 71.

Accordingly, for pleading purposes, the Complaint contains far more allegations than
necessary showing that Defendants and Ms. Hughes operated within the boundaries of traditional
agency relationships.  Based on a multi-factor inquiry, Ms. Hughes was an employee such that
Defendants were not free to inflict abhorrent gender discrimination on her, as well as threaten her
with adverse repercussions should she fail to follow their directives or submit to Payne's lustful
desires.  Defendants cannot escape liability for their own unlawful employment practices based
on their self-serving depiction of Ms. Hughes as someone they did not consider to be an
"employee."  Rather, in discovery, Defendants must disclose how Fox executives, including, but
not limited to, Bill Shine ("Shine"), Payne and producers of Fox programs, perceived Ms.
Hughes as compared to similarly-situated individuals that may or may not have received
monetary payments for the same work.  Specifically, Defendants must disclose the evidence they
have to conclusively lead a trier of fact to determine that Ms. Hughes was not employee.

Defendants must disclose evidence showing that Ms. Hughes properly was not an employee – although what role Defendants believe she fit into exactly is unclear.  If Fox considered Ms. Hughes as a "volunteer," it must provide the basis for this belief.  Similarly, if Fox considered Ms. Hughes as an "unpaid intern," it must provide the basis for this belief.

## IV.    THE AGENCY RELATIONSHIP DOES NOT HINGE ON THE EXISTENCE OF MONETARY PAYMENTS

Defendants misleadingly claim that the "threshold issue" of monetary payments is an "essential condition to the existence of an employer-employee relationship."  Dkt. No. 35, Defs' Br., at p. 16.  This is inaccurate.  Further, throughout their motion, Defendants inappropriately lump the federal, state and city laws together for purposes of arguing this disputed question.

Because Title VII does not cover independent contractors, such disputes about properly defining the term "employee" stemmed from questions as to whether a plaintiff was an employee or an independent contractor.  The language of the act provides little clarity as an employee is defined only as "an individual employed by an employer."  42 U.S.C. § 2000e(f).  In order to determine that a plaintiff was not an independent contractor and thus deserved protection under Title VII, courts analyzed facts of individual cases according to common law agency principles.  See Community for Creative Non–Violence v. Reid, 490 U.S. 730, 751 (1989).  In Reid, the Supreme Court articulated the standard for determining whether an individual is an employee:

> In determining whether a hired party is an employee under the general common law of agency, we consider the hiring party's right to control the manner and means by which the product is accomplished. Among the other factors relevant to this inquiry are the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying the assistants; whether the work is part of the regular business of the hiring party; whether the

hiring party is in business; the provision of employee benefits; and
the tax treatment of the hired party.

Id. at 751-52.  "Though no single factor is dispositive, the 'greatest emphasis' should be placed

on the first factor --that is, on the extent to which the hiring party controls the 'manner and

means' by which the worker completes his or her assigned tasks."  Reid, 490 U.S. at 751-52.  In

the Second Circuit, for Title VII claims, whether an individual is an employee also depends on

whether they have received "direct or indirect remuneration from the alleged employer."  Pietras

v. Bd. of Fire Comm'rs of the Farmingville Fire Dist., 180 F.3d 468, 473 (2d Cir. 1999).  No one

factor is decisive and, in many cases, some factors have no relevance.  See, e.g., Aymes v.

Bonelli, 980 F.2d 857, 861 (2d Cir. 1992); Eisenberg v. Advance Relocation & Storage, Inc., 237

F.3d 111, 114 (2d Cir. 2000) (finding Reid factors that are irrelevant or of indeterminate weight

must be disregarded by a court) (internal quotation marks omitted); Salamon v. Our Lady of

Victory Hosp., No. 06 Civ. 1707, 2008 WL 2609712, at *7 (2d Cir. Jan. 16, 2008) (finding that

Reid factors that are either "irrelevant or of indeterminate weight" should be disregarded).

Contrary to Defendants' claims, monetary payments are not required.  When considering

the term "remuneration," courts apply a broad construction.  See Gallagher v. AEG Mgmt.

Brooklyn, LLC, No. 16 Civ. 4779, 2017 WL 2345658, at *3 (E.D.N.Y. May 30, 2017).  In

Gallagher the court clarified that:

> **The employee must receive a financial benefit, but it need not**
> **be monetary**.

Id. (emphasis added).  Thus, the issue of remuneration, whether direct or indirect, is but one

factor among many that a court must consider when assessing the agency relationship.

Tellingly, Defendants avoid any discussion of the thirteen Reid factors.  Similarly,

Defendants avoid discussion of any other factors from "non-exhaustive lists" of items that courts

12

have considered in various cases.  For purposes of this motion to dismiss, Ms. Hughes's allegations must be considered true; the only question being whether she includes facts that could plausibly support her claims.  Unquestionably, as set forth above, the Complaint contains a series of allegations directly relevant to an analysis under Reid.  Supra.  At a minimum, the existence of such allegations propels Ms. Hughes to the discovery phase of litigation as to whether she and Defendants were employees-employers for purposes of holding Defendants responsible for complying with the anti-discrimination laws.

### A.   State and City Claims

It is important to note that Defendants refer to federal court cases assessing Title VII claims as part of their argument that claims under the NYSHRL and NYCHRL deserve similar treatment.  Specifically, Defendants rely on the 2013 decision in Wang v. Phoenix Satellite Television US, Inc., 976 F. Supp. 2d 527 (S.D.N.Y. 2013).  However, outraged with the result, the Wang opinion caused city and state legislators to seek amendments of the laws regarding unpaid workers.  As a result, the NYCHRL was amended to include protection against sexual harassment and discrimination for unpaid interns.  The amended NYCHRL that went into effect on June 14, 2014, mandates that an intern is afforded protections "without regard to whether the employer pays them a salary or wage."[6]

Similarly, the amendment to the NYSHRL became effective on July 22, 2014, to clarify that unpaid interns are protected from harassment and other workplace discriminations.  See

---

[6]     The NYCHRL § 8-107 *et seq*., reads in part:

> All employers in NYC with four or more employees must comply with the NYC Human Rights Law regardless of whether their employees are full-time or part-time, permanent or temporary, paid on the books or off the books, or are paid or unpaid interns.

See https://www1.nyc.gov/site/cchr/law/in-the-workplace.page.

https://dhr.ny.gov/interns.  This state and city legislation clarifies that a defendant cannot escape

accountability for unlawful conduct, including sexual discrimination and retaliation, by claiming

that a plaintiff is not an "employee" for purposes of protection, even if the defendant fails to

provide monetary payments.

Whether Ms. Hughes received traditional compensation in the form of money is a factor

that likely holds substantially less weight when assessing her relationship with Defendants under

the state and city discrimination laws.  For instance, Fox could have treated Ms. Hughes in the

same manner that it treats workers classified as unpaid interns, but that is a question resolved

after discovery of Fox's internal records.  Ms. Hughes's status as an employee is a question that

deserves discovery and an ultimate determination by the trier of fact.  How Ms. Hughes

functioned at Fox is a factual inquiry.

### B.    **Promise of Payment**

Ms. Hughes need only allege that Defendants promised remuneration – a requirement the

Complaint easily satisfies.   In O'Connor v. Davis, 126 F.3d 112 (2d Cir. 1997), the court

considered Title VII claims by a plaintiff who, as part of her senior year in college, was required

to perform 200 hours of field work with a social service agency.  On a motion for summary

judgment, the court considered the fact that it was uncontested that plaintiff received "no salary

or other wages, and no employee benefits such as health insurance, vacation, or sick pay, **nor**

**was she promised any such compensation**."  Id. at 116 (emphasis added).  After O'Connor,

other courts considered whether the plaintiff was "promised remuneration."  York v. Ass'n of Bar

of City of New York, 286 F.3d 122, 125-26 (2d Cir. 2002) (Remuneration includes "salary or

other wages; employee benefits, such as health insurance; vacation; sick pay; or the promise of

any of the foregoing." (emphasis added) (internal citations omitted)); Wadler v. E. Coll. Athletic

<u>Conference</u>, No. 00 Civ. 5671 (JSM) 2003 WL 21961119, at *2 (S.D.N.Y. Aug. 14, 2003) (same).

Here, Ms. Hughes alleges numerous facts that, when accepted as true, are sufficient to show that Defendants promised her remuneration.   For example, the allegations include references to a "promise" of a contributor contract:

> Fox encouraged Ms. Hughes to continue appearing on its many programs, and she did so, <u>based on Fox's promises to retain her contractually</u>.   In early 2014, after Payne was told that he was getting Making Money, he promised Ms. Hughes that he would secure her as a "regular panelist."

Dkt. No. 29 at ¶¶ 103-104.   The Complaint contains allegations that show how Defendants provided remuneration to Ms. Hughes outside of traditional compensation arrangements. Defendants fail to acknowledge the allegations specific to the benefits that Ms. Hughes received when she appeared on programs, and her claims that her services had value.   Remuneration other than money can support an agency relationship between parties.   Here, as between Ms. Hughes and Fox, the allegations specifically address the unique factors that exist in the television network industry:

> Fox knew how valuable an opportunity to appear on one of its nationally televised programs was to analysts and commentators such as Ms. Hughes.   Fox believed that it was providing a valuable benefit to Ms. Hughes simply by asking her to appear.   Indeed, Fox expected Ms. Hughes to embrace the opportunities and be grateful for each appearance - after all, as Fox continuously reminded her, there were "many" female political panelists in line waiting to take her spot.

Dkt. No. 29 at ¶ 72.

In 2013, Ms. Hughes was attempting to increase her value as a political commentator. Because of her conservative positions, appearances on Fox provided her an opportunity to reach a massive audience and broaden her impact.   Fox's popularity among conservative television

viewers placed it in a position of power for commentators such as Ms. Hughes.  Indeed, Ms.

Hughes was not in a unique position.  As alleged, such an understanding was normal protocol in

the media industry, including at Fox:

> Because of the high level of competition to appear on news
> programs of the major networks, only a small percentage of
> contributors are paid to appear.  For example, at the time that Ms.
> Hughes was working regularly at Fox, a number of other similarly
> situated women were operating under the same workplace
> relationship with Fox.  Although these individuals were not paid to
> appear, upon information and belief, these women hoped to
> negotiate a contractual arrangement with Fox.

Dkt. No. 29 at ¶ 72.

In addition to increasing her visibility nationwide each time she appeared, Ms. Hughes, as

well as other similarly-situated contributors, understood that her performance was evaluated on a

constant basis by Fox producers and executives for the purpose of receiving a coveted

contributorship contract with Fox.  Such a position would solidify her place among conservative

political commentators.  It is well known that for conservative reporters and analysts, obtaining

the status of a "Fox contributor" opened many doors and provided opportunities to work for

influential political groups and politicians.  Fox ignores the allegations in the Complaint about

such unique factors in the television network industry.

In sum, Defendants prematurely ask the Court to rule on whether Plaintiff was

Defendants' employee and entitled to protection under the anti-discrimination laws based on the

sole issue of monetary payments and traditional economic compensation.  See Dkt. No. 35, Defs'

Br., at pp. 13-20.  Ms. Hughes is entitled to develop a factual record to support her allegations

regarding the existence of an employer-employee relationship.  For purposes of placing

Defendants on "fair notice" of the basis of her claims, the Complaint contains far more

allegations than necessary to show that Ms. Hughes was an "employee," as that term is defined under the anti-discrimination laws.

## V.    MS. HUGHES WAS A CANDIDATE FOR  POSITION AT FOX

The Complaint contains numerous allegations that, when accepted as true, properly classify her as an "employee" in connection with her continued efforts to receive a contributorship contract.  Fox and Payne repeatedly used the offer of a contract to coerce Ms. Hughes into continued performance subject to their control and will.  For example, the allegations include *inter alia*:

- Payne yelled at Ms. Hughes, "Get the fuck out of my office…if you think someone else can get you the contributorship!"  Ms. Hughes knew that to receive a contributor contract, she must continue to submit to Payne's sexual advances.  Dkt. No. 29 at ¶¶ 93-94.

- Fox encouraged Ms. Hughes to continue appearing on its many programs, and she did so, based on Fox's promises to retain her contractually.  In early 2014, after Payne was told that he was getting Making Money, he promised Ms. Hughes that he would secure her as a "regular panelist."  Id. at ¶¶ 103-104.

- As Ms. Hughes's appearances increased on Fox programs, Fox producers suggested the possibility of a permanent contract.  Based on these representations, Ms. Hughes's agent spoke to Fox executives, including Shine, about a contract.  Shine repeatedly told her agent that Fox need to "wait" a little longer and that they could discuss it "next month."  Id. at ¶ 106.

- On March 17, 2014, Ms. Hughes's agent at that time, Keith Urbahn wrote to Shine to follow up on their discussions in late 2013 about a possible contributor contract for Ms. Hughes.  On March 19, 2014, Shine wrote back to Mr. Urbahn, "Right now we're not going to be in a position to offer a contributorship but if that changes I'll let you know."  Id. at ¶ 107.

At all relevant times, Ms. Hughes was a covered employee when she appeared on Fox programs.  Simultaneously with her ongoing work, at all times, Ms. Hughes also was considered

an applicant for a full-time contract at Fox.  Such a position, whether termed a contributor, commentator or "performer," inferred that Ms. Hughes would secure an agreement to perform exclusive work for Fox in return for a salary.  Unquestionably, a contract position would confer an employment relationship, especially given that Fox generally requires that contract employees agree to appear on Fox networks exclusively.  Id. at ¶ 108.

- During her work on the hundreds of Fox segments that she appeared on, Fox executives such as Shine continuously evaluated her performance for purposes of offering a contract.  As set forth supra, Ms. Hughes was not unique in this regard.  Numerous other commentators hoped to secure a multi-year contract as well, including Ms. Sheffield, Ms. Konst, Ms. Smith, Ms. Pratte and Ms. Loudon.  Id. at ¶ 109.

- Ms. Hughes reached out to Shine to discuss her position at Fox and the offer of a contributor contract.  Id. at ¶ 110.

- When Ms. Hughes reached out to Shine in December 2014 to see if he had time to discuss her work at Fox for the following year, Shine responded, "Only because every minute of my schedule for the rest of the year really is packed let's talk in early 2015.  I very much appreciate all the time and travel that you're doing for the show."  Id. at ¶ 110.

The above allegations more than sufficiently satisfy the pleading standards under Rule 8(a) that Ms. Hughes's performances were evaluated by Fox executives in an ongoing fashion, such that a contributor contract could have been provided to her at any time during her work there.  Section 2000e-2 of Title VII, reads in part:

> It shall be an unlawful employment practice for an employer - (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's … sex."

Defendants claim that Ms. Hughes was not a candidate for a position because she fails to allege that she applied for an "open position at Fox."   Dkt. No. 35, Defs' Br., at p. 19.

Defendants state, "if plaintiff was qualified for the position, yet she never applied, she was never rejected under circumstances that would give rise to an inference of sex discrimination." Dkt. No. 35, Defs' Br., at p. 18. As set forth above, detailed allegations exist that show Defendants promised Ms. Hughes a contributorship contract and led her to believe that, at all relevant times, everything she did to support the "Fox team" brought her one step closer to the coveted contract. Allegations include, *inter alia*:

- Fox molded and branded Ms. Hughes into the "Fox look" that is associated with the females who appear on Fox programs.

- By having her appear as often as four to five times a week, Fox branded Ms. Hughes as part of the Fox team. By way of example only, **numerous email exchanges between Ms. Hughes and Fox executives, including Shine, Payne and Fox producers, discuss Ms. Hughes in terms of being "a part of the Fox family," a "true member of the team" and a "house guest of the Fox News family.**"

- Using her conservative views and political connections, Fox wanted the benefit of its association with Ms. Hughes for purposes of increasing its bottom line. Fox succeeded. As a direct result of Fox's ability to cast her as a Fox regular, despite not agreeing to monetary exchanges, other networks, such as CNN and MSNBC became less interested in having Ms. Hughes appear on their programs and gradually stopped extending invitations to her.

Dkt. No. 29 at ¶¶ 61-63.

At a minimum, this issue is subject to discovery. Whether Shine, Payne or other executives at Fox communicated to Ms. Hughes and her managers that they intended to provide her with a contract is relevant and critical to her claims. Similarly, how Shine, Payne and other producers viewed Ms. Hughes's repeated appearances and work efforts in connection with the decision to provide her a contract is relevant and critical to her claims. For instance, if Defendants analyzed Ms. Hughes's performances on a regular basis as part of their decision-making process to afford her a contract, such information is relevant and discoverable. If

Defendants analyzed Ms. Hughes's performances on a regular basis for purposes of comparing her work with that of similarly-situated commentators vying for the same contract, such information is relevant and discoverable.

Ms. Hughes is not required to prove a *prima facie* case at this stage of the litigation. Defendants want the Court "to evaluate the truth as to what really happened," based on the pleadings alone. This is not a proper application of the rules and the Court cannot engage in the analysis that Defendants seek.

## VI.   PAYNE HAD THE POWER TO SUBJECT MS. HUGHES TO ADVERSE EMPLOYMENT ACTIONS

Defendants seek dismissal of Ms. Hughes's claims because they claim that Payne had no authority over Ms. Hughes. Specifically, Fox claims that Payne was "an 'anchor, contributor and host' – but not an officer or executive." Dkt. No. 35, Defs' Br., at p. 5 (emphasis added). This argument is meaningless. Again, the allegations in the Complaint more than adequately detail the power and authority that Payne held at Fox as a "host," and importantly, that he held over Ms. Hughes and other individuals that appeared on *Making Money*:

- Fox also controlled her on-air performance by telling Ms. Hughes that while on-air, she was not to challenge the host or pose questions to the host that may appear to be disrespectful or undermine his opinion.

- By way of example only, Lou Dobbs berated Ms. Hughes for challenging his point of view during a live segment. After the program, Mr. Dobbs turned to Ms. Hughes and said, "Don't you ever question me on my show again." Thereafter, Mr. Dobbs and Fox banned her from appearing on his show.

- Fox, as well as **the hosts of its programs, such as Mr. Dobbs and Payne, had the ability to ban individuals from appearing on their programs at a moment's notice. Fox and Payne retained the power to terminate the work relationship, and they controlled the right to extend more opportunities to her**.

- Payne regularly reminded Ms. Hughes that other women were "hustling" to impress Fox's male hosts and executives and it was critical for her to remember to compliment these men on their work. Payne told Ms. Hughes to communicate to these powerful men that she would welcome any advice or constructive criticism, including to ask if she could do anything "better."

- For example, Payne said that Kayleigh McEnany intentionally went out of her way to compliment Stuart Varney and praise him, and that **Ms. Hughes needed to act more like Ms. McEnany if she wanted to keep getting appearances on his show**.

- Payne would single out specific women as examples of those who were "hustling" to try to make Ms. Hughes feel indebted to him for the opportunities that Payne was giving to her.

Dkt. No. 29 at ¶¶ 64-70.

- After the sexual assault, Payne's invitations to Ms. Hughes to appear on Fox programs increased dramatically. **Requests to appear came directly from Payne or from Dean Sicoli, the executive producer of *Making Money*.**

- **At Payne's suggestion, Fox producers for other programs increased their requests for Ms. Hughes to appear.**

- Payne did little to hide his romantic interest in Ms. Hughes, and Fox employees, including producers and executives, were aware of his sexually motivated favoritism. Moreover, it was known that Shine considered Payne a personal favorite and a rising star at Fox. As the head of programming at Fox, all the producers at Fox ultimately reported to Shine.

- At all times, in his position as an anchor and host at Fox, Payne exercised managerial and supervisory authority over Ms. Hughes. **Payne had the discretion to have Ms. Hughes appear more or less frequently on his show, decide what topics he wanted her to discuss, and determine for what length of time she would appear on any given show.** Moreover, Payne regularly critiqued her performance, mentoring her with the purpose of helping her secure appearances on other Fox programs.

- Payne decided to have Tracy Byrnes, a contributor and guest host on Fox programs be removed as a regular panelist on *Making Money*. Shortly after the program began, Payne and Ms. Byrne

reportedly clashed on and off the air.  **Payne went to Shine and said he wanted Ms. Byrnes off the show.  She was removed.**

- During the time that Ms. Hughes worked on *Making Money*, **Payne removed another female commentator, Hitha Herzog from the program.  Again, Payne objected to things that Ms. Herzog said and as a result, she was cut from future appearances.**

- Because of Payne's authority and power over Ms. Hughes, his acts of favoritism and preferential treatment affected her work assignments, compensation, treatment at Fox and evaluations of her performance.

- Ms. Hughes's willingness to engage in sexual conduct with Payne translated into tangible employment benefits that would have been withdrawn from her had she refused Payne's sexual advances.  Indeed, each time that Ms. Hughes attempted to sever the sexual relationship, Payne refused and responded angrily and violently.  In addition to being prone to angry outbursts and profanity-laced tirades, on several occasions, when Payne was angry at her, he forcibly grabbed Ms. Hughes in such a way that he bruised her arms.   These incidents took place in Payne's office at Fox's headquarters, 1211 Avenue of the Americas.

Id. at ¶¶ 84-92.

Payne played an instrumental role in connection with Ms. Hughes's work at Fox, and his opinion was critical as to whether she would receive the contributor contract.  For purposes of liability under federal, state and city law, the allegations in the Complaint specifically detail that Fox is responsible for the conduct of Payne.

## VII.   MS. HUGHES'S CLAIMS ARE NOT TIME-BARRED

If a trier of fact decides that Ms. Hughes is an employee as that term is used in the applicable laws, Defendants contend that her causes of action are time-barred.[7]  Under Title VII, a plaintiff alleging discrimination must file a charge with the EEOC "within three hundred days

---

[7]     Defendants argue that the Title VII claims are time-barred to the extent they are based on conduct that allegedly occurred before December 1, 2016, as are claims based on conduct before September 18, 2014, under the NYCHRL and NYSHRL.  Dkt. No. 35, Defs' Br., at p. 20.

after the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e-5(e)(1).   This statute of limitations "precludes recovery for **discrete acts** of discrimination or retaliation that occur outside the statutory time period." Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 105 (2002) (emphasis added).   In Morgan, the Supreme Court held that "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges. Each discrete discriminatory act starts a new clock for filing charges alleging that act." Id. at 113.   At this early stage, the Court need not identify the specific allegations that may or may not be time barred.   Even if some of the actions described in the Complaint are time-barred, the statute of limitations does not bar Ms. Hughes from using those acts "as background evidence in support of a timely claim." Id..   Thus, early resolution of all the statute of limitations issues in this case would not have a significant effect on the scope of discovery.

## VIII.   THE COMPLAINT ALLEGES RETALIATION CLAIMS

Misleadingly, Defendants claim that the Complaint contains just one discrete act of engaging in protected activity that Ms. Hughes could use as a basis for her retaliation claims. See Dkt. No. 35, Defs' Br. at pp. 22-23.   Based on this false depiction, Defendants seek dismissal of the second, fourth and seventh causes of action.   Id. at pp. 21-25.   Defendants position is that the only protected conduct alleged that is casually connected to retaliation is Ms. Hughes's June 2017 communications with Fox during which she disclosed the sexual assault and rape by Payne, as well as other details about his conduct. Dkt. No.  p. 22.   This is wrong.   The issue as to what constitutes retaliation under the applicable discrimination laws is well-settled.   The very nature of the harassment as depicted in the Complaint makes clear that for more than two years, Payne manipulated, coerced, threatened and engaged in textbook predatory behavior with regard to Ms. Hughes.   The expectation that Ms. Hughes needs to allege a continuous stream of examples of

his discrete retaliatory acts over this time is unsound.  For example, for years, the EEOC guidance makes clear that:

> **A supervisor who makes sexual advances toward a subordinate employee may communicate an implicit threat to adversely affect her job status if she does not comply**.

See https://www.eeoc.gov/eeoc/publications/upload/currentissues.pdf.

Harassment and retaliation as experienced by Ms. Hughes and detailed in the Complaint often blurs between conduct to support "discrimination" and that of "retaliation," but that does not mean a woman must decide between asserting claims pursuant to the discrimination prongs of these statutes verses the retaliation prongs:

> "Hostile environment" harassment may acquire characteristics of "quid pro quo" harassment if the offending supervisor abuses his authority over employment decisions to force the victim to endure or participate in the sexual conduct. Sexual harassment may culminate in a retaliatory discharge if a victim tells the harasser or her employer she will no longer submit to the harassment, and is then fired in retaliation for this protest. Under these circumstances it would be appropriate to conclude that both harassment and retaliation in violation of section 704(a) of Title VII have occurred.

See https://www.eeoc.gov/eeoc/publications/upload/currentissues.pdf.

The Complaint contains an abundance of allegations are that would support retaliation claims:

- Payne used his position of power to pressure Ms. Hughes into submission.  Dkt. No. 29 at ¶ 32.

- Payne made clear that her increase in appearances and other employment benefits would have been withdrawn had Ms. Hughes refused his sexual advances.  On those occasions that Ms. Hughes did attempt to terminate the relationship, Payne became enraged and physically violent.  Despite his temper, Ms. Hughes summoned the courage finally to cut off the relationship.  Id. at ¶ 33.

- Thereafter, Ms. Hughes went from appearing on Fox programs four or five times a week to only appearing five times in total over

a ten-month period.  Eventually, she learned that Fox had blacklisted her.  Id. at ¶ 34.

- Payne was not disciplined.  He continues to work as the host of Making Money.  Id. at ¶ 35.

- Ms. Hughes's willingness to engage in sexual conduct with Payne translated into tangible employment benefits that would have been withdrawn from her had she refused Payne's sexual advances. Indeed, each time that Ms. Hughes attempted to sever the sexual relationship, Payne refused and responded angrily and violently. In addition to being prone to angry outbursts and profanity-laced tirades, on several occasions, when Payne was angry at her, he forcibly grabbed Ms. Hughes in such a way that he bruised her arms.   These incidents took place in Payne's office at Fox's headquarters, 1211 Avenue of the Americas.  Id. at ¶ 92.

- On another occasion that occurred in Payne's office, by way of example only, he burst into anger and yelled at Ms. Hughes, "Get the fuck out of my office…if you think someone else can get you the contributorship!"  Id. at ¶ 93.

- As such, Ms. Hughes knew that if she wanted to continue to appear on Fox programs, and potentially receive a contributor contract, she must continue to submit to Payne's sexual advances.  Id. at ¶ 94.

- A female booking agent for Payne told Ms. Hughes about an incident in Payne's office in 2015 during which Payne inappropriately grabbed her in a "bear hug" and held her there. Payne was pressed up against her so tightly that this woman felt his penis pressing against her leg.  This same woman also reported incidents in which she witnessed Payne's excessive temper.  Id. at ¶ 95.

- Another female Fox employee told Ms. Hughes about personally witnessing Payne's "tantrums" at the workplace, including his yelling and screaming.  Id. at ¶ 96.

- Such threatening conduct even if directed to multiple employees at once, contributes to and fosters a work environment where reasonable employees feel at risk to speak out or complain.  Id. at ¶ 97.

- At 6'4" and 285 pounds, Payne is a physically imposing individual, and particularly threatening to female employees.

25

Payne's demeaning and menacing behavior created an environment of fear and caused employees, including Ms. Hughes, to not complain to Human Resources ("HR") or to Shine.  Id. at ¶ 98.

- Payne engaged in conduct expressly meant to intimidate Ms. Hughes, keep her "in line" and continue to submit to his advances. For example, in an effort to convince Ms. Hughes to submit to his advances in exchange for increased on-air visibility, Payne often cited to other "relationships" between certain Fox male hosts and subordinate female employees to suggest that such conduct was acceptable and ratified by Fox.  Payne said that, as a female, it was important to have a male host who would "go to bat" for you.  Id. at ¶ 99.

- In an attempt to bully Ms. Hughes, in reference to former Fox employee Andrea Mackris, Payne told Ms. Hughes that Ms. Mackris's career was "over" after she made a sexual harassment complaint against Bill O'Reilly.  Id. at ¶ 100.

- In a reference to rumors that Mr. Varney had a longtime affair while at Fox, Payne warned Ms. Hughes a number of times that Mr. Varney would "bury" any woman who crossed him, including by using the public relations team at Fox if necessary.  Id. at ¶ 101.

- Payne also told Ms. Hughes about a "special friendship" between a certain male host and a subordinate female panelist that resulted in a vast increase in the female's on-air appearances.  Id. at ¶ 102.

- Although Ms. Hughes continued to work towards obtaining the contract, her candidacy for the position was dealt an unlawful blow when she garnered the strength to tell Payne that she was no longer willing to submit to his sexual demands.  Id. at ¶ 112.

- In or about June 2015, Ms. Hughes told Payne that she was no longer willing to continue her relationship with him.  Id. at ¶ 113.

- Furious, Payne threatened that she must choose between (a) her family and not appearing on Fox, or (b) Payne and continued appearances on Fox.  Id. at ¶ 114.

- Ms. Hughes remained steadfast in her decision to end the relationship with Payne despite his violent temper and threats about her continued work at Fox.  Id. at ¶ 115.

- It was known throughout Fox that Shine favored Payne and acted as a mentor to him, not just a boss.  Id. at ¶ 116.

26

- Without speaking to Ms. Hughes, Shine decided that she must be to blame for the alleged affair. Not surprisingly, Shine acted to protect Payne, at Ms. Hughes's expense. Such blatant gender discrimination is behavior Fox has engaged in for years. Id. at ¶ 117.

- As threatened by Payne, and as orchestrated by Shine, after June 2015, Ms. Hughes appearances on Fox programs dramatically decreased. After months of appearing four or five times a week on Making Money, plus regular and weekly appearances on other Fox programs, suddenly Ms. Hughes's appearances were reduced to a mere five appearances on The O'Reilly Factor over the course of the following ten months. Id. at ¶ 118.

Ms. Hughes alleges that once she dared tell Payne that she would no longer submit to his sexual desires, the retaliation was swift and severe. Ms. Hughes went from regular weekly appearances to months without even one appearance. Further, Shine and other executive producers were complicit in the retaliation. As alleged throughout, the offers for her to appear were made under the direction of Shine, Payne, as well as by other producers, including Dean Sicoli, an executive producer:

- Ms. Hughes was expected to, and did in fact, make sure to send Bill Shine ("Shine"), the former co-President and head of programming, and other producers emails expressing her "loyalty and appreciation" and gratitude for appearances on Fox programs. Id. at ¶ 50.

- At all times, the discretion to offer appearances rested with producers and hosts of the various programs. Producers regularly referred to what was described as the "host preference" for who would be asked to appear on certain programs, and how often. Id. at ¶ 51.

Discovery will reveal the identities of all the Fox employees that had the authority to retaliate against Ms. Hughes, and who did in fact opt to shun her from appearances once she refused to submit to Payne's sexual demands.

As detailed *infra*, Ms. Hughes summoned the courage to break free from Payne's sexual control in June 2015.  Id. at ¶ 113.  Thereafter, Fox intentionally and unlawfully proceeded to retaliate against her for refusing Payne's sexual advances by excising Ms. Hughes from Fox programs.  Fox's willingness to cut her off was cruel; especially because at the time, she had appeared on more than 200 programs in a 24-month period.  The devotion and determination that Ms. Hughes had invested in work at Fox, branding herself as a "Fox team player" and patiently waiting for the promised contributorship contract was jeopardized in one fell swoop after she detached from Payne's grip.

The temporal proximity alone suggests an inference of discriminatory retaliation. However, when coupled with the allegations about Payne's repeated threats to do exactly what he did after she severed ties, the retaliation is blatant.  The fact that Shine and Payne enjoyed a special mentoring relationship cannot be over-looked.  Only discovery will reveal the extent to which Shine operated to protect, promote and foster the rise of Payne's influence at Fox, but as alleged, and in sufficient detail, it is entirely plausible that Shine acted swiftly to force Ms. Hughes from the workplace in order to appease Payne.  Similarly, it is plausible that Shine was motivated to appease Payne's wife, as alleged in the Complaint, and following her communications to rid Ms. Hughes from all of Fox's programs, not only *Making Money*, Shine acted to banish her completely.

Fox's own arguments reveal that the allegations of blacklisting survive a Rule 12(b)(6) motion and are subject to discovery.  Fox claims that CNN's decision not to renew their contract with Ms. Hughes in 2017 resulted in her lack of appearances on other news networks. Dkt. No. 35, Defs' Br., at p. 8. (any drop off in her appearances post January 2017 resulted from CNN's public announcement that it had not renewed her contract – and nothing to do with Fox's black-

listing).   Fox also speculates that her requests for appearances diminished because of Ms.

Hughes's own performance.   Dkt. No. 35, Defs' Br., at pp. 8-9.   Such speculation demonstrates

that it is a question of fact whether blacklisting efforts continued by Shine and other Fox

producers into early 2017 as alleged in the Complaint:

- Fox refused to schedule Ms. Hughes for any appearances even after President Trump's administration took over, despite her well-established connections.   Eventually, a booking agent for Ms. Hughes learned that Fox had messaged to its bookers, as well as other networks, that Ms. Hughes was blacklisted from future appearances because of her alleged affair with Payne.   Dkt. No. 29 at ¶ 123.

- As a direct result of her refusal to submit to continued sexual relations with Payne, and Shine's decision that she was to blame while Payne was not, Ms. Hughes was blacklisted from Fox.   Id. at ¶ 124.

- This decision is sexual in nature, based on gender-bias and motivated to adversely affect Ms. Hughes.   Because Ms. Hughes was the female in the relationship, Fox opted to marginalize and blame her for Payne's conduct, rather than hold Payne accountable. Id. at ¶ 125.

- In the spring of 2017, Ms. Hughes confirmed the truth of her suspicions that Fox had blacklisted her.   Id. at ¶ 131.

- In January 2017, Ms. Hughes's booking agent increased her efforts to get Ms. Hughes booked on Fox programs.   However, each time she reached out to Fox to schedule appearances, she repeatedly was told that Fox does "not have anything for Ms. Hughes right now."   Suddenly, other major networks also claimed that they had no appearances for Ms. Hughes despite the fact that previously, many of these same networks made requests for Ms. Hughes to appear.   Aware that the sudden drop-off was unusual, especially since Donald Trump had taken office, Ms. Hughes's booker began pressing her contacts at networks for underlying reasons of the new disinterest.   Id. at ¶ 132.

- "off the record," Ms. Hughes's booker was told by a colleague that Ms. Hughes had "had an affair with someone at Fox and we were told not to book her."   Id. at ¶ 133.

- Also during this time, Ms. Hughes learned that she had been in the running for several high profile positions in the Trump administration, but was taken out of consideration once it became known that Fox labeled her as "not bookable."  Id. at ¶ 134.

- At all relevant times, Payne continued to appear as the host of Making Money.  Purportedly, Fox and Payne agreed to a lucrative three-year contract in late spring 2017.  Id. at ¶ 135.

Fox's remarks about the non-disclosure of the sexual assault and rape until June 2017 are meritless in connection with her retaliation claims for retaliatory conduct that took place after she told Payne in June 2015 that she refused to endure his sexual demands.

## IX.   BRANDI AND BRIGANTI ARE PROPER DEFENDANTS

As pleaded, Brandi and Briganti unquestionably face liability exposure for their conduct. Brandi has served as Fox's Executive Vice President, Legal and Business Affairs, for more than twenty years.  As chief general counsel, Brandi reported directly to Roger Ailes, and was senior to most executives, including Shine when he was head of programming.  Indeed, Brandi operated at such senior levels that, in the case EEOC v. Fox News Network, LLC, No. 05 Civ. 9419 (WHP), it was Brandi who signed the Consent Decree on behalf of Fox in August 2006. Unquestionably, Brandi was at all times senior to Payne and the other executives and producers who controlled and supervised Ms. Hughes at the workplace during the relevant time.

Briganti has also worked at Fox for over twenty years and is the Executive Vice President of Corporate Communications.  Known as Fox's "powerful chief publicist," Briganti operates at the most senior levels at Fox.  A named defendant in countless lawsuits lodged against Fox, Briganti's power and authority in terms of its media relations operation is unparalleled.  For purposes of a motion to dismiss, the complaint more than sufficiently includes Briganti as an employer.  Senior to Payne and other executives and producers at Fox that supervised and controlled Ms. Hughes's work, absent discovery proving otherwise, Briganti possessed the

requisite executive authority when she opted to contact the National Enquirer in June 2017 about Ms. Hughes.

Fox is the party in possession of corporate documents and internal data such that it knows the power wielded by Briganti and Brandi, but it cannot possibly expect Ms. Hughes to have access to such detailed information in the early stages of this case.  Again, Defendants are asking the Court to make factual determinations based on Defendants' self-serving information, and assess "the truth of the matter," rather than the sufficiency of the pleadings under Rule 8.  Such a request by Defendants on the Court is improper.

The complaint alleges that, shortly after Ms. Hughes told Fox about Payne's sexual assault, rape and discriminatory and retaliatory conduct, the retaliation by Shine and others after she refused to continue submitting to Payne's sexual demands, including the continuing blacklisting, Brandi and Briganti contacted the National Enquirer.  Specifically, just ***hours*** after a call between Brandi and Ms. Hughes's manager to discuss the unlawful employment claims, Brandi, Briganti or both, contacted and communicated a false narrative to the National Enquirer regarding Ms. Hughes.  Dkt. No. 29 at ¶¶ 139-151.

- Approximately four to five hours after the call with Brandi, Ms. Hughes's manager received a call from a reporter at the National Enquirer who was seeking comment about a "breaking story" involving an alleged affair between Ms. Hughes and Payne.

- Shockingly, Ms. Hughes's manager learned that Briganti leaked Ms. Hughes's identity to the reporter.

- The reporter also told Ms. Hughes's manager that Briganti sent the National Enquirer a prepared statement from Payne.

- The statement misleadingly categorized their relationship merely as a consensual affair.

31

- Ms. Hughes's agent learned from the Enquirer that Briganti had supplied Ms. Hughes's identity when it emailed over Payne's statement.

Id. at ¶¶ 139-40, 142.

The temporal proximity between Ms. Hughes's protected complaints and this retaliatory conduct is undeniable.  Brandi's and Briganti's blatant intent to intimidate, threaten and harm Ms. Hughes through their acts is textbook retaliation.  As set forth in EEOC guidance,

> Types of Materially Adverse Actions
>
> A materially adverse action may also be an action that has no tangible effect on employment, or even an action that takes place exclusively outside of work, as long as it might well dissuade a reasonable person from engaging in protected activity. Prohibiting only employment-related actions would not achieve the goal of avoiding retaliation because an employer can effectively retaliate against an employee by taking actions not directly related to his employment or by causing him harm outside the workplace.
>
> **Other examples of materially adverse actions may include: disparaging the person to others or in the media**.

https://www.eeoc.gov/laws/guidance/retaliation-guidance.cfm#_ftn120 (emphasis added).  It is well settled that only a "fact-driven analysis approach" can determine whether an employer's acts are retaliatory within the applicable discrimination laws.  Id.; see also Burlington Northern & Santa Fe Railway Co. v. White, 548 U.S. 53, 69 (2006).  Ms. Hughes is not required to prove prima facie claims in her complaint.  Rather, she need only sufficiently place Defendants on fair notice of her claims and, if considered as true, as they must be here, plausibly suggest entitlement to relief.  The complaint's allegations far exceed this burden and Defendants' motion to dismiss claims against Brandi and Briganti for defamation must be denied.

## X.   COMMUNICATIONS TO THE NATIONAL ENQUIRER THAT WERE KNOWINGLY FALSE AND MALICIOUS ARE DEFAMATORY

The complaint sets forth facts detailing the information Fox gave to the National Enquirer, when the information was communicated and the falsity of the information that had the intended impact of causing Ms. Hughes reputational and professional harm.  This intended harm continues to affect Ms. Hughes through the present, as media outlets regularly report on the potential "falsity" of her claims, discredit her character and marginalize Payne's conduct.[8]  The complaint alleges that, as a direct result of the communications made by Fox to the National Enquirer:

- Hughes endured horrific humiliation and criticism.  Dkt. No. 29 at ¶ 146.

- The false statements are defamatory *per se* because they injure Ms. Hughes in her trade, business or profession.  Id. at ¶ 147.

- Her ability to secure employment was diminished greatly and she continues to be unemployed.  Id. at ¶ 147.

- Statements imputing sexual immorality are defamatory *per se*.  Id. at ¶ 149.

- Fox's malicious decision to reveal her identity to the National Enquirer, knowing that she is a rape victim exceeds the bounds of all decency.  Id. at ¶ 150.

- Disclosure of a rape victim's identity is a documented re-traumatization that leads to underreporting of rape.  Id. at ¶ 150.

In connection with Brandi and Briganti's communications with the Enquirer, Fox drafted a carefully worded "statement" from Payne that was false and sent to the Enquirer:

> I would like to extend an apology to my family and friends for having been involved in a romantic affair that ended two years ago.

---

[8]   The causes of action for defamation plead the requisite elements for Ms. Hughes in her capacity as a limited public figure or "public figure.  At no time has Ms. Hughes argued that any other standards apply.

> My wife and I have worked hard over these past two years to restore the trust in our marriage that I squandered.

Id. at ¶ 141.

In an effort to dismiss her claims, Defendants argue, "a story in the National Enquirer about Payne's affair with an unnamed colleague cannot be deemed 'retaliatory,'" and "that the National Enquirer did not publish her name in its story about Payne's 'romantic affair.'"  Dkt. No. 35, Defs' Br., at p. 2.  Such claims obscure the basis of Ms. Hughes's defamation claims, as well as their sufficiency for pleading purposes.

First, the source of the defamation is the communications from Fox, whether via Brandi, Briganti, Payne or all three, to the Enquirer just *hours* after Ms. Hughes's manager concluded a call with Brandi regarding Ms. Hughes's claims.  The precise wording of the communication, and whether telephone calls took place, emails, or both, is in Fox's possession, not Ms. Hughes's possession.  That information will be uncovered in discovery.  Further, Defendants know exactly what they did or did not say to the National Enquirer, since they issued the communications themselves.  At a minimum, Ms. Hughes has alleged that Fox transmitted falsehoods about her, including her identity, that relate specifically to her sexual morality in her professional or business capacity.  Fox did so maliciously and intentionally, and Ms. Hughes suffered harm as a direct result.

Second, whether the National Enquirer then engaged in conduct that also served to defame Ms. Hughes is not determinative as to whether Fox defamed Ms. Hughes.  But for Fox's transmission of the false information in the first place, the National Enquirer could not have published the article eventually disseminated.  As such, Defendants' arguments about the article and its content are unpersuasive.  Tellingly, Defendants' motion reveals that, by their own account, Defendants cannot agree as to exactly who "drafted" the statements that were sent to the

National Enquirer, or what statements Payne drafted as opposed to what statements Briganti drafted.  Similarly, Defendants cannot agree about who had the requisite knowledge about the nature of the sexual relationship between Payne and Ms. Hughes such that the veracity of the statements were known to Brandi, Briganti or Payne.  Dkt. No. 35, Defs' Br., at pp. 43-45 ("Brandi had no reason to doubt the veracity of Payne's statements," Briganti could not have known it was a "romantic affair" or not, and "Payne's state of mind cannot be imputed to Fox.")

Third, sufficiency of "malice" is pleaded based on the fact that Fox intentionally told the National Enquirer Ms. Hughes's name, promoted a false narrative about her of a sexual nature, and did so knowing that, *just hours earlier*, Brandi was discussing Ms. Hughes's protected complaints that she was a victim of sexual assault and rape at the hands of Payne.  "Outing" the identity of a rape victim without her permission or consent is reprehensible and heinous, and more than satisfies the definition of "malice."  Worse, outing her identity to a national tabloid such as the National Enquirer, without her consent or permission, in connection with a false and self-serving story about a romantic affair with Payne, is hateful.

In sum, the complaint more than sufficiently pleads causes of action for defamation in connection with the information conveyed to the National Enquirer about Ms. Hughes.

## XI.   THE COMPLAINT ESTABLISHES A CLAIM UNDER THE GENDER-MOTIVATED VIOLENCE ACT

The complaint alleges proper claims under the GMVA.  It contains detailed allegations that Payne committed a violent act because of Ms. Hughes's gender or on the basis of her gender, and that it was due in part to an animus based on gender.  Defendants contend that this claim must be dismissed because the complaint fails to allege facts showing animus, and additionally, the use of the word "animus" in the GMVA is unconstitutionally vague and improperly delegates its legislative function to the judiciary, such that dismissal is warranted.

Perhaps no greater event outside of a man's rape of a woman exemplifies violence and sufficient contempt against women.  Here, Ms. Hughes alleges in detail that Payne physically forced himself on her and, against her consent, unlawfully penetrated her.  Rape is violent, horrifying and has lasting psychological harm.  It is not possible to discuss sexual assault and rape without the inherent inclusion of violence and animus.  Further, as set forth in the complaint, in New York, sexual misconduct, rape and criminally sexual acts are felonies.  See N.Y. Penal Law, Article 130.

Although the term "animus" is not defined by the GMVA, it is not ambiguous when analyzing the plain language of the statute.  The New York City Council is not precluded "from using ordinary terms to express ideas that find adequate interpretation in everyday usage and understanding."  People v. Illardo, 48 N.Y.2d 408, 414 (1979).  In recognizing that there can never be mathematical certainty in language, the New York Court of Appeals held that "it is enough that the language used 'conveys sufficiently definite warnings as to the proscribed conduct when measured by common understanding and practices.'"  Id. (quoting Miller v. California, 413 U.S. 15, 28 n.10 (1973)).  In fact, courts frequently consult the dictionary "to determine the sense with which a word was used in a statute."  People v. Fox, 844 N.Y.S. 2d 627, 637 (N.Y. Sup. Ct., Kings Cty. 2007) (internal quotation omitted).  Both the American Heritage Dictionary and Merriam-Webster define "animus" in nearly identical fashion.[9]  A simple comparison of the definitions from these two leading dictionaries confirms that there is unequivocally a common understanding regarding the meaning of "animus."  Quite simply,

---

[9]      The American Heritage reveals that "animus" is "1. A feeling of animosity; ill will; 2. An attitude that informs one's actions; disposition or intention."  The American Heritage Dictionary (December 13, 2017), http://www.ahdictionary.com/word/search.html?q=animus.      Similarly, Merriam-Webster defines "animus" as "1: an usually prejudiced and often spiteful or malevolent ill will; 2 basic attitude or governing spirit: disposition, intention."  Merriam-Webster Dictionary (December 13, 2017), http://www.merriam-webster.com/dictionary/animus.

"animus" denotes feelings of animosity and a malevolent ill will.  See, e.g., Bray v. Alexandria Women's Health Clinic, 506 U.S. 263, 268-69 (1993) (using the term "animus," without providing a definition, when interpreting what was required to establish a violation of 42 U.S.C.A. § 1985 – a statute regulating conspiracies that interfere with civil rights); New York State Nat. Org. for Women v. Terry, 886 F.2d 1339, 1359 (2d Cir. 1989) ("animus merely describes a person's basic attitude or intention").[10]

In sum, the complaint contains a short and plain statement of a claim under the GMVA that shows Ms. Hughes is entitled to relief.  See Rule 8(a)(2).  This is all Ms. Hughes must establish in order to proceed to discovery.  The facts alleged on this claim are far more than "threadbare recitals" of causes of action supported by broad, conclusory statements.  As such, Plaintiff respectfully requests that the Court deny Defendants' request to dismiss her claims under the GMVA.

---

[10]     The cases cited by Defendants, unlike this one, utilize terms in the context at issue that were vague.  In Gentile v. State Bar of Nev., 501 U.S. 1030, 1048-49 (1991), the Supreme Court found that terms like "general" or "elaborate" were vague as both are "classic terms of degree" without any "settled usage or tradition of interpretation in law."  Similarly in People v. New York Trap Rock Corp., 57 N.Y.2d 371, 380 (1982), the New York Court of Appeals found the term "unnecessary noise" to be vague as, without further guidelines, there is nothing unlawful about making noise.

## **CONCLUSION**

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendants'

motion to dismiss Plaintiff's Amended Complaint in its entirety, and for such other and further

relief as this Court deems just and proper.

Dated:  February 12, 2018                              **WIGDOR LLP**
       New York, New York

By:
       Jeanne M. Christensen
       Michael J. Willemin

       85 Fifth Avenue
       New York, New York 10003
       Tel: (212) 257-6800
       jchristensen@wigdorlaw.com
       mwillemin@wigdorlaw.com

       *Counsel for Plaintiff*