UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------ :
                                                 :
SCOTTIE NELL HUGHES,                             :
                                                 :        17cv7093
                           Plaintiff,            :
                                                 :        OPINION & ORDER
              -against-                           :
                                                 :
TWENTY-FIRST CENTURY FOX, INC.., *et al.*,       :
                                                 :
                           Defendants.           :
------------------------------------------------ :

WILLIAM H. PAULEY III, United States District Judge:

              Defendants Twenty-First Century Fox, Inc. and Fox News Network LLC ("Fox"),

Dianne Brandi, Irena Briganti, and Charles Payne move to dismiss the Amended Complaint

("Complaint") for failure to state a claim.  For the reasons that follow, Defendants' motion is

granted in part and denied in part.

BACKGROUND

              The allegations of the Complaint are presumed true for purposes of this motion.

This action is one of many in a cavalcade of sexual harassment suits plaguing Fox.  It arises from

a sexual relationship between Charles Payne—a Fox anchor, contributor, and host—and Scottie

Nell Hughes, a conservative political strategist and pundit.  After meeting in the spring of 2013,

Payne took an interest in Hughes and sought out opportunities to spend time with her.  The two

reunited in New York in the summer of 2013.  As they made their way to Fox's studios, Payne

pressured Hughes into providing him with her hotel room information.  Under the guise of

mentoring her, Payne persuaded Hughes to agree to a private meeting in her room.  But instead

of discussing work and career opportunities, Hughes alleges that Payne sexually assaulted and

raped her.

While humiliating and traumatizing, Hughes, like many sexual assault victims, chose not to report the incident.  Rather, invitations to appear as a guest contributor on various Fox programs, including Payne's, began flowing in.  She began making regular appearances on Fox's program circuit, at one point appearing nearly every day of the week on Payne's show.  But Hughes' ability to pursue these opportunities were significantly constrained by a quid pro quo relationship with Payne.  That is, Fox and Payne offered her appearances on these nationally televised shows as long as she continued to maintain a sexual relationship with Payne.  Indeed, whenever the boundaries of that relationship were tested through Hughes' attempts to sever the affair, she was invariably presented with the threat of losing her program appearances.

By June 2015, however, Hughes ended her relationship with Payne.  The fallout was swift.  Once a regular guest on a panoply of Fox programs, Hughes found herself appearing as a panelist on only five occasions over the following ten months.  As Fox and Payne stymied the flow of work to Hughes, Hughes also found it difficult to secure opportunities with other networks.  Hughes and her manager later learned that Fox had blacklisted her across the industry, casting her as "not bookable" due to her affair with Payne.

In June 2017, amid the various sexual harassment scandals engulfing Fox, Hughes reported the 2013 rape to Fox and its outside counsel.  In an attempt to find a business solution, Hughes hoped that Fox would remove her from the blacklist.  To her surprise, Fox appeared uninterested in helping her, instead assuming a hostile position toward her and aggressively seeking additional details about her report.  Mere hours after that conversation, Fox disseminated a prepared statement from Payne to the National Enquirer, a tabloid that had planned on running a story about Payne's affair.  While the statement did not expressly identify Hughes as Payne's paramour, it revealed Fox's strategy of undermining Hughes' report that she had been a rape

victim.  Hughes asserts that the National Enquirer story led reporters to deduce that Hughes was the woman in question.  A few days after the publication of the article, a cache of emails detailing the lascivious nature of her communications with Payne were leaked to the public, definitively casting doubt on Hughes' credibility and subjecting her to widespread scorn.

Based on these events, Hughes now brings an assortment of employment and gender discrimination claims predicated on Title VII, the New York State Human Rights Law ("NYSHRL"), and the New York City Human Rights Law ("NYCHRL").  She also asserts three separate causes of action for defamation, seeking damages arising from Fox's alleged disclosure of her identity to the National Enquirer.  Finally, Hughes invokes a seldom used New York City law—the Gender-Motivated Violence Act—against Payne seeking damages arising from the sexual assault and rape.

I.   The Alleged Rape and Sexual Assault

In April 2013, Hughes met Charles Payne, a Fox Business Network anchor and contributor.  They appeared together on a number of Fox programs.  (Amended Complaint, ECF No. 29 ("Compl."), ¶¶ 26, 75.)  After their first meeting, Hughes and Payne again appeared together on Hannity.  (Compl. ¶ 75.)  Over the next several months, Hughes and Payne corresponded with each other.  Payne expressed his willingness to mentor Hughes and help advance her career.  (Compl. ¶ 76.)

In July 2013, Hughes accepted Payne's invitation to accompany him to a Manhattan museum, after which they shared a cab back to Fox's headquarters.  During this ride, Payne asked Hughes for her hotel room information.  She refused.  At Fox's studios, Payne persisted in his efforts to obtain Hughes' hotel room number.  Hughes ultimately relented and agreed to meet privately with Payne in her room.  (Compl. ¶¶ 28, 78.)

Later that night, Payne sexually assaulted and raped Hughes.  Although Hughes had rebuffed Payne's advances multiple times, Payne refused to listen, telling Hughes "you know you want this."  (Compl. ¶¶ 79–81.)  He intensified his overtures and tightened his grip on her, saying, "You have a bright future but you're not acting like you have the priorities I thought you did . . . you know you want it."  (Compl. ¶ 81.)  Payne overpowered Hughes, who eventually stopped resisting.  After raping Hughes, Payne announced on his way out, "This changes things." (Compl. ¶ 81–82.)  Despite this harrowing incident, Hughes was too shocked, humiliated, and afraid to report the rape.  (Compl. ¶ 83.)

Following the rape and sexual assault, Payne began inviting Hughes to appear on Fox programs on a more frequent basis.  (Compl. ¶¶ 30, 84–85.)  Hughes attributes her increased appearances to her sexual relationship with Payne.  She alleges that "Payne did little to hide his romantic interest in [her]," and that Fox employees were "aware of his sexually motivated favoritism."  (Compl. ¶ 86; see also Compl. ¶¶ 87–92, 94.)  But as easily as Payne gave Hughes these valuable on-air opportunities, he could take them away.  He had "the discretion to have [ ] Hughes appear more or less frequently on his show, decide what topics he wanted her to discuss, and determine for what length of time she would appear on any given show."  (Compl. ¶ 87.)

As their sexual relationship continued, Payne began to exhibit violent tendencies, including "forcibly grabb[ing] [ ] Hughes in such a way that he bruised her arms."  (Compl. ¶ 92; see also Compl. ¶¶ 95–97.)  When Hughes attempted to sever the affair, he "refused and responded angrily and violently."  (Compl. ¶ 92.)  Payne also subjected Hughes to verbal abuse, making clear that without him, Hughes had no chance of obtaining a full-time contributor position at Fox.  (Compl. ¶ 93.)

II.   <u>Hughes' Work for Fox</u>

   In March 2013—just a month before meeting Payne—Hughes made her first appearance on <u>Fox and Friends</u> providing commentary on an assortment of political issues. According to Hughes, Fox asked her to appear as a political analyst because she "provided insights and commentary on current political and financial issues that Fox considered important to its viewers."  (Compl. ¶ 37.)  Over the next three years, Hughes appeared regularly on multiple programs, including <u>Fox and Friends</u>, <u>The O'Reilly Factor</u>, <u>Varney & Co.</u>, <u>Hannity</u>, and <u>Making Money</u>.  (Compl. ¶ 38.)  In total, she appeared more than 240 times on Fox programs, working on 110 full-hour appearances and more than 130 segments for almost every program aired on Fox News and Fox Business Channel.  (Compl. ¶ 45.)

   Fox and Payne dictated the terms of Hughes' appearances.  She was often asked to appear on less than twenty-four hour notice, and expected to be present at Fox's studios just hours before a scheduled program.  (Compl. ¶ 46.)  If Fox canceled a particular program at the last minute, it directed Hughes to remain available for the next twenty-four hours in case the network decided to run the program.  (Compl. ¶ 48.)  The terms that Fox imposed on Hughes were onerous—if she declined the opportunity to appear, Fox told her that she would not be offered another appearance for months.  (Compl. ¶ 46.)  Fox and Payne further represented that if Hughes was not willing to acquiesce to their terms, they would have no problem filling her position with other female commentators vying for the same opportunities.  (Compl. ¶ 49.)  As a result, Hughes accepted every opportunity Fox gave her.  (Compl. ¶ 46.)  Because these opportunities were extended on an irregular basis and on short notice, Hughes was precluded from accepting invitations to programs on other networks, such as Newsmax, The Blaze, and

NRATV.  Fox made it clear that it disapproved of her appearances as an on-air contributor for competing networks.  (Compl. ¶¶ 52–53.)

Fox and Payne also controlled the scope of Hughes' work.  All of Hughes' appearances took place at Fox's studios in New York, Washington, D.C., or Nashville, Tennessee.  (Compl. ¶ 54.)  Fox and Payne dictated the topics on which Hughes could provide commentary, and provided her with specific talking points and substantive responses.  (Compl. ¶ 56.)  Before live shows on <u>Making Money</u>, Hughes was required to provide Payne and the show's producers a draft of her talking points for their review.  (Compl. ¶ 57.)

Aside from content, Hughes was beholden to a rigid set of requirements regarding her physical appearance.  Fox told her that she must physically look like she belonged on Fox, which meant spurning pants for short, above-the-knee, and solid color dresses that had a low cut neckline.  She also had to keep her hair long and blonde, maintain a tanned skin tone, have "nice legs," wear attractive high heels, and do her hair and makeup in a style that gave her the "Fox look."  (Compl. ¶ 59.)  Payne separately insisted that Hughes wear heels at all times, even when she was not on a program.  (Compl. ¶ 60.)

When on air, Fox controlled Hughes' performance, directing her to refrain from challenging the host or posing questions that appeared disrespectful.  (Compl. ¶ 64.)  Fox often revised Hughes' talking points, rehearsed her the night before shows, and conducted a final follow-up meeting prior to the program.  (Compl. ¶ 57.)  Hughes was reprimanded if she ever deviated from Fox's instructions regarding her performance.  For example, on one occasion, program host Lou Dobbs berated Hughes for challenging his point of view during a live segment, admonishing her not to "ever question me on my show again."  Thereafter, Dobbs banned Hughes from appearing on his program.  (Compl. ¶ 65.)

Hughes was never paid for her appearances, but Fox covered expenses associated with her transportation to and from its headquarters in Manhattan.  It also incurred the costs of doing her hair and make-up for appearances on <u>Making Money</u>.  (Compl. ¶ 71.)

III.   <u>Hughes' Relationship with Payne</u>

Although Hughes had suffered a traumatic rape at Payne's hands in 2013, Payne managed to coerce Hughes into a long-term sexual relationship in exchange for career opportunities and benefits.  Though the relationship appeared consensual on the surface, Hughes claims that she felt pressured by the imbalance of power between a "male employee in a position of authority" and a "female subordinate in the workplace" to engage in an affair with Payne. (Compl. ¶¶ 31–32.)  Payne made clear that he would withdraw Hughes' opportunities to appear on Fox programs if she refused his sexual advances.  (Compl. ¶ 33.)  When Hughes attempted to terminate the affair, Payne became enraged and physically violent.  (Compl. ¶ 33.)

IV.   <u>Hughes' Attempts to Secure Full-Time Employment at Fox</u>

As Hughes' on-air appearances increased, she intensified her efforts to secure a full-time contributor position with Fox.  She was told on several occasions, both by Fox and Payne, that she would be considered for a full-time contract.  (Compl. ¶¶ 21, 103–105.)  Based on those representations, Hughes' agent contacted Fox executives, including Bill Shine, who repeatedly told her "agent that Fox need[ed] to 'wait' a little longer and that they could discuss it 'next month.'"  (Compl. ¶ 21.)

By March 2014, after inquiring several times, Hughes was told that Fox was "not going to be in a position to offer a contributorship but if that changes" she would be informed. (Compl. ¶ 107.)  Fox, however, did not definitively rule Hughes out of contention for the position.  By the end of 2014, Shine signaled his willingness to discuss the issue "in early 2015,"

and noted that he "appreciate[d] all the time and travel that [she was] doing for the show."
(Compl. ¶ 111.)

V.   <u>Hughes Terminates the Affair and Fox Blacklists Her</u>

In June 2015, Hughes "summoned the courage" to tell Payne that she was no
longer willing to continue her relationship with him.  (Compl. ¶ 33.)  Although Payne threatened
to take away her appearances on Fox, Hughes ended the affair.  (Compl. ¶¶ 113–115.)

The consequences of Hughes' decision to terminate her relationship with Payne
were devastating.  Hughes saw her appearances on Fox programs decline precipitously.  In
essence, she went from appearing "four or five times a week to only appearing five times in total
over a ten-month period."  (Compl. ¶¶ 34, 118.)

In March 2016, Hughes made her final appearance on Fox.  (Compl. ¶ 122.)
Thereafter, Fox refused to schedule her for any appearances.  Hughes' booking agent later
learned that Fox had told other bookers—and networks—that Hughes was blacklisted from
future appearances because of her affair with Payne.  (Compl. ¶ 123.)

In January 2017, Hughes' booking agent redoubled her efforts to get Hughes
booked on Fox programs.  Each time she contacted Fox, however, she was repeatedly told that
Fox "does not have anything for Ms. Hughes right now."  (Compl. ¶ 132.)  Other major networks
followed suit, informing Hughes' agent that they had no appearances available despite the fact
that they had previously made requests for Hughes to appear on their programs.  (Compl. ¶ 132.)
According to Hughes, Fox labeled her "not bookable," a designation that had not only precluded
her from appearing as a guest contributor on other networks, but removed her from consideration
for several high profile positions in the Trump administration.  (Compl. ¶ 134.)

VI.   <u>Hughes Reports the Rape to Fox</u>

   The Complaint alleges that Fox and its executives were aware of the <u>quid pro quo</u> relationship between Hughes and Payne.  (Compl. ¶¶ 86, 91.)  But in the aftermath of several public reports concerning the culture of sexual harassment at Fox—and after learning that she had been blacklisted by Fox—Hughes directed her manager to contact Fox's outside counsel to report Payne's rape.  (Compl. ¶ 136.)  Instead of formally investigating Hughes' claims, however, Fox's outside counsel proposed a "business solution," to avoid "open[ing] a can of worms."  (Compl. ¶ 137.)  Outside counsel said they would contact the programming organizers and Fox's newly hired head of human resources, who would in turn reach out to Hughes' manager.  (Compl. ¶ 137.)  Hughes hoped for a productive discussion about removing her name from Fox's blacklist.

   Fox's head of human resources never contacted Hughes.  Rather, on June 26, 2017, Hughes' manager received a phone call from Defendant Brandi, who interrogated him about the facts underlying Hughes' report.  (Compl. ¶ 138.)  Sensing that their interests were not aligned, Hughes' manager refused to divulge any details.  (Compl. ¶ 138.)

VII.   <u>National Enquirer Story</u>

   Approximately five hours after the call with Brandi, Hughes' manager received a call from a National Enquirer reporter seeking comment about a "breaking story" involving the affair between Hughes and Payne.  Hughes' manager learned that Defendant Briganti leaked Hughes' identity to the reporter.  (Compl. ¶¶ 139, 142.)

   The reporter also informed Hughes' manager that Briganti provided a prepared statement from Payne in response to the impending story.  (Compl. ¶ 139.)  Payne's statement mischaracterized the nature of the sexual relationship as consensual.  (Compl. ¶ 141.)  In view of

this inaccuracy, Hughes' manager asked the National Enquirer to delay publishing the article, including Hughes' identity.  According to Hughes, Fox and Payne knowingly drafted a false statement about her involvement in the affair to preempt any actions she would have taken to expose Payne's rape, as well as the discrimination and blacklisting that she suffered.  (Compl. ¶ 155.)

The delay was short-lived.  On July 5, 2017, the National Enquirer ran the story, including Payne's false account of the events.  The article reported that Payne had engaged in a "romantic affair that ended two years ago."  (Compl. ¶ 141.)  Hughes' identity was never revealed, but it took "reporters mere hours to confirm that [ ] Hughes was the woman referred to in Payne's statement."  (Compl. ¶ 143.)  The story was reported on for days nationally and internationally.  (Compl. ¶ 144.)  By advancing a narrative crafted from their own perspective, Fox and Payne cast Hughes in a negative light and made her the subject of public contempt, ridicule, and disgrace.  (Compl. ¶¶ 157–165.)

Three days later, on July 8, 2017, a select group of personal emails between Payne and Hughes was leaked on social media.  The emails, read in isolation, supported Payne's narrative that the affair was consensual, leading media outlets to publish additional stories styled "[l]eaked emails cast doubt on Hughes's allegations against Charles Payne."  (Compl. ¶ 145.)  With these indiscretions out in full view, Hughes "endured horrific humiliation and criticism," and found her ability to secure employment greatly diminished.  (Compl. ¶¶ 146–147.)

DISCUSSION

I.   <u>Standard</u>

On a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), a court must accept as true all well-pleaded facts and draw all reasonable

10

inferences in the light most favorable to the non-moving party.  Krassner v. 2nd Ave.

Delicatessen Inc., 496 F.3d 229, 237 (2d Cir. 2007).  "To survive a motion to dismiss, the

plaintiff's pleading must contain sufficient factual matter, accepted as true, to state a claim to

relief that is plausible on its face."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citation

omitted).

II.     Title VII, NYSHRL, and NYCHRL—Gender Discrimination and Retaliation

Claims for employment discrimination are analyzed under the burden-shifting

framework of McDonnell-Douglas Corp. v. Green, 411 U.S. 792 (1973), which requires a

plaintiff to establish a prima facie case of discrimination.  See Tex. Dep't of Cmty. Affairs v.

Burdine, 450 U.S. 248, 253–54 (1982); Ruiz v. Cty. of Rockland, 609 F.3d 486, 491 (2d Cir.

2010).  However, the Supreme Court has held that "the requirements for establishing a prima

facie case under McDonnell-Douglas [do not] apply to the pleading standard that plaintiffs must

satisfy in order to survive a motion to dismiss."  Williams v. N.Y.C. Hous. Auth., 458 F.3d 67,

71 (2d Cir. 2006) (citations omitted); Satina v. N.Y.C. Human Res. Admin., 2014 WL 5353697,

at *3 (S.D.N.Y. Oct. 21, 2014).  Rather, a "plaintiff[] need only satisfy the pleading requirements

of Federal Rule of Civil Procedure 8(a) as interpreted by the Supreme Court's holdings in

Twombly and Iqbal to survive a motion to dismiss."  Peguero-Miles v. City Univ. of N.Y, 2014

WL 4804464, at *3 (S.D.N.Y. Sept. 25, 2014).  "Nonetheless, the elements of the prima facie

case still provide an outline of what is necessary to render a plaintiff's . . . claims for relief

plausible, and so courts consider these elements in determining whether there is sufficient factual

matter in the complaint which, if true, gives Defendant a fair notice of Plaintiff's claim and the

grounds on which it rests."  Peguero-Miles, 2014 WL 4804464, at *3 (alterations omitted).

A.  Gender Discrimination

    i.   Employee Status

        Defendants attack Hughes' employment discrimination and retaliation claims on the basis that she was never a Fox employee.  Their contention rests on the fact that Fox never paid her.  (Defendants' Memorandum of Law in Support of Motion to Dismiss ("Mot."), ECF No. 38, at 16–15.)

        Title VII defines "employee" as "an individual employed by an employer."  42 U.S.C. § 2000e(f).  To clarify this circular definition, the Second Circuit established a two-part test to determine employee status.  First, the plaintiff must demonstrate "that she was hired by the putative employer.  To prove that she was hired, she must establish that she received remuneration in some form for her work.  This remuneration need not be a salary, but must consist of substantial benefits not merely incidental to the activity performed."  United States v. City of N.Y., 359 F.2d 83, 91–92 (2d Cir. 2004).  Second, this Court must determine whether a hired person is an employee under a thirteen-factor agency rubric articulated by the Supreme Court in Cmty. for Creative Non-Violence v. Reid, 490 U.S. 730, 751–52 (1989).  Those factors include: (1) the hiring party's right to control the manner and means by which the product is accomplished; (2) the skill required; (3) the source of the instrumentalities and tools; (4) the location of the work; (5) the duration of the relationship between the parties; (6) whether the hiring party has the right to assign additional projects to the hired party; (7) the extent of the hired party's discretion over when and how long to work; (8) the method of payment; (9) the hired party's role in hiring and paying assistants; (10) whether the work is part of the regular business of the hiring party; (11) whether the hiring party is in business; (12) the provision of employee benefits; and (13) the tax treatment of the hired party.  Reid, 490 U.S. at 751–52.  In

the context of anti-discrimination cases, courts place the "greatest emphasis on the extent to which the hiring party controls the manner and means by which the worker completes his or her assigned tasks." City of N.Y., 359 F.3d at 92.  In essence, the two-part test is designed to assess whether the "employer compensates and controls an employee's work."  Nelson v. Beechwood Org., 2004 WL 2978278, at *3 (S.D.N.Y. Dec. 21, 2004) (emphasis original).

To counter Defendants' argument that she was never paid, Hughes shifts the analysis from remuneration to common law agency principles.  (Hughes Memorandum of Law in Opposition to Motion to Dismiss, ECF No. 43 ("Opp."), at 9 ("pursuant to common law agency principles, [she] was an employee for purposes of holding Defendants accountable for their reprehensible conduct in violation of discrimination laws").)  She rejects the proposition that remuneration is a threshold issue to determine whether an employee-employer relationship exists.  (Opp. at 11.)  But the Second Circuit's test makes clear that "[o]nce [a] plaintiff furnishes proof that her putative employer remunerated her for services she performed, [courts then] look to the thirteen" agency factors under Reid.[1]  City of N.Y., 359 F.3d at 92.  Thus, "the first inquiry is whether the plaintiff has received some form of remuneration from the defendant."  Knight v. State Univ. of N.Y. at Stony Brook, 2014 WL 4639100, at *2 (E.D.N.Y. Sept. 16, 2014).

Remuneration may exist even where the purported employee does not receive a salary.  The term is broadly defined to encompass any financial benefit.  Aside from monetary payment, benefits such as "health insurance; vacation; sick pay; or the promise of any of the

---

[1]      Other circuits have declined to recognize an "independent antecedent remuneration requirement" on the basis that when "evaluating a particular relationship, all of the incidents of the relationship must be assessed and weighed with no one factor being decisive."  Bryson v. Middlefield Volunteer Fire Dep't, Inc., 656 F.3d 348, 354 (6th Cir. 2011).  But the Second Circuit has spurned that position, instead holding that where there is no financial benefit, there can be "no plausible employment relationship of any sort."  York v. Assoc. of Bar of the City of N.Y., 286 F.3d 122, 126 (2d Cir. 2002) (citing O'Connor v. Davis, 126 F.3d 112, 115–16 (2d Cir. 1997)).

foregoing" may constitute remuneration.  <u>York v. Assoc. of the Bar of the City of N.Y.</u>, 286 F.3d

122, 126 (2d Cir. 2002).  "[B]enefits must meet a minimum level of significance or

substantiality, in order to find an employment relationship in the absence of more traditional

compensation."  <u>York</u>, 286 F.3d at 125–26.

      Hughes readily concedes that she was never paid a salary or received a monetary

payment.  (Compl. ¶¶ 63, 73.)  Rather, the only benefit she appears to have received is "travel to

and from" Fox's Manhattan headquarters and the cost of doing "her hair and make-up for all of

her appearances on <u>Making Money</u>."  (Compl. ¶ 71.)  But these benefits fall short of the

"minimum level of significance or substantiality" required to establish employee status in the

absence of a salary.  <u>York</u>, 286 F.3d at 126.  They are merely benefits incidental to the activity

performed—appearances on Fox's television programs.  <u>York</u>, 286 F.3d at 126.

      Citing <u>O'Connor v. Davis</u>, 126 F.3d 112, 116 (2d Cir. 1997), Hughes attempts to

satisfy the remuneration requirement by arguing that she was promised remuneration in

exchange for her work.  (Opp. at 14.)  She alleges that "Fox encouraged [her] to continue

appearing on its many programs, and she did so, based on Fox's promises to retain her

contractually."  (Compl. ¶ 103.)  Hughes separately argues that "Defendants provided

remuneration to [her] outside of traditional compensation arrangements," like the valuable

opportunities to appear on nationally televised programs, which burnished her reputation as a

political commentator.  This publicity was particularly valuable in view of the heated

competition among other female panelists vying for spots on Fox's programs.  (Opp. at 15 (citing

Compl. ¶ 72.).)

      While <u>O'Connor</u> first referenced the promise of compensation under the financial

benefit test, courts have yet to clarify the contours of such an amorphous category.  Hughes cites

14

York and Wadler v. E. Coll. Athletic Conference, 2003 WL 21961119 (S.D.N.Y. Aug. 14, 2003), as cases that have "considered whether the plaintiff was promised remuneration," but neither of them squarely address that issue.  York merely re-hashes O'Connor's reference to promised compensation.  York, 286 F.3d at 126.  But aside from a perfunctory nod to the possibility that promised compensation may satisfy the remuneration requirement, York focused its analysis on other benefits, holding that "[c]lerical support, limited tax deductions, and 'networking opportunities'" fell short of meeting the remunerative threshold.  York, 286 F.3d at 126.  Wadler is more unremarkable insofar as its citation to York merely acknowledged that promised remuneration may be considered a financial benefit, but ultimately declined to confer employee status on the plaintiff because the defendant never paid him.  Wadler, 2003 WL 21961119, at *3.

One case that appears to have meaningfully contemplated the parameters of promised compensation is Consolmagno v. Hosp. of St. Raphael Sch. of Nurse Anesthesia, 72 F. Supp. 3d 367, 378 (D. Conn. 2014).  The Consolmagno court found that the plaintiff may have been promised a "stipend or health insurance like the rest" of her colleagues "as a matter of school policy," and that there was a genuine factual issue as to whether the plaintiff had waived her right to receive such remuneration.  72 F. Supp. 3d at 378.  But this is different from what Hughes alleges.

Hughes' reliance on Fox's purported assurances regarding a full-time contributor contract is misplaced.  First, the allegations are too general.  That Payne once told Hughes that "he would secure her as a 'regular panelist'" on his show does not mean he had promised her the type of financial benefits recognized as remuneration.  (Compl. ¶ 104.)  This allegation merely suggests that Hughes would have appeared on Payne's program with greater regularity and

frequency without the guarantee of a salaried contract or long-term benefits.  Second, any allegations concerning Fox's promises to retain her contractually were prospective.  The Complaint does not allege that Fox promised to pay her for prior appearances.  Thus, as Hughes herself concedes, allegations regarding the "offer of a contract to coerce [her] into continued performance subject" to Fox and Payne's "control and will" are more relevant to a failure-to-hire claim.  (Opp. at 17–18 (citing Compl. ¶¶ 93–94, 103–104, 106–107).)

Additionally, Hughes' allegations that her nationally televised appearances were a valuable benefit because it increased her influence and "broaden[ed] her impact" on audiences, (Opp. at 15), are akin to the vague benefits—like the networking opportunities in York—that courts have excluded from the financial benefit analysis.  If such allegations were deemed a financial benefit for purposes of determining employee status, virtually every commentator on a national television network could satisfy the remuneration requirement.  In any event, an incidental benefit of appearing on a nationally televised program is widespread publicity and name recognition, and may not be considered under the financial benefit analysis.

Finally, Hughes contends that Defendants' arguments address only her federal claim, and that the issue of remuneration is a "factor that likely holds substantially less weight when assessing her relationship with Defendants" under the more lenient standards of the NYSHRL and NYCHRL.  (Opp. at 14.)  Hughes relies on 2014 amendments to the NYSHRL and NYCHRL, which she claims protects unpaid interns from sexual harassment and discrimination.  (Opp. at 14.)  While that may be true, Hughes never alleged that she was an intern at Fox.  The 2014 amendments were designed to protect college students who took internships as a valuable learning experience and a steppingstone to the job market.  N.Y. Exec. Law § 296–c; N.Y.C. Admin. Code § 8–107(23); N.Y. Bill Jacket, 2014 A.B. 8201, Ch. 97

(2014).  Hughes' role as a guest television contributor falls outside the ambit of these

amendments.

      ii.   <u>Failure to Hire</u>

      While Hughes' status as a non-employee is fatal to certain of her discrimination

claims, she may still pursue failure-to-hire and retaliation claims based on her status as a job

applicant.  A "failure-to-hire claim is distinguishable from other employment discrimination

claims in that it necessarily applies in most circumstances to non-employees seeking

employment positions rather than current employees.  The relevant employment status inquiry in

a failure-to-hire claim is the status of the position an applicant is seeking rather than the current

relationship between the applicant and the would-be employer."  <u>Suri v. Foxx</u>, 69 F. Supp. 3d

467, 475–76 (D.N.J. 2014); <u>Wang v. Phx. Satellite Television US, Inc.</u>, 976 F. Supp. 2d 527,

538–39 (S.D.N.Y. 2013).  Moreover, "[r]etaliation claims may be brought by applicants for

employment, if the retaliatory conduct is related to the employment application."  <u>Suri</u>, 69 F.3d

at 476; <u>Hicks v. Baines</u>, 593 F.3d 159, 165 (2d Cir. 2010) ("Title VII's anti-retaliation provision

applies broadly to employer actions that would have been materially adverse to a reasonable

employee or job applicant.") (citing <u>Burlington N. and Santa Fe Ry. Co. v. White</u>, 548 U.S. 53,

57 (2006)); <u>Riddle v. Citigroup</u>, 640 F. App'x 77, 79 (2d Cir. 2016).

      To make out a failure-to-hire claim under Title VII and the NYSHRL, a plaintiff

must demonstrate that: (1) she is a member of a protected class; (2) she applied and was qualified

for a job for which the employer was seeking applicants; (3) she was rejected despite being

qualified; and (4) after this rejection, the position remained open and the employer continued to

seek applicants with plaintiff's qualifications.  <u>McDonnell–Douglas</u>, 411 U.S. at 802; <u>Petrosino</u>

<u>v. Bell Atl.</u>, 385 F.3d 210, 226 (2d Cir. 2004).  Under the more liberal NYCHRL, a plaintiff must

merely "plead facts sufficient to support an inference that [she has] been treated less well at least in part because of a protected trait." <u>Jablonski v. Special Counsel, Inc.</u>, 2017 WL 4342120, at *5 (S.D.N.Y. Sept. 28, 2017) (internal quotation marks omitted).  Hughes adequately pleads a failure-to-hire claim under either standard.

Defendants contend that Hughes never "applied for a job for which Fox was seeking applicants," and that "[m]ere expressions of interest in working for an employer do not constitute a job application."  (Mot. at 18.)  Of course, an "essential element of a failure to hire claim is that a plaintiff allege that she applied for a specific position and was rejected." <u>Carr v. N. Shore–Long Island Jewish Health Sys.</u>, 2015 WL 4603389, at *3 (E.D.N.Y. July 30, 2015) (citation omitted).  But while a "general request for employment is insufficient, a formal application is not always required." <u>Carr</u>, 2015 WL 4603389, at *3 (citing <u>Wang</u>, 976 F. Supp. 2d at 537).  In such case, a plaintiff may be deemed to have applied for an open position if she pleads that "(1) the vacancy at issue was not posted, and (2) the employee either had (a) no knowledge of the vacancy before it was filled or (b) she attempted to apply for it through informal procedures endorsed by the employer." <u>Petrosino</u>, 385 F.3d at 227; <u>see also</u> <u>Mauro v. S. New England Telecomm'cns, Inc.</u>, 208 F.3d 384, 387 (2d Cir. 2000) (requirement of applying for specific job "does not apply where, as here, the plaintiff indicated to the employer an interest in being promoted to a particular class of positions, but was unaware of specific available positions because the employer never posted them").

Here, the Complaint amply supports Hughes' contention that Fox openly entertained Hughes' expressions of interest in a full-time contributorship, and induced her into believing that she had a realistic chance of obtaining the position, despite never formally posting it.

Defendants selectively cite from the Complaint to support their argument that "[a]t most, [Hughes] [ ] alleged that she (or her agent reached out to [Bill] Shine to express her hopes of getting a contributor contract," and that he "explicitly told her there were no openings." (Opp. at 19 (citing Compl. ¶¶ 106–107).)  But those allegations, considered together with others, such as Payne's assurance that Hughes would receive a position as a regular panelist on his show, <u>Making Money</u>, (Compl. ¶¶ 103–104), and that "Fox executives such as Shine continuously evaluated [Hughes'] performance for purposes of offering a contract," (Compl. ¶ 109), lend credence to Hughes' argument that Fox had considered her candidacy as a full-time contributor on an ongoing basis.  That Fox foreclosed Hughes from appearing on competing networks amplifies the notion that Hughes was auditioning exclusively to be a Fox contributor. (Compl. ¶ 53.)

Moreover, at oral argument, Fox seemed to acknowledge that it had no formal application process for full-time contributor positions.  Fox's counsel suggested that absent a formal process, the law could not provide a failure-to-hire claim.  (Hr'g Tr. dated February 23, 2018, ECF No. 57 ("Tr."), at 10:19–20.)  This Court disagrees.  It is undisputed that Fox extends contributor contracts to certain candidates.  Despite the opaque process of determining who becomes a contributor, the "only way that Fox can winnow people and consider people . . . is to put them on [a program]."  (Tr. at 9:14–18.)  And if Fox routinely puts an individual on a program—signaling to that individual that he or she is qualified enough to appear with regularity—it cannot then seek an end-run to a failure-to-hire claim simply because no formal application process exists.

Fox used the lure of a full-time contributorship as a carrot and a stick to secure Hughes' continued appearances.  On one occasion, Payne threatened to remove her from

consideration for the position, telling her to leave his office if she thought "someone else can get you the contributorship." (Compl. ¶¶ 93–94.) On other occasions, Fox and Shine strung Hughes and her agent along, deferring discussion of the position until a later time, yet creating the impression that it was only a matter of time until Hughes would be hired as a full-time contributor. (Compl. ¶¶ 61–62; 110.)

        Defendants further argue that even if "there were an open position for which [Hughes] applied, [Hughes] has not made even a conclusory allegation that she was qualified to fill an open position at Fox," or that the contributor position "that she claims to have wanted was ever available and remained open at Fox" to other applicants. (Opp. 19.) But the Complaint's allegations belie those arguments. Over the course of two years, Hughes was repeatedly invited back on an assortment of Fox programs. Fox regularly evaluated her performance, and molded her in the network's image. (Compl. ¶¶ 61–62.) Fox treated her as a qualified candidate, gladly showcasing her "conservative views and political connections," to "increas[e] its bottom line." (Compl. ¶ 63.) Moreover, the Complaint alleges that there was a long line of other candidates who would have "no problem filling in [Hughes'] role." (Compl. ¶ 49; see also Compl. ¶¶ 68–70.) This suggests, at the very least, that Fox kept Hughes' specific contributor position open to test out other candidates.

        Having satisfied the four elements required to make out a failure-to-hire claim under the applicable statutes, this Court finds that the alleged "circumstances could reasonably be read as supporting an inference of discrimination." Gaffney v. Dep't of Info. Tech. and Telecomm'cns, 536 F. Supp. 2d 445, 462 (S.D.N.Y. 2008). Accordingly, the Complaint sufficiently alleges a failure-to-hire claim under Title VII, NYSHRL, and NYCHRL.

     iii.   Retaliation

The Second Circuit has held that "Title VII's anti-discrimination and anti-retaliation provisions are not coterminous; anti-retaliation protection is broader and extends beyond workplace-related or employment-related retaliatory acts and harm." Hicks, 593 F.3d at 165. Under Title VII, "it is unlawful for an employer to discriminate against an applicant for employment because that applicant has opposed any practice made an unlawful employment practice" under the statute. Johnson v. Conn. Dep't of Admin. Servs., 972 F. Supp. 2d 223, 260 (D. Conn. 2013) (citing 42 U.S.C. § 2000e–3(a)).

To establish a prima facie case of retaliation under Title VII and the NYSHRL, a plaintiff must show: (1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) that the defendant took adverse employment action against plaintiff; and (4) that there was a causal connection between the protected activity and the adverse employment action. Hicks, 593 F.3d at 164. Under the NYCHRL, the third element—adverse employment action—may be satisfied if an action is "reasonably likely to deter a person from engaging in protected activity." N.Y.C. Admin. Code § 8–107(7); Fletcher v. Dakota, Inc., 99 A.D.3d 43, 51–52 (N.Y. App. Div. 2012) (prohibiting retaliation of any kind that "disadvantaged" plaintiff even if it does "not result in an ultimate action [ ] or in a materially adverse change"). Here, the Amended Complaint alleges two forms of retaliation—(1) depriving Hughes of future appearances on Fox and other networks; and (2) leaking her identity in connection with the National Enquirer's article reporting Payne's affair.

     1.   Blacklisting

Defendants' arguments against Hughes' blacklisting allegations center on the causal connection element. They claim that because Fox blacklisted Hughes before she reported

Payne's rape to the company, her protected activity did not trigger the adverse employment action.  (Opp. at 21–22.)

But by cabining the purported protected activity to Hughes' June 2017 report regarding Payne's rape, Defendants ignore Hughes' repeated attempts to stave off Payne's overtures.  "Rejecting sexual advances from an employer [ ] constitutes 'protected activity.'  The prohibition against retaliation is intended to protect employees who resist unlawful workplace discrimination.  Sexual harassment by an employer or supervisor is an unlawful practice, and an employee's refusal is a means of opposing such unlawful conduct."  Little v. Nat'l Broad. Co., Inc., 210 F. Supp. 2d 330, 386 (S.D.N.Y. 2002); Laurin v. Pokoik, 2005 WL 911429, at *4 (S.D.N.Y. Apr. 18, 2005); Johnson v. Medisys Health Network, 2011 WL 5222917, at *16 (E.D.N.Y. June 1, 2011) ("There is no reason to disagree with the view of the majority of courts that allegations that an employee consistently refused her supervisor's sexual advances constitutes 'protected activity' for purposes of a retaliation claim.").  Here, Hughes rebuffed Payne's advances at various periods during their relationship, but "each time [she] attempted to sever the sexual relationship, Payne refused and responded angrily and violently."  (Compl. ¶ 92; see also Compl. ¶¶ 77–78, 94, 113–115.)  Payne's sexual advances "qualified as an unlawful employment practice," and Hughes engaged in protected activity each time she rejected them. Cooper v. N.Y. State Dep't of Labor, 819 F.3d 678, 681 (2d Cir. 2016); Cruz v. Coach Stores, Inc., 202 F.3d 560, 566 (2d Cir. 2000) (protected activity is "action taken to protest or oppose statutorily prohibited discrimination").

This Court is mindful that other courts in this Circuit have expressed divergent viewpoints on whether rejecting sexual advances qualifies as protected activity.  See Reid v. Ingerman Smith LLP, 876 F. Supp. 2d 176, 189 (E.D.N.Y. 2012) ("rejection of sexual advances

22

does not constitute a protected activity"). But in this Court's view, those positions overlook the complex dynamics underlying a work environment fraught with power disparities. Sexual harassment can manifest itself in many forms. Some are less obvious than others but just as invidious. Formally reporting an incident of sexual assault is one form of protected activity, but it is not always available. An individual who is sexually harassed by her supervisor, or someone with clout within the company, faces a Hobson's choice—she is either forced to endure her supervisor's unwanted overtures, or file a complaint that will inevitably bruise his ego and jeopardize her job and career.

The Complaint adequately pleads the second and third elements of the retaliation claim. In addition to Payne's obvious knowledge of Hughes' decision to terminate the sexual relationship, Bill Shine "decided that [Hughes] must be to blame for the alleged affair." (Compl. ¶ 117.) Payne, with Shine's assistance, then followed through on his threats to end her career at Fox. "[A]fter June 2015, [ ] Hughes' appearances on Fox programs dramatically decreased." (Compl. ¶ 118.) Suddenly, her "appearances were reduced to a mere five appearances on the The O'Reilly Factor over the course of the following ten months." (Compl. ¶ 118.) Her diminished opportunities, along with "not being offered a contributor contract," constitute adverse employment action. Hicks, 593 F.3d at 165 (an adverse employment action is one that is "materially adverse to a reasonable employee or job applicant"). Hughes also asserts that Fox told other networks that she was "not bookable," thereby precluding her from similar opportunities. (Compl. ¶¶ 123, 205.) This was tantamount to giving a negative reference to prospective employers solely to punish Hughes. Noni v. Cty. of Cahutauqua, 511 F. Supp. 2d 355, 364 (W.D.N.Y. 2007) (A "negative employment reference given to a potential employer seeking to hire the defendant employer's former employee qualifies as an adverse employment

action."); see also Veprinsky v. Fluor Daniel, Inc., 87 F.3d 881, 890 (7th Cir. 1996) ("The ability to 'blacklist' a former employee, and thus foreclose future employment possibilities, is but one example of an employer's power to punish a former employee for the exercise of her Title VII rights.").

Crediting Hughes' allegations about her decision to end the affair in June 2015, the Complaint sufficiently pleads the final element of causal connection. Title VII and the NYSHRL impose a "but-for" standard of causation—that is, the "desire to retaliate was the but-for cause of the challenged employment action." Adams v. Montefiore Med. Ctr., 2017 WL 4417695, at *4 (S.D.N.Y. Oct. 3, 2017) (citation omitted). While the NYCHRL has a less demanding standard, a "plaintiff still must establish that there was a causal connection between [her] protected activity and the employer's subsequent action, and must show that a defendant's legitimate reason for [her] termination was pretextual or motivated at least in part by an impermissible motive." Adams, 2017 WL 4417695, at *5 (citation omitted).

Here, Payne's overt threats to cut Hughes off from future appearances, which immediately followed Hughes' decision to end the affair, establish the nexus between her protected activity and Defendants' adverse employment action. Stordeur v. Computer Assocs. Int'l, Inc., 995 F. Supp. 94, 105 (E.D.N.Y. 1998). Further, the precipitous decline in her appearances on Fox programs, along with allegations that Fox had blacklisted her across the industry, bolsters the notion that Hughes' "protected activity was closely followed in time by the adverse [employment] action." Gorman–Bakos v. Cornell Co–op. Extension of Schenectady Cty., 252 F.3d 545, 554 (2d Cir. 2001). The temporal proximity in this case is undisputed—after terminating her relationship with Payne, Hughes saw her appearances "reduced to a mere five

appearances" over the next ten months.  (Compl. ¶ 118.)  The sum of Hughes' allegations

satisfies the causal connection element under Title VII, NYSHRL, and NYCHRL.

2.  National Enquirer Leak

Hughes asserts that Defendants' disclosure of a false narrative regarding her affair

with Payne was retaliatory because it was intended to cast her in a negative light.  (Compl.

¶¶ 184, 200, 219.)  But this aspect of Hughes' retaliation claim fails for two reasons.  First, the

statement peddled to the National Enquirer does not reference Hughes by name.  And even if

Defendants disclosed her name to the National Enquirer, it was not published.

Second, an employer is entitled to undertake reasonable defensive measures

against an employee's charge of discrimination.  See Richardson v. Comm. on Human Rights &

Opportunities, 532 F.3d 114, 123 (2d Cir. 2008).  Indeed, such measures "do not violate the anti-

retaliation provision of Title VII, even though [they are] adverse to the charging employee and

result in differential treatment."  Richardson, 532 F.3d at 123.  The "defensive measure" here—

preemptively releasing a statement to the National Enquirer—did not "result in differential

treatment" because Hughes' name was not published.  More importantly, given that Hughes was

expected to charge Fox and Payne with sexual harassment claims, Defendants' attempt to blunt

the inflammatory force of her allegations was a colorable defense to protect their business.  They

proffered this defense without the use of threats or menacing language impugning Hughes'

character.  Shih v. JPMorgan Chase Bank, NA, 2013 WL 842716, at *8 (S.D.N.Y. Mar. 7, 2013);

see also Dixon v. Int'l Bhd. of Police Officers, 504 F.3d 73, 84 (1st Cir. 2007) ("[T]he person or

entity accused of discrimination must be allowed to defend himself or itself . . . There is an

important difference between defending oneself, on the one hand, and threatening, intimidating,

or otherwise interfering with someone's right to pursue a discrimination claim on the other.").

Accordingly, Defendants' motion to dismiss with respect to this aspect of Hughes' retaliation claim is granted.

B. <u>Statute of Limitations</u>

Defendants argue that Hughes' employment discrimination claims are untimely. They contend that any Title VII claims arising from alleged discriminatory conduct prior to December 1, 2016 are time-barred because Hughes's charge with the Equal Employment Opportunity Commission—which covers a 300-day period from the alleged unlawful activity— was filed on September 27, 2017.  (Mot. at 20.)  Defendants also maintain that the NYSHRL and NYCHRL's three-year statutes of limitation bar any claims stemming from alleged misconduct occurring before September 18, 2014—three years before Hughes filed her complaint—which would exclude the July 2013 rape.

The statute of limitations under Title VII and its state and city counterparts bars claims for any discrete acts of discrimination occurring outside of the limitations period.  <u>Nat'l R.R. Passenger Corp. v. Morgan</u>, 536 U.S. 101, 114–15 (2002); <u>Dawson v. Bumble & Bumble</u>, 398 F.3d 211, 217 (2d Cir. 2005) (analyzing NYSHRL claims under same analytic framework as Title VII cases).  Hughes does not appear to contest this point.  Rather, she argues that at the pleading stage, this "Court need not identify the specific allegations that may or may not be time barred."  (Opp. at 23.)  Indeed, even if some of the acts are untimely, they may be used as "background evidence in support of a timely claim."  <u>Morgan</u>, 536 U.S. at 113.  Thus, while certain acts of misconduct preceding December 2016 may be time-barred for purposes of bringing a Title VII failure-to-hire or retaliation claim, they nevertheless contextualize the discrete acts that fall within the limitations period.  The same is true with respect to Hughes' NYSHRL and NYCHRL claims for alleged acts arising prior to September 2014.  Accordingly,

26

this Court "need not identify, at this early stage of the litigation, the specific allegations before"

December 1, 2016 or September 18, 2014.  Underwood v. Roswell Park Cancer Inst., 2017 WL

131740, at *11 (W.D.N.Y. Jan. 13, 2017).

      C.   Direct or Aiding and Abetting Liability of Individual Defendants

        The Complaint asserts NYSHRL and NYCHRL claims against all defendants,

including the individual defendants—Brandi, Briganti, and Payne.  (Compl. ¶¶ 193–207, 212–

227.)  Additionally, Brandi and Briganti face aiding and abetting liability under the NYSHRL.

(Compl. ¶¶ 208–211.)

        i.   Individual Liability—Brandi, Briganti, and Payne

        The NYSHRL provides that it is "an unlawful discriminatory practice for any

person engaged in any activity to which this section applies to retaliate or discriminate against

any person because he or she has opposed any practices forbidden under this article."  N.Y.

Exec. Law § 296(7).  The NYCHRL provides a broader basis for individual liability, making it

unlawful for "an employer or an employee or agent thereof, because of the actual or

perceived . . . gender . . . of any person . . . to discharge from employment such person or to

discriminate against such person in compensation or in terms, conditions or privileges of

employment."  N.Y.C. Admin. Code § 8–107(1)(a).

        "Individual liability under [the NYSHRL] lies where a defendant actually

participates in the conduct giving rise to discrimination, but is limited to individuals with

ownership interest or supervisors, who themselves, have the authority to hire and fire

employees."  Emmons v. City Univ. of N.Y., 715 F. Supp. 2d 394, 420 (E.D.N.Y. 2010)

(citations omitted).  Since the NYSHRL "uses virtually identical language" to the applicable

NYCHRL provision, "claims under both statutes are subject to the same analysis."  Emmons,

715 F. Supp. 2d at 421 (citation omitted).

Here, Hughes fails to allege that Brandi or Briganti actually participated in the

conduct giving rise to the alleged discrimination.  The Complaint does not assert that Brandi or

Briganti had an ownership interest in Fox, nor does it allege that they had direct supervisory

authority over Hughes.  Hughes does not allege that either defendant had the power to grant or

rescind a contributor contract.  Moreover, it is unclear whether Brandi or Briganti ever interacted

with Hughes during her time at Fox, nor is there any indication that they actually participated in

the decision to terminate her candidacy and blacklist her.  The only allegation remotely specific

to Brandi and Briganti—their role in providing a false story to the National Enquirer—falls short

of establishing liability because this Court has already concluded that such actions were not

retaliatory.

Payne, on the other hand, faces individual liability for his actions following

Hughes' termination of their sexual relationship.  The Complaint is replete with allegations that

Payne exercised supervisory authority over Hughes.  He told Hughes that he could provide her

with a full-time contributor position.  He also exercised his influence to give her regular

appearances on his show.  (Compl. ¶¶ 25, 87.)  Indeed, he "used his position of power to pressure

[ ] Hughes into submission."  (Compl. ¶¶ 32, 165.)  In the aftermath of the affair, Payne

retaliated against Hughes when he made good on his threat to end Hughes' chances of having a

career at Fox.  (Compl. ¶¶ 115–125.)  The Complaint places blame on Shine for "orchestrat[ing]"

the blacklisting efforts, but in view of Payne's prior threats, and his close relationship with

Shine, the allegations establish a plausible inference that Payne was directly involved, and

actively participated, in the retaliatory conduct.

ii.   Aiding and Abetting Liability—Brandi and Briganti

Individuals who are not a plaintiff's employer may be held liable for aiding and abetting discriminatory or retaliatory conduct under the NYSHRL.  Patrick v. Adjusters Int'l, Inc., 2017 WL 6521251, at *6 (E.D.N.Y. Dec. 18, 2017) (citing N.Y. Exec. Law § 296(6) & (7), N.Y.C. Admin. Code § 8–107(6)).  Indeed, Section 296(6) of the statute provides that "[i]t shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article or to attempt to do so."  N.Y. Exec. Law § 296(6).  To be found liable under this provision, an "individual need not have supervisory or hiring or firing power, but still must have actually participated in the conduct giving rise to the claim of discrimination and engaged in direct, purposeful[] participation."  Emmons, 715 F. Supp. 2d at 420 (citations omitted).  Courts have emphasized that "[a]iding and abetting liability requires that the aider and abettor share the intent or purpose of the principal actor, and there can be no partnership in an act where there is no community of purpose."  Fried v. LVI Servs., 2011 WL 2119748, at *7 (S.D.N.Y. May 23, 2011).

For essentially the same reasons underlying this Court's determination that Brandi and Briganti are not individually liable, the aiding and abetting claims against them are also dismissed.  Importantly, the Complaint has not set forth any allegations regarding their "direct, purposeful" participation in depriving Hughes of her opportunities at Fox and other networks.  Hughes also fails to show that either Brandi or Briganti participated in the decision not to hire her as a full time contributor.

III.   Defamation

Hughes' defamation claims revolve around a statement that Defendants provided to the National Enquirer concerning her affair with Payne.  She contends that these statements

were false—namely, that the affair was consensual—and that the subsequent publication of these

misrepresentations injured her reputation and caused her emotional distress.  (Compl. ¶¶ 235–

262.)  Hughes asserts three separate causes of action on this theory—defamation per se,

defamation, and libel by implication.

        "Defamation, consisting of the twin torts of libel and slander, is the invasion of

the interest in a reputation and good name."  Albert v. Loksen, 239 F.3d 256, 265 (2d Cir. 2001)

(internal citation omitted).  Under New York law, the elements of defamation are a (1) false

statement, (2) published without privilege or authorization to a third party, (3) constituting fault

with negligence or actual malice depending on the status of the defamed party, and (4) special

damages or per se actionability.  Celle v. Filipino Reporter Enters. Inc., 209 F.3d 163, 176 (2d

Cir. 2000); Frechtman v. Gutterman, 979 N.Y.S.2d 58, 61 (App. Div. 2014) (citation omitted).

"An individual must be clearly identifiable in an allegedly defamatory statement to support a

claim for defamation."  Algarin v. Town of Wallkill, 421 F.3d 137, 139 (2d Cir. 2005).

        The Complaint characterizes the defamatory statement as the "false, untrue

depiction of the events surrounding the sex discrimination committed against [ ] Hughes at Fox,

and at the hands of Payne."  (Compl. ¶ 154.)  Hughes asserts that Fox and Payne intentionally

drafted and provided the National Enquirer with false statements because they "feared that [ ]

Hughes would publically disclose her story about the rape, discrimination and blacklisting first,

causing another wave of negative publicity against Fox."  (Compl. ¶ 155 (emphasis added).)

        Defendants counter that the defamatory statement at issue was not "of and

concerning plaintiff," because the National Enquirer article publishing Fox's statement never

named Hughes.  (Mot. at 27–28.)  But it is "well settled that where the person defamed is not

named in a defamatory publication, it is necessary, if it is to be held actionable as to him, that the

language used be such that persons reading it will, in light of the surrounding circumstances, be able to understand that it refers to the person complaining." DeBlasio v. N. Shore Univ. Hosp., 624 N.Y.S.2d 263, 264 (App. Div. 1995). The National Enquirer article reported that Payne's paramour was a "married colleague" and "former CNN and Fox News contributor." (Declaration of Linda Goldstein in Support of Motion to Dismiss, ECF No. 36, Ex. A.) While this description may encompass a broad spectrum of Payne's colleagues, an average reader could have deduced that Hughes was Payne's mistress. The Complaint alleges this: "Although the statement published on July 5, 2017 did not use [ ] Hughes's name . . . [i]t took reporters mere hours to confirm that [ ] Hughes was [the] woman referred to in Payne's statement." (Compl. ¶¶ 142–143.) Hughes' allegations that one point during her two-year run at Fox she appeared on Payne's show on a near daily basis undermines Defendants' position that "[n]o National Enquirer reader could have figured out that Payne's 'romantic affair' was with [Hughes]." (Mot. at 29.) At a minimum then, the question of whether Defendants' false statements to the National Enquirer were made with Hughes in mind is a question of fact better suited for summary judgment.

Nevertheless, Hughes' defamation claims fail because the Complaint does not sufficiently allege the actual malice and damages elements. Here, Hughes admits that she is a public figure. (Opp. at 5 ("It is uncontested that [ ] Hughes is a public figure."), 33 n.8.) Therefore, in order to survive a motion to dismiss, Hughes is required to allege "specific facts that plausibly evidence actual malice in a clear and convincing manner." Palin v. N.Y. Times Co., 264 F. Supp. 3d 527, 537 (S.D.N.Y. 2017). Actual malice exists if a false statement was made "with knowledge that it was false or with reckless disregard of whether it was false or not." N.Y. Times Co. v. Sullivan, 376 U.S. 254, 279–80 (1964). The Complaint's allegations

31

regarding the element of actual malice are conclusory and provide no detail as to each Defendants' knowledge or mental state.

Hughes alleges that Defendant Brandi aggressively questioned her manager on the phone about her report to Fox's outside counsel.  (Compl. ¶ 138.)  In that conversation, Hughes' manager declined to provide any details about Hughes' allegations.  (Compl. ¶ 138.)  Brandi also relied on Payne's version of the events, which was eventually provided to the National Enquirer.  (Compl. ¶ 6.)  With these facts, and in view of Brandi's fiduciary position as Fox's general counsel, it is no surprise that she credited Payne's story.  But even if this Court credited Hughes' allegation that Payne coerced her into an affair, the Complaint does not adequately state that Brandi was aware of that fact and acted with a "high degree of awareness of [the statement's] probable falsity."  Garrison v. Louisiana, 379 U.S. 64, 74 (1964).

The same goes for Defendant Briganti.  The Complaint is bereft of "sufficient particularized facts to support a claim of actual malice by clear and convincing evidence" that Briganti knew, or was highly aware, that the statement Fox fed to the National Enquirer was untrue.  Palin, 264 F. Supp. 3d at 536.  Indeed, Briganti's only role appears to have been to transmit Payne's statement to the National Enquirer in her capacity as Fox's corporate communications head.  (Compl. ¶¶ 6, 139.)

Payne's situation is more complex, given that he was the alleged perpetrator who coerced Hughes into a sexual relationship.  But the Complaint's allegations ultimately fail to satisfy the lofty standard of actual malice even as to Payne.  The element of actual malice in a defamation claim focuses primarily on what a defendant knew or believed at the time a purportedly false statement was made.  Celle, 209 F.3d at 184 (actual malice "focuses on the defendant's state of mind in relation to the truth or falsity of the published information");

Robertson v. Doe, 2010 WL 11527317, at *5 (S.D.N.Y. May 11, 2010).   While an inquiry into the defendant's state of mind at the pleadings stage is sometimes better left for discovery, Kerik v. Tacopina, 64 F. Supp. 3d 542, 571 n.9 (S.D.N.Y. 2014), the Complaint's allegations regarding Payne suggest nothing more than the whimsical ups and downs of a scorned lover who, for nearly two years, expressed "romantic interest" in Hughes, and reciprocated her "willingness to engage in sexual conduct with" him.  (Compl. ¶¶ 27, 30–31, 86, 92.)  In view of these allegations, Hughes fails to plead that Payne's statements maintaining the consensual nature of the affair were made with actual malice.

Absent specific allegations that individuals at Fox acted with actual malice, Fox as a corporate defendant cannot face liability for Hughes' defamation claim.  "[W]hen the defendant is an organization, a plaintiff must prove that a particular agent or employee of the defendant acted with actual malice at the time that agent or employee participated in the publication of the statement in question; an organizational defendant is not charged with the collective knowledge of all its agents and employees for purposes of the actual malice inquiry." Dongguk Univ. v. Yale Univ., 873 F. Supp. 2d 460, 465 (D. Conn. 2012) (citing Sullivan, 376 U.S. at 287)).  Here, the Complaint "fails on its face to adequately allege actual malice[] because it fails to identify any individual who possessed the requisite knowledge and intent, and instead, attributes it to [Fox] in general.  This will not suffice."  Palin, 264 F. Supp. 3d at 536.

While the defamation claims fail to plead actual malice, it is worth noting that they also flounder on the element of damages.  Generally, a plaintiff in a defamation action must prove special damages, which consist of "the loss of something having economic or pecuniary value, which must flow directly from the injury to reputation caused by the defamation and not

33

from the effects of the defamation." [2] <u>Nunez v. A–T Fin. Info., Inc.</u>, 957 F. Supp. 438, 441

(S.D.N.Y. 1997).  Here, the Complaint does not clearly allege that Hughes suffered economic,

emotional, and reputational damage from the publication of Defendants' statement to the

National Enquirer.  Rather, the Complaint appears to suggest that after a "select group of

personal emails between Payne and [ ] Hughes were leaked to social media"—three days after

the National Enquirer ran its original article—Hughes "endured horrific humiliation and

criticism."  (Compl. ¶¶ 145–146.)  The purported damages therefore appear to arise from the

lurid nature of these emails, not the publication of Payne's statement in the National Enquirer

article.

IV.     <u>NYC Gender-Motivated Violence Act</u>

                The New York City Gender-Motivated Violence Act ("GMVA") provides that

"any person claiming to be injured by an individual who commits a crime of violence motivated

by gender as defined in section 8–903 of this chapter, shall have a cause of action against such

individual."  N.Y.C. Code § 8–904.  Section 8–903, in turn, defines a "crime of violence" as an

"act or series of acts that would constitute a misdemeanor or felony against the person as defined

in state or federal law . . . if the conduct presents a serious risk of physical injury to another,

---

[2]     Nor does Hughes sufficiently allege that injury should be assumed because the defamatory statements are
actionable <u>per se</u>.  Hughes baldly asserts that the "false statements were defamatory <u>per se</u> because they injure [her]
in her trade, business or profession," and that her "ability to secure employment was diminished greatly."  (Compl. ¶
147.)  But none of her allegations support the notion that Defendants' statement "tende[d] to disparage [her] in the
way of [her] office, profession or trade."  <u>Celle</u>, 209 F.3d at 179.  Payne's statement, according to Hughes, falsely
characterized their sexual relationship as consensual.  While such statement may have vilified Hughes' chastity and
character, it says nothing of her abilities as a political pundit and media contributor.  <u>See</u> <u>Yesner v. Spinner</u>, 765 F.
Supp. 48, 52 (E.D.N.Y. 1991) ("It has long been the law in New York that a defamatory statement that is a direct
attack upon the business, trade or profession of the plaintiff is considered defamation 'per se,' and therefore
actionable without any proof of special damages."); W. Page Keeton et al., <u>Prosser & Keeton on the Law of Torts</u>,
§ 112, at 791 (5th ed. 1984) ("[I]t is actionable without proof of damage to say of a physician that he is a butcher . .
., of an attorney that he is a shyster, of a school teacher that he has been guilty of improper conduct as to his pupils,
of a clergyman that he is the subject of scandalous rumors, of a chauffeur that he is habitually drinking, of a
merchant that his credit is bad or that he sells adulterated goods, of a public officer that he has accepted a bribe or
has used his office for corrupt purposes . . .—since these things discredit [one] in his chosen calling.").

whether or not those acts have actually resulted in criminal charges." N.Y.C. Code § 8–903.
Such an act is "motivated by gender" if it is "committed because of gender or on the basis of
gender, <u>and</u> due, at least in part, to an animus based on the victim's gender." N.Y.C. Code § 8–
903 (emphasis added). A plaintiff is required to establish the following elements in support of
this claim: (1) the alleged act constitutes a misdemeanor or felony against the plaintiff; (2)
presenting a serious risk of physical injury; (3) that was perpetrated because of plaintiff's gender;
(4) in part because of animus against plaintiff's gender; and (4) resulted in injury.

       Hughes fails to plead gender-specific animus. Even if this Court credited
Hughes' contention that Payne's sexual harassment and <u>quid pro quo</u> discrimination was
motivated by her gender, the Complaint is devoid of facts demonstrating that Payne's actions
were also motivated, in part, by "feelings of animosity and malevolent ill will" against women.
(Opp. at 37.) In this regard, while the alleged rape in 2013, if true, is despicable and
undoubtedly constitutes "discriminat[ion] on the basis of sex," <u>Meritor Sav. Bank, FSB v.
Vinson</u>, 477 U.S. 57, 64 (1986), such an act was not a "hate crime." <u>Gottwald v. Sebert</u>, 2016
WL 1365969, at *9 (N.Y. Sup. Ct. Apr. 6, 2016). Hughes offers no specific allegations that
Payne harbored or expressed any animosity toward women. Rather, it appears that Payne was
generally prone to angry outbursts in the workplace, and contributed to an "unsettling,
intimidating and unprofessional" work environment that deterred employees from "speak[ing]
out or complain[ing]." (Compl. ¶¶ 95–98.)

       The cases addressing the GMVA are scant. While actions arising from the statute
are invariably predicated on reprehensible conduct against female victims, this factor alone
cannot sustain a GMVA claim. In spite of the egregious nature of the allegations, courts have
dismissed GMVA claims based on the plaintiff's failure to state "any facts showing that

[defendant's] alleged acts demonstrated any hostility based on gender." <u>Cordero v. Epstein</u>, 22 Misc. 3d 161, 163 (N.Y. Sup. Ct. 2008) (defendant touched plaintiff's private parts and coerced oral sex); <u>see also</u> <u>Gottwald</u>, 2016 WL 1365969, at **4, 9 (defendant repeatedly drugged and raped plaintiff, made negative comments about plaintiff's body, and threatened to destroy plaintiff's career); <u>Adams v. Jenkins</u>, 2005 WL 6584554, at **1, 4 (N.Y. Sup. Ct. Apr. 22, 2005) (defendant slapped and pushed plaintiff, called her a "bitch," and threatened to kill her but court found plaintiff had failed to plead that assault was "motivated by gender bias"). Even the non-GMVA cases that Hughes cites by analogy—like the Violence Against Women Act—expressly require the gender animus element to be pleaded. <u>See</u> <u>Fierro v. Taylor</u>, 2012 WL 6965719, at *1 (S.D.N.Y. Oct. 22, 2012) (animus can be shown through factors such as "perpetrator's language, severity of the attack, lack of provocation, previous history of similar incidents, absence of other apparent motive, and common sense"); <u>Jugmohan v. Zola</u>, 2000 WL 222186, at *3–4 (S.D.N.Y. Feb. 2000) ("extensive history of acting in a humiliating, abusive, or degrading sexual manner exclusively toward other women" that included criminal charges). Hughes' allegations draw nowhere near to establishing that Payne was motivated, even in part, by animosity against women.

<u>CONCLUSION</u>

For the foregoing reasons, Defendants' motion to dismiss is granted in part and denied in part. The Third, Fourth, Fifth, Sixth, and Seventh Causes of Action against Defendants Brandi and Briganti are dismissed. The Ninth, Tenth, and Eleventh Causes of Action against all Defendants are dismissed. The Eighth Cause of Action against Defendant Payne is dismissed. All other causes of actions shall proceed to discovery.

The Clerk of Court is directed to terminate the motion pending at ECF No. 34.

Dated: April 24, 2018
      New York, New York

SO ORDERED:

_____
WILLIAM H. PAULEY III
U.S.D.J.